1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  - - - - - - - - - - - - - - - - - - -x
   YEVGENTY DIKLER,
3
                    Plaintiff,
4
        -against-
5
   THE CITY OF NEW YORK, DETECTIVE MICHAEL
6  VISCONTI, SHIELD O6482, SECURITY OFFICER
   WILSON VEGA, HWA, INC.,
7
                    Defendants.
8
   - - - - - - - - - - - - - - - - - - -x
9  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
10 - - - - - - - - - - - - - - - - - - -x

11 LAJZER GRYNSZTAIN,

12                    Plaintiff,

13     -against-

14

15 THE CITY OF NEW YORK, DETECTIVE MICHAEL

16 WILLIAMS, SHIELD 06409, SECURITY OFFICER

17 WILSON VEGA, HWA, INC.,

18

19                    Defendants.

20

21 - - - - - - - - - - - - - - - - - - -x

22

23           MAY 21, 2008

24

25           11:55 A.M.

Page 2

1    MAY 21, 2008
2
3    11:55 A.M.
4
5
6
7
8        EXAMINATION BEFORE TRIAL of the
9    DEFENDANTS by MICHAEL VISCONTI taken by the
10   PLAINTIFFS, pursuant to Order, held at the
11   office of Lester Schwab Katz & Dwyer, 120
12   Broadway, New York, New York taken before
13   Mindy Corcoran, a Shorthand Reporter and
14   Notary Public of the State of New York.
15
16
17
18
19            *    *    *
20
21
22
23
24
25

Page 3

1
2    APPEARANCES:
3
4        DAVID A. ZELMAN, ESQ.
5            Attorney for Plaintiffs
6            612 Eastern Parkway
7            Brooklyn, New York 11225
8
9
10   MICHAEL A. CARDOZO
11   Corporation Counsel of the
12   City of New York
13   Special Federal Litigation Unit
14       100 Church Street
15       New York, New York 10007
16   BY:  JOYCE CAMPBELL PRIVETERRE, ESQ.
17
18
19   LESTER SCHWAB KATZ & DWYER
20   Attorneys for Defendant HWA, Inc.
         120 Broadway
21       New York, New York
22   BY:  LEONARD SILVERMAN, ESQ.
23
24
25

Page 4

1
2                *    *    *
3
4
5
6
7
8        IT IS HEREBY STIPULATED AND AGREED, by and
9    among counsel for the respective parties
10   hereto, that the filing, sealing and
11   certification of the within deposition shall
12   be and the same are hereby waived;
13       IT IS FURTHER STIPULATED AND AGREED that
14   all objections, except as to form of the
15   question, shall be reserved to the time of the
16   trial;
17       IT IS FURTHER STIPULATED AND AGREED that
18   the within deposition may be signed before any
19   Notary Public with the same force and effect
20   as if signed and sworn to before the Court.
21            *    *    *,
22
23
24
25

Page 5

1                    M. Visconti
2    M I C H A E L    V I S C O N T I,
3        the Witness herein, having first been duly
4        sworn by the Notary Public, was examined
5        and testified as follows:
6    EXAMINATION BY
7    MR. ZELMAN:
8        Q.    Would you please state your name
9    for the record.
10       A.    Michael Visconti.
11       Q.    What is your present business
12   address?
13       A.    11-40 45th Road, Long Island,
14   New York  11701.
15       Q.    Good morning.
16       A.    Good morning.
17       Q.    My name is David Zelman, and I
18   represent the Visconti plaintiffs.  I am going
19   to ask you some questions today with respect
20   to a case called Dikler versus The City of New
21   York, et al.
22           If at any time you do not
23   understand my question just let me know and I
24   will try to rephrase it for you.
25           You understand that if there is

Page 6

M. Visconti

1            M. Visconti
2 a question pending, your counsel is not
3 allowed to speak to you about it. The only
4 thing he can do is object to the form of the
5 question.
6       Do you understand that?
7     A.     Yes.
8     Q.     You could take a break at any
9 time, but you have to answer any questions
10 that are pending. Okay?
11    A.     Yes.
12    Q.     Have you ever testified before?
13    A.     Yes.
14    Q.     Have you ever testified in a
15 civil case before?
16    A.     Yes.
17    Q.     And how many times have you
18 testified in a civil case?
19    A.     Once, I believe.
20    Q.     Have you ever testified in a
21 deposition forum like this?
22    A.     Yes.
23    Q.     Was that also a case brought
24 against you as a sergeant, police officer or a
25 detective?

Page 7

M. Visconti

1            M. Visconti
2    A.     Yes.
3    Q.     What was the name of that case?
4       MS. PRIVETERRE: If you can
5 remember.
6    A.     Clanton versus New York City.
7    Q.     What was that?
8    A.     Clanton.
9    Q.     Do you know how to spell that?
10    A.     C-L-A-N-T-O-N.
11    Q.     Was that a false arrest case?
12    A.     I am not sure. I think so.
13    Q.     What court was that case in?
14    A.     I don't know.
15    Q.     Did you testify here in
16 Manhattan?
17    A.     It was a deposition.
18    Q.     At a deposition?
19    A.     Yes.
20    Q.     Did it go to trial, if you know?
21    A.     No, I don't know.
22    Q.     Do you remember the allegations
23 in that case?
24    A.     I am not sure. I think it was
25 a false arrest.

Page 8

M. Visconti

1            M. Visconti
2    Q.     What year was it that you
3 testified in that case?
4    A.     I don't understand the question.
5    Q.     What year did you testify in
6 that case?
7    A.     This year.
8    Q.     2008?
9    A.     Yes.
10    Q.     And the corporation counsel was
11 your attorney?
12    A.     Yes.
13    Q.     Do you know if the case is still
14 pending?
15    A.     I am not sure.
16    Q.     Was that the only time you
17 testified in a civil case other than today?
18    A.     Yes.
19    Q.     You are now a detective; is that
20 correct?
21    A.     Yes.
22    Q.     What is your title?
23    A.     Detective-investigator.
24    Q.     How long has that been your
25 title?

Page 9

M. Visconti

1            M. Visconti
2    A.     Since May of 2002, I believe.
3    Q.     Prior to that, what was your
4 title?
5    A.     Detective-specialist.
6    Q.     Do you remember when you got
7 that title?
8    A.     July of '99.
9    Q.     Prior to that?
10    A.     Police officer.
11    Q.     When did you become a police
12 officer?
13    A.     1992.
14    Q.     Did you do street patrol?
15    A.     Yes.
16    Q.     How long?
17    A.     Up until 2002.
18    Q.     From 1992 until 2002?
19    A.     Yes.
20    Q.     So it was approximately ten
21 years?
22    A.     Yes.
23    Q.     Were you at the same precinct or
24 did you work at different precincts?
25    A.     I stayed at the same precinct.

Page 10

```
1                M. Visconti
2      Q.     What precinct?
3      A.     108th.
4      Q.     Is that in Queens?
5      A.     Yes.
6      Q.     As an officer at the 108th, did
7  you perform more than 100 arrests?
8      A.     Yes.
9      Q.     Ranging from murders, rapes to
10 shoplifting, et cetera?
11         MS. PRIVETERRE:  Objection to
12     the form.
13         Can you break that down?
14     Q.     And so you did all types of
15 arrests?
16     A.     Yes.
17     Q.     And when you became a
18 detective-specialist, were you assigned to a
19 specific unit?
20     A.     Patrol.
21     Q.     Patrol?
22     A.     Yes.
23     Q.     Did you remain on patrol as a
24 detective-specialist?
25     A.     Yes.
```

Page 11

```
1                M. Visconti
2      Q.     Are you still on patrol now?
3      A.     No.
4      Q.     When did you stop being on
5  patrol?
6      A.     May of 2002.
7      Q.     Where are you stationed now?
8         MS. PRIVETERRE:  Do you mean
9      what command she is at?
10     A.     Could you repeat the question,
11 please?
12     Q.     Where do you report to work?
13     A.     Do you want the address?
14     Q.     The command.
15     A.     Internal affairs bureau.
16     Q.     Did there come a time that you
17 worked at 26 Federal Plaza?
18     A.     No.
19     Q.     Were you ever present there in a
20 working capacity?
21     A.     Yes.
22     Q.     How often were you present there
23 in a working capacity?  Was it more than a
24 month?  Was it more than a year?
25         MS. PRIVETERRE:  Are you asking
```

Page 12

```
1                M. Visconti
2  how long ago?
3         MR. ZELMAN:  No, just for how
4      long.
5         MS. PRIVETERRE:   In his entire
6      career?
7         MR. ZELMAN:  At 26 Federal
8      Plaza, the amount of time he was working
9      there.
10     A.     I was there on individual days
11 at a time.
12     Q.     Why would you get called in to
13 26 Federal Plaza?
14         MS. PRIVETERRE:  Objection to
15     the form.  He didn't say he was called
16     in.
17     Q.     Did you get called in to 26
18 Federal Plaza?
19     A.     Could you rephrase the question?
20     Q.     What brought you to 26 Federal
21 Plaza?
22         MS. PRIVETERRE:  When?
23     Q.     The first time you went there.
24     A.     I was sent there.
25     Q.     By whom?
```

Page 13

```
1                M. Visconti
2      A.     By my superiors.
3      Q.     At the internal affairs?
4      A.     Yes.
5      Q.     What was the purpose?
6      A.     There were individuals there who
7  had duplicate shields.
8      Q.     On how many working days were
9  you at 26 Federal Plaza investigating
10 duplicate shields or shield issues?
11     A.     I don't know.
12     Q.     Was it more than a month?
13     A.     No.
14     Q.     Was it less than a month?
15     A.     Yes.
16     Q.     Was it more than two weeks?
17     A.     No.
18     Q.     Was it less than two weeks?
19     A.     Yes.
20     Q.     Was it more than five days?
21     A.     Was it a total of maybe five
22 days.
23     Q.     Five days total?
24     A.     Yes.
25     Q.     You were the arresting officer
```

Page 14

M. Visconti

1  for Mr. Dikler; is that correct?
2  
3       A.    Yes.
4            MS. PRIVETERRE:   Objection to
5  the form.
6       Q.    Were there any other persons at
7  26 Federal Plaza that you arrested for
8  badge-related issues?
9            MS. PRIVETERRE:   When?
10           MR. ZELMAN:   At any other time.
11      A.    Me personally?
12      Q.    Yes.
13      A.    No.
14      Q.    He was your only arrest at 26
15  Federal Plaza for a badge-related issues?
16           MS. PRIVETERRE:   Do you
17  understand what he is asking?
18      A.    Me, as me being the arresting
19  officer?
20      Q.    Yes.
21      A.    Yes.
22      Q.    The five times that you went
23  there, that was each time to investigate a
24  badge-related issue?
25           MS. PRIVETERRE:   Objection.

Page 15

M. Visconti

1  
2       A.    I don't know.   I don't know if
3  every single occurrence was for that
4  specifically.
5       Q.    How many times did you report to
6  26 Federal Plaza for a badge-related issue?
7       A.    I don't know.
8       Q.    More than once?
9       A.    Yes.
10      Q.    More than twice?
11      A.    Yes.
12      Q.    More than three times?
13      A.    I don't know.
14      Q.    This arrest occurred on March
15  22, 2006; is that correct?
16      A.    I think so, yes.
17      Q.    These other times that you
18  reported to 26 Federal Plaza for a
19  badge-related issue, do you remember if it was
20  before this time or after this time?
21      A.    It was probably before and
22  after.  I am not certain.
23      Q.    Was it in approximately March of
24  2006 or other months?
25           MS. PRIVETERRE:   Objection to

Page 16

M. Visconti

1  the form.   Do you know what he is
2  asking?
3       A.    Rephrase the question.
4       Q.    The other times you reported to
5  26 Federal Plaza to investigate a
6  badge-related issue; do you recall if it was
7  in March of 2006?
8       A.    No.
9       Q.    Do you remember if it was in a
10  different month?
11      A.    I am not sure what month it was.
12      Q.    Do you recall if it was in 2006?
13      A.    I am not sure.
14      Q.    Have you ever been to 26 Federal
15  Plaza in 2008 to investigate a badge-related
16  issue?
17      A.    No.
18      Q.    When you were sent to 26 Federal
19  Plaza on the Dikler case, who sent you?
20           MS. PRIVETERRE:   Objection.
21  What do you mean by sent?
22      Q.    When you were informed to go
23  there, who informed you?
24      A.    I received a phone call from one

Page 17

M. Visconti

1  of the supervisors at the office.
2       Q.    Do you remember the person's
3  name?
4       A.    No.
5       Q.    Was it a supervisor at internal
6  affairs?
7       A.    Yes.
8       Q.    Is it common that you would get
9  a call from a supervisor at internal affairs
10  to go to a specific location and investigate a
11  certain allegation or crime?
12           MS. PRIVETERRE:   Objection to
13  the form.   What do you mean by  common?
14      Q.    You could answer the question.
15           MS. PRIVETERRE:   I don't know
16  what common means.
17      Q.    Is it typical in your
18  performance --
19           MS. PRIVETERRE:   I don't know
20  what typical means.
21           MR. ZELMAN:   Excuse me,
22  counselor.
23           MS. PRIVETERRE:   I don't know
24  what typical means.

Page 18

```
 1              M. Visconti
 2       MR. ZELMAN:  Look it up.
 3       MS. PRIVETERRE:  What do these
 4   words that are qualifying as typical and
 5   common --
 6       MR. ZELMAN:  Let me ask my
 7   questions.  The federal rules are, if
 8   you have an objection, you could say
 9   objection to form and that is it.
10       Q.    Sir, is it typical or common in
11   your professional duties to report to a
12   certain location after you get a call from a
13   supervisor?
14       MS. PRIVETERRE:  Do you know
15   what he means when he uses the words
16   "typical" or "common" or would you like
17   him to rephrase the question?
18       Q.    Is it routine for you?
19       A.    Yes.
20       Q.    How many times have you
21   testified in criminal cases?
22       A.    I don't know.
23       Q.    Was it more than 100?
24       A.    I don't know.
25       Q.    Was it more than 50?
```

Page 19

```
 1              M. Visconti
 2       A.    I don't know.
 3       Q.    Was it more than ten?
 4       A.    Yes.
 5       Q.    Was it more than 20?
 6       A.    I don't know.
 7       Q.    Is there any way that you could
 8   find out?
 9       A.    Probably.
10       Q.    How?
11       A.    If I went over every arrest I
12   ever made to see how far it went in court.
13       Q.    Have you ever testified in front
14   of the CCRB?
15       A.    Yes.
16       Q.    How many times?
17       A.    I am not sure.
18       Q.    Was it more than five?
19       A.    No.
20       Q.    More than two?
21       A.    Yes.
22       Q.    When was the last time you
23   testified in front of the CCRB?
24       A.    I don't remember.
25       MS. PRIVETERRE:  We don't want
```

Page 20

```
 1              M. Visconti
 2   you to guess.
 3       A.    I don't remember.
 4       Q.    Was it in 2008?
 5       A.    I don't remember.
 6       Q.    Was it last week?
 7       A.    No.
 8       Q.    Was it this month, May 2008?
 9       A.    No.
10       Q.    Was it in April of 2008?
11       A.    No.
12       Q.    Can you approximate when you
13   testified in front of the CCRB?
14       MS. PRIVETERRE:  You mean the
15   last time?
16       MR. ZELMAN:  Yes, the most
17   recent time.
18       A.    It has been several years.
19       Q.    That was the most recent time,
20   several years ago?
21       A.    Yes.
22       Q.    Do you recall what the
23   allegation was in that case?
24       A.    No.
25       Q.    Do you recall the outcome?
```

Page 21

```
 1              M. Visconti
 2       A.    No.
 3       Q.    The other case where you
 4   testified in front of the CCRB, do you recall
 5   what year that was?
 6       A.    No.
 7       Q.    Do you recall what the
 8   allegation was?
 9       A.    No.
10       Q.    Do you remember the outcome?
11       A.    No.
12       Q.    Were you ever disciplined from
13   the time you began working at the NYPD?
14       A.    Yes.
15       Q.    When?
16       A.    In the police academy I was
17   issued a CD for being late.
18       Q.    Any other time?
19       A.    And I was issued a CD some time
20   after 2002.
21       Q.    Do you remember what it was for?
22       A.    Failure to notify a supervisor.
23       Q.    Were you docked vacation pay or
24   did you receive any other discipline for those
25   things?
```

Page 22

1              M. Visconti
2      A.    No.
3      Q.    Was there any other discipline
4 action at the NYPD?
5      A.    No.
6      Q.    Have you ever been arrested?
7      A.    No.
8      Q.    Are you still full time with the
9 NYPD?
10     A.    Yes.
11     Q.    Do you recall the arrest of Mr.
12 Dikler?
13     A.    Somewhat.
14     Q.    What do you recall about it?
15     A.    I arrested him for being in
16 possession of a duplicate type of NYPD
17 detective shield.
18     Q.    Prior to the arrest, did you
19 investigate, did you look at that shield, that
20 badge?
21     A.    Rephrase the question.
22     Q.    Did you decide to place Mr.
23 Dikler under arrest?
24     A.    Yes.
25     Q.    Before you decided to place Mr.

Page 23

1              M. Visconti
2 Dicker under arrest, did you look at the
3 badge?
4      A.    Yes.
5      Q.    What did the badge say, if you
6 recall?
7      A.    I don't remember exactly.
8      Q.    Do you remember if it said he
9 worked at the Transit Authority?
10           MS. PRIVETERRE:   You mean those
11     exact words?
12     Q.    Or the MTA.
13     A.    Something to that effect, but I
14 don't remember what it said.
15     Q.    To your knowledge, how many
16 people were arrested at 26 Federal Plaza from
17 2005 to 2008 with respect to badges?
18     A.    I don't know.
19     Q.    Do you know if it was more than
20 100?
21     A.    I don't know.
22     Q.    Do you know why you received the
23 assignment to go to 26 Federal Plaza on this
24 particular date as opposed to someone else?
25     A.    Probably we were available.

Page 24

1              M. Visconti
2      Q.    Did you receive the call on
3 March 22 to go to 26 Federal Plaza?
4      A.    Yes, it was on the same day.
5      Q.    It was on the same day?
6      A.    Yes.
7      Q.    Do you recall if that was the
8 first time you ever performed an arrest for
9 somebody in possession of allegedly a forged
10 badge?
11     A.    I don't remember.
12     Q.    Do you remember placing anyone
13 under arrest for a badge-related issue at any
14 other time?
15           MS. PRIVETERRE:   Objection to
16     the form.
17     A.    There were other people
18 arrested, but I don't remember if it was for
19 badge related or police impersonation.
20     Q.    Before you went to 26 Federal
21 Plaza did you receive instructions about what
22 you were to do when you got there?
23           MS. PRIVETERRE:   When?
24     Q.    On March 22 or any time before.
25     A.    Yes.

Page 25

1              M. Visconti
2      Q.    When did you receive those
3 instructions?
4      A.    I don't remember.
5      Q.    Did you receive them in writing
6 or did you receive them orally?
7      A.    Orally.
8      Q.    Who told you those instructions?
9      A.    The super.  I don't know who
10 specifically.
11     Q.    Do you recall if it was the date
12 of the incident or some other date?
13     A.    Some other date.
14     Q.    Do you recall what the
15 instructions were?
16     A.    Specifically, no.
17     Q.    In general.
18     A.    In general, basically, anyone
19 who went into Federal Plaza with a forged
20 shield of any type would be arrested.
21     Q.    How were you to determine
22 whether or not it was forged?
23     A.    Training as a police officer
24 and/or intelligence bulletins which described
25 it specifically.

Page 26

```
1              M. Visconti
2      Q.     Did you receive any specific
3   intelligence bulletins with respect to the
4   Dikler shield?
5      A.     Would you rephrase the question?
6      Q.     Sure.  You indicated that one
7   way to figure out if the shield was forged was
8   if you received an intelligence instruction;
9   is that correct?
10         MS. PRIVETERRE:  Objection to
11     the form.
12     A.     Are you referring to the
13  intelligence bulletin?
14     Q.     Yes.  What did the intelligence
15  bulletin say, if you recall?
16         MS. PRIVETERRE:  Which one?
17         MR. ZELMAN:  Regarding a
18     shield.
19     A.     It defined the specific shape of
20  the shields that were allowed to be carried
21  and by what persons.
22     Q.     So it listed permissible
23  shields; is that correct?
24     A.     Yes.
25     Q.     Did it have pictures of shields
```

Page 27

```
1              M. Visconti
2   that were not permissible?
3      A.     Specifically, no.
4      Q.     Unless the shield fell into one
5   of these categories on the instructions, it
6   was a forged badge?
7          MS. PRIVETERRE:  Objection to
8      the form.  Are you asking him a
9      question?
10         MR. ZELMAN:  Yes, that is the
11     question.
12         MS. PRIVETERRE:  May I have
13     that read back?
14         [The requested portion of the
15     record was read.]
16         MS. PRIVETERRE:  Which
17     categories, that is what I am not
18     following?
19     Q.     You indicated that you received
20  an instruction sheet listing the permissible
21  badges; is that correct?
22     A.     Yes.
23     Q.     How many permissible badges were
24  on the instruction sheet?
25     A.     That doesn't exactly describe
```

Page 28

```
1              M. Visconti
2   it.
3      Q.     Can you describe the instruction
4   sheet better?
5      A.     Sure.  The shield possessed by
6   law enforcement, specifically, for the city
7   police department can be described and
8   nothing can resemble them in terms of shape,
9   which is the starburst.  And there are a few
10  people who are actually allowed to carry
11  shields, such as registered law enforcement
12  and security guards.
13     Q.     So is that what instruction the
14  instruction sheet said?
15     A.     To some extent, yes.
16     Q.     Any time you see a starburst, if
17  it wasn't an authorized NYPD holder, it was
18  forged?
19         MS. PRIVETERRE:  Is that
20     correct?
21         THE WITNESS:  No.
22         MS. PRIVETERRE:  Listen to the
23     way he is characterizing it.
24         THE WITNESS:  No.
25     Q.     Can you categorize it?
```

Page 29

```
1              M. Visconti
2      A.     The court officers have shields
3   like detectives.  There are various types of
4   shields, but it is limited as to who is
5   allowed to possess a shield and if they are
6   allowed to possess a shield.  There are
7   defined shapes as to what the shield looks
8   like.  For example, a security guard's
9   shield, it should be in a specific shape.
10     Q.     How long was this instruction
11  sheet?  Was it one page?
12     A.     Yes.
13     Q.     Do you have a copy of it?
14     A.     Not with me, no.
15     Q.     Do you remember when you saw it?
16     A.     Not specifically.
17     Q.     Do you remember what year?
18     A.     2006.
19     Q.     Is it safe to say that unless a
20  person was authorized to wear a starburst-type
21  of shield, for example, a court officer, a
22  police officer, that any other persons wearing
23  a starburst shield would be arrested for a
24  forged shield?
25         MS. PRIVETERRE:  Objection to
```

Page 30

1          M. Visconti
2     the form.   Objection to the safe to
3     say.
4          But, otherwise, do you
5     understand what he is asking?
6          THE WITNESS:   Yes.
7     Q.    Can you answer it?
8     A.    Yes.
9     Q.    And that is the situation we
10    found ourselves in on March 22 when Mr. Dikler
11    was arrested, he was not authorized to carry a
12    starburst type of a shield; correct?
13    A.    Yes.
14    Q.    Prior to the arrest of Mr.
15    Dikler, did you confirm that he worked at the
16    Transit Authority or the MTA?
17    A.    Yes.
18    Q.    How did you do that?
19    A.    He had ID.
20    Q.    He had ID?
21    A.    Yes.
22    Q.    Did you ever call his employer
23    on that date to verify his employment there?
24    A.    No.
25    Q.    Because you were confident that

Page 31

1          M. Visconti
2     he did, in fact, work there?
3     A.    Yes.
4          MS. PRIVETERRE:   Objection to
5     the form.
6     Q.    And that is because you felt the
7     ID was valid?
8          MS. PRIVETERRE:   Which ID?
9          MR. ZELMAN:   The Transit
10    Authority ID.
11         MS. PRIVETEERE:   Is that
12    correct?
13         THE WITNESS:   Yes.
14    Q.    When you arrested Mr. Dikler,
15    did you feel that he had any intent to deceive
16    anybody about the fact that he worked at the
17    Transit Authority?
18         MS. PRIVETERRE:   Objection to
19    the form.   He is not a mind reader.
20    What are you asking?
21         MR. ZELMAN:   You could object to
22    the form, but you can't ask questions.
23    That is all you could do.
24         MS. PRIVETERRE:   If I can't
25    understand it -- what are you asking?

Page 32

1          M. Visconti
2          MR. ZELMAN:   You could object to
3     the form.
4          MS. PRIVETERRE:   May I have that
5     read back, please.
6          [The requested portion of the
7     record was read.]
8     A.    The question -- there is no way
9     for me to know that.
10    Q.    When you arrested Mr. Dikler,
11    did you feel that he was trying to trick
12    anybody?
13         MS. PRIVETERRE:   When?
14         MR. ZELMAN:   At any time.
15         MS. PRIVETERRE:   At any time
16    that day?
17         MR. ZELMAN:   Yes.
18    Q.    Prior to your arrest.
19    A.    When you say trick I don't
20    understand.
21    Q.    In any respect, do you know if
22    he tried to use the shield to get into the
23    building?
24    A.    No.
25         MS. PRIVETERRE:   Is that a no,

Page 33

1          M. Visconti
2     you don't know?
3     A.    No, I don't know.
4     Q.    You never found out if he ever
5     tried to use the shield to get into the
6     building?
7     A.    No.
8     Q.    Did anybody tell you that shield
9     was forged at 26 Federal Plaza, did anybody
10    that day tell you that this shield was forged?
11    A.    No.
12    Q.    It was your decision?
13    A.    Well, the question -- my
14    decision, you mean based on what?
15    Q.    Based upon your investigation
16    that the shield was forged.
17    A.    Yes.
18    Q.    Did anyone participate in that
19    decision and tell you, I think it is forged,
20    or I don't think it is forged?
21         MS. PRIVETERRE:   Objection to
22    the form.
23    A.    I don't understand question.
24    Q.    Did you speak to any other
25    officer or any other secretary on March 22,

Page 34

```
1              M. Visconti
2  about whether or not the shield was forged?
3        MS. PRIVETERRE:  When?
4        MR. ZELMAN:  On March 22.
5        MS. PRIVETERRE:  The whole day?
6        MR. ZELMAN:  The whole day.
7        MS. PRIVETERRE:  The whole day
8  before the arrest?
9        MR. ZELMAN:  The whole day.
10   A.   Yes.
11   Q.   Who did you speak to?
12   A.   I don't remember.  There were
13  several people there.
14   Q.   When you say there, do you mean
15  at 26 Federal Plaza?
16   A.   Yes.
17   Q.   Do you remember if you spoke to
18  the NYPD or to someone else?
19   A.   My partner was with me.
20   Q.   Who is your partner?
21   A.   I don't know who my partner was
22  on that day, I am not sure.
23   Q.   What did he or she say to you?
24   A.   I don't remember.
25   Q.   Did it influence you about
```

Page 35

```
1              M. Visconti
2  whether or not to perform this arrest?
3    A.   No.
4    Q.    More so than anything else, you
5  did this arrest because the instruction sheet
6  did not allow Mr. Dikler to carry this
7  particular shield?
8        MS. PRIVETERRE:  Please read
9        back the question.
10        [The requested portion of the
11        record was read.]
12        MS. PRIVETERRE:  Objection to
13        the form.
14        MR. ZELMAN:  That is all you
15        could say.
16        MS. PRIVETERRE:  More or less,
17        do you understand what the question is
18        asking or purports to ask?
19        THE WITNESS:  Yes, but it is
20        kind of general.
21    Q.    Other than instructions you got
22  from the instruction sheet, was there any
23  other factor which you used to make a
24  determination to do the arrest with Mr.
25  Dikler?
```

Page 36

```
1              M. Visconti
2    A.   Yes.
3    Q.   What was that?
4    A.   Bus drivers do not have shields.
5    Q.   Where did you learn that
6  information from?
7    A.   I had spoken to someone at the
8  MTA.
9    Q.   So you personally knew that bus
10  drivers were not supposed to have shields?
11   A.   Yes.
12   Q.   Do you remember the person who
13  told you that?
14   A.   No.
15   Q.   Before you arrested Mr. Dikler,
16  did you ask him where he got this shield?
17   A.   Me specifically, no.
18   Q.   Did you find out where he got
19  the shield before you made the arrest?
20   A.   Yes.
21   Q.   And how did you find that out?
22   A.   He had made statements to others
23  indicating that he purchased it from someone.
24   Q.   Did you find out what he had
25  said?
```

Page 37

```
1              M. Visconti
2    A.   Specifically, what I had just
3  stated.
4    Q.   Which was what?
5    A.   He purchased it from someone
6  else.
7    Q.   Did you find out where he had
8  purchased it?
9    A.   No.
10   Q.   Do you know if he purchased it
11  on MTA property or not?
12   A.   I don't know.
13   Q.   Is it true, the fact that Mr.
14  Dikler worked at the Transit Authority had no
15  bearing on whether or not he was going to be
16  arrested on that day?
17        MS. PRIVETERRE:  Objection to
18        the form.
19        You could answer if you
20        understand the question.
21   A.   I don't really understand it.
22   Q.   The fact that he worked at the
23  MTA or at the Transit Authority was irrelevant
24  to this arrest; is that correct?
25        MS. PRIVETERRE:  Objection to
```

Page 38

1              M. Visconti
2     the form.
3     A.      How do you mean that?
4     Q.      When you made the arrest, it was
5     not your claim that he was not working at the
6     Transit Authority and trying to trick people
7     into believing that he was working at the
8     Transit Authority; is that correct?
9              MR. SILVERMAN:   Objection to
10             the form.
11             MS. PRIVETERRE:   Objection to
12             the form.
13             Could you rephrase that, please,
14     Mr. Zelman?
15             MR. ZELMAN:   I will withdraw
16             the question.
17     Q.      Do you know if every badge that
18     went through 26 Federal Plaza was
19     investigated?
20             MS. PRIVETERRE:   At what time
21             frame?
22             MR. ZELMAN:   At any time.
23             MS. PRIVETERRE:   The time frame
24             that he had been called there?
25             MR. ZELMAN:   Let's say in 2006.

Page 39

1              M. Visconti
2     Q.      Were you aware of a policy in
3     Federal Plaza that all badges had to be
4     investigated?
5     A.      Yes.
6     Q.      When did you become aware of
7     that?
8     A.      I don't remember.
9     Q.      What did you become aware of?
10    A.      They would notify us if someone
11    was found to be in possession of a shield.
12    Q.      When you say they, who are you
13    referring to?
14    A.      26 Federal Plaza.
15    Q.      Who at 26 Federal Plaza would
16    tell you that?
17    A.      Federal Protective Service.
18    Q.      Was the Federal Protective
19    Service called up in the NYPD or would they
20    call up internal affairs?
21    A.      Yes.
22    Q.      Would they tell internal affairs
23    we have here a fake badge or we have a badge
24    that we want you to look into or something
25    else?

Page 40

1              M. Visconti
2              MS. PRIVETERRE:   Objection to
3              the form.
4     A.       Specifically?
5     Q.       Yes.
6     A.       You would have to rephrase the
7     question.
8     Q.       When the Federal Protective
9     Service was called, were they telling you they
10    wanted to do an arrest or that the NYPD should
11    investigate whether or not to do an arrest?
12             MS. PRIVETERRE:   Do you
13             understand what is being asked?
14    A.       If you could rephrase the
15    question, I'm sorry.
16    Q.       When the Federal Protective
17    Service was called --
18    A.       Yes.
19    Q.       -- what would they say?
20    A.       In general, there is someone
21    here with a forged shield.
22    Q.       They would say it is forged?
23    A.       Yes.
24    Q.       Do you know how they made a
25    determination it was forged?

Page 41

1              M. Visconti
2              MS. PRIVETERRE:   Again, we are
3              talking about generally and not about
4              the Dikler arrest?
5              MR. ZELMAN:   Right.
6              MR. SILVERMAN:   Objection to
7              the form.
8     Q.       Generally speaking.
9     A.       They were trained.
10    Q.       You didn't speak to the Federal
11    Protective Services over the phone while you
12    were at internal affairs; is that correct?
13             MS. PRIVETERRE:   Objection to
14             the form.
15    A.       On what date?
16    Q.       March 22.
17    A.       I don't think I spoke to them.
18    Q.       When you arrived at 26 Federal
19    Plaza, did you speak to someone at the federal
20    agency?
21    A.       Yes.
22    Q.       Who?
23    A.       I don't remember.
24    Q.       What did that person tell you?
25    A.       Mr. Dikler had gone through a

Page 42

M. Visconti

1  metal detector at the entrance and it was in
2  the pocket of a jacket, the shield that he had
3  in his possession.
4      Q.      Did the Federal Protective
5  Service tell you it was a forged shield?
6      A.      Yes.
7      Q.      Did you ask them why they
8  thought it was forged?
9          MR. SILVERMAN:   Objection to
10  the form.
11         MS. PRIVETERRE:  I join.
12         Do you understand the question?
13     A.      If you could rephrase it.
14     Q.      Did you ask him why he thought
15  that the shield was forged?
16         MS. PRIVETERRE:  Are you
17  talking about the Federal Protective
18  Service agency?
19         MR. ZELMAN:  Yes.
20         MS. PRIVETERRE:  Agency?
21         MR. ZELMAN:  Yes.
22     A.      I don't remember.
23     Q.      When you got to the scene it was
24  your determination to make about whether or

Page 43

M. Visconti

1  not it was forged?
2      A.      Yes.
3          MS. PRIVETERRE:  Objection to
4  the form.
5      Q.      Can you describe the procedure
6  that you went through after you got through 26
7  Federal Plaza investigating this particular
8  badge?
9      A.      Yes.
10     Q.      Go ahead.
11     A.      Mr. Dikler was placed in
12  handcuffs, he was removed to the 5th Precinct
13  where pedigree information was taken, and an
14  online booking sheet was prepared.  There was
15  a complaint report prepared, he was
16  fingerprinted and taken to Manhattan Central
17  Booking.  I spoke with the Manhattan DA --
18     Q.      What I was really referring to
19  was prior to the arrest, can you describe
20  anything that you did or investigated about
21  this badge before you made the decision to
22  place Mr. Dikler under arrest?
23     A.      I don't understand the question.
24     Q.      When you got to 26 Federal

Page 44

M. Visconti

1  Plaza, did you just put him in handcuffs?
2      A.      No.
3      Q.      Did you investigate the badge?
4  Did you look at the badge?
5      A.      Yes.
6      Q.      What else did you do besides
7  look at it?
8      A.      I don't know what you mean, what
9  else?
10     Q.      You don't know what I mean?
11     A.      No.  Are you --
12         MS. PRIVETERRE:  No, no, no,
13  you already told him you don't
14  understand what he means.  Let him
15  rephrase it.
16     Q.      When you got to 26 Federal
17  Plaza, before you placed Mr. Dicker under
18  arrest, did you investigate the badge to
19  determine whether or not it was forged or not?
20     A.      Yes.
21     Q.      How?
22     A.      Simply by looking at it.
23     Q.      Anything else?
24     A.      No.

Page 45

M. Visconti

1      Q.      And you could tell by looking at
2  it that it was a forged badge?
3      A.      Yes.
4      Q.      Why is that?
5      A.      The specific shape of the badge
6  and what it said on the face of it.
7      Q.      When did it say on the face of
8  it?
9      A.      Again, I don't recall
10  specifically.  It was something about the
11  Transit Authority.
12     Q.      Do you recall if that was the
13  first arrest that you made with respect to a
14  Transit Authority badge?
15     A.      I am not sure.
16     Q.      It is possible that there were
17  prior arrests?
18         MS. PRIVETERRE:  Objection.
19     A.      I am not sure.
20     Q.      How about after this arrest, did
21  you arrest any other Transit Authority
22  employees for carrying a badge?
23     A.      No, I don't believe so.
24     Q.      Do you recall how you became in

Page 46

M. Visconti

1
2  possession of the badge?  Did someone hand it
3  to you?
4      A.    I don't remember.
5      Q.    Do you remember if you saw it on
6  a desk?
7      A.    I don't remember.
8      Q.    Did you ever speak to Mr. Dikler
9  about the badge?
10     A.    Yes.
11     Q.    What did you ask him?
12     A.    I don't remember.
13     Q.    Do you remember what he
14 responded?
15     A.    I don't remember.
16     Q.    Do you have any memo book notes
17 that would assist you in determining that?
18     A.    No.
19     Q.    Any other documentation that
20 would assist you in determining what Mr.
21 Dikler told you?
22     A.    No.
23     Q.    Do you recall if he told you
24 that he worked at the MTA?
25     A.    Yes.

Page 47

M. Visconti

1
2      Q.    Do you recall anything else that
3  he said?
4      A.    No.
5      Q.    You accompanied Mr. Dikler back
6  to the precinct?
7      A.    Yes.
8      Q.    Did he have to make a phone
9  call?
10     A.    I don't remember.
11     Q.    Do you recall telling Mr. Dikler
12 that it is better for him to call in sick
13 rather than to say he was arrested?
14     A.    No.
15     Q.    Do you deny that you said that?
16     A.    Yes.
17     Q.    Did you speak to Special Agent
18 Thomas Mahoney about this arrest?
19     A.    I don't remember.
20     Q.    Is there anything that you could
21 review that would assist you in determining
22 whether you spoke to him or not?
23     A.    My notes, maybe.
24     Q.    Where are your notes?
25     A.    I don't know.

Page 48

M. Visconti

1
2      Q.    Are you talking about your memo
3  book?
4      A.    No.
5      Q.    What type of notes are you
6  talking about?
7      A.    Arrest paperwork.
8      Q.    In other words it's what you
9  would enter on the computer?
10     MS. PRIVETERRE:  Is that a
11 question?
12     MR. ZELMAN:  Yes.
13     Q.    I am asking you what type of
14 notes were these?  Were these handwritten
15 notes?
16     A.    Yes.
17     Q.    What do you do with the
18 handwritten notes after the arrest?
19     A.    It stays with the folder.
20     Q.    So it is in the folder at the
21 internal affairs bureau?
22     A.    Yes.
23     Q.    Did you look at that in
24 preparation for today's deposition?
25     A.    Yes.

Page 49

M. Visconti

1
2      Q.    But you did not bring it with
3  you?
4      A.    No.
5      Q.    What is contained in the
6  internal affairs folder?
7      A.    You have to rephrase that
8  question.
9      Q.    You have an internal affairs
10 folder on Mr. Dikler; is that correct?
11     A.    Internal affairs folder is not
12 really the right term, it is a broad term.
13     Q.    How would you define it?
14     A.    There are all different types of
15 folders.
16     Q.    The folders that you looked at
17 today or yesterday refer to Mr. Dikler; is
18 that correct?
19     A.    Yes.
20     Q.    What type of folder is that?
21     A.    In this particular case it is an
22 online booking, so there are some notes and an
23 affidavit.
24     Q.    An affidavit?
25     A.    Yes.

Page 50

```
1                M. Visconti
2       Q.    What is the name of that folder?
3   Does the folder have a name?
4       A.    No.
5       Q.    Does it say "Mr. Dikler" on it?
6       A.    I have my own folder.
7       Q.    So this is your own personal
8   document at internal affairs?
9       A.    Yes.
10      Q.    Whose affidavit is this in that
11  folder?
12      A.    I don't understand.
13      Q.    You said you looked at an
14  affidavit in the folder; is that right?
15      A.    Yes.
16      Q.    Who signed the affidavit?
17      A.    I did.
18      Q.    What did the affidavit state?
19      A.    I don't remember specifically.
20      Q.    In general, what was it about?
21      A.    It was in reference to the
22  shield.
23      Q.    What did it say about the
24  shield?
25      A.    It was a forged shield.
```

Page 51

```
1                M. Visconti
2       Q.    Is there anything else in the
3   affidavit besides it was a forged shield?
4       A.    Who I spoke to and his name.
5       Q.    Mr. Dikler's name?
6       A.    Yes, in general, things of that
7   nature.
8       Q.    How many pages is the affidavit?
9       A.    I think it is less than a page.
10      Q.    When you say who you spoke to,
11  do you mean who you spoke to in regard to the
12  arrest?
13      A.    Yes.
14      Q.    What was contained in your notes
15  in that folder?
16      A.    An online booking sheet,
17  affidavit, the handwritten notes, the
18  paperwork from the Federal Protective Service
19  in regard to the shield.  A central booking
20  photo.  I think that is probably about it.
21  Maybe a few other -- that is about it.
22      Q.    You have that information held
23  at the internal affairs office?
24      A.    No.
25      Q.    I'm sorry, you have that
```

Page 52

```
1                M. Visconti
2   paperwork at the internal affairs office?
3       A.    Yes.
4       Q.    You indicated that there is
5   something from the Federal Protective agency;
6   is that it?
7             MS. PRIVETERRE:  Objection to
8        the form.
9       Q.    What is the name of the federal
10  agency?
11      A.    I am not certain.  I believe it
12  is Federal Protective Service.
13      Q.    You indicated just now there is
14  a document in the folder from the Federal
15  Protective Service.
16            Was that a document referring to
17  Mr. Dikler himself or just generally about
18  shields and badges?
19      A.    You have to rephrase that
20  question.
21      Q.    Did that document that you just
22  referred to from the Federal Protective
23  Service relate to Mr. Dikler specifically?
24  Did it list his name?
25      A.    Yes, in regard to this incident.
```

Page 53

```
1                M. Visconti
2       Q.    So it was a document prepared
3   specifically about Mr. Dikler's shield and
4   arrest?
5       A.    Yes.
6             MS. PRIVETERRE:  Why don't you
7        show him the initial disclosure.
8             MR. ZELMAN:  Relax.  You could
9        show him before the deposition is
10       finished whatever you want.
11            MS. PRIVETERRE:  Are you going
12       to mark it as an exhibit?
13            MR. ZELMAN:  Yes.
14      Q.    Did you speak to Police Officer
15  Frank Torres about this arrest?
16      A.    I don't know.
17      Q.    Do you know if he was involved
18  in the arrest in any manner?
19      A.    No.
20      Q.    Sergeant Robert Allay, did you
21  speak to him about the arrest in any way?
22      A.    I don't know.
23      Q.    Do you know if he was involved
24  in the arrest?
25      Q.    Detective Gregory McCain, the
```

Page 54

1           M. Visconti
2  same question, did you speak to him about this
3  arrest?
4      A.    He would have probably been my
5  partner.
6      Q.    Do you recall speaking to him
7  about the arrest?
8      A.    I don't understand the question.
9      Q.    Do you recall speaking to him
10 about this arrest at any time?
11     A.    Yes.
12     Q.    When?
13     A.    I guess on the date of the
14 arrest.
15     Q.    At any other time did you speak
16 to him or was it only on that date?
17     A.    I don't understand the question.
18     Q.    At any time did you speak
19 to Detective Gregory McCain about Mr. Dikler's
20 arrest other than on March 22, 2006?
21     A.    Yes.
22     Q.    When?
23     A.    Everybody in my office probably
24 knew I was getting sued.
25     Q.    I guess my question is this, on

Page 55

1           M. Visconti
2  March 22, 2006, what did you speak to him
3  about?
4      A.    I don't remember.
5      MS. PRIVETERRE:    That is a
6  different question now.
7      Q.    You don't recall anything he
8  said about this?
9      A.    No, I don't recall.
10     Q.    Do you know if Detective Gregory
11 McCain was involved in the arrest in any way
12 other than the fact you spoke to him about it?
13 Did he prepare any paperwork on it, if you
14 know?
15     A.    If he was my partner he might
16 have done some of the paperwork for me, and
17 entered it into the computer.
18     Q.    Do you know if he did that?
19     A.    Probably, but I am not sure.
20     Q.    Detective Mark DaTorro, does
21 that name sound familiar to you?
22     A.    He is a sergeant.
23     Q.    Did you speak to him on March
24 22, at any time about this arrest?
25     A.    No.

Page 56

1           M. Visconti
2      Q.    At any time did you speak to him
3  about the arrest?
4      A.    No.
5      Q.    Lieutenant Robert Stapleton, did
6  you speak to him at all about this arrest?
7      A.    I am not even sure who that is.
8      Q.    Did you ever learn what became
9  of Mr. Dikler's prosecution?
10     A.    Yes.
11     Q.    What?
12     A.    It was sealed.   Apparently, the
13 arrest was thrown out of court.
14     Q.    When did you first learn that
15 information?
16     A.    When I found out I was being
17 sued.
18     Q.    You indicated earlier that you
19 spoke to the DA about the case on March 22.
20     A.    Yes.
21     Q.    Was that the last time you spoke
22 to the DA about the case?
23     A.    Yes.
24     Q.    Were you ever called to testify
25 in court?

Page 57

1           M. Visconti
2      A.    I don't remember.
3      Q.    Did the DA tell you anything
4  about the case?
5      A.    Not that I remember.
6      Q.    The DA had you sign a criminal
7  court complaint?
8      A.    Yes.
9      Q.    Did you review that before you
10 signed it?
11     A.    Yes.
12     Q.    Mr. Dikler, do you recall if he
13 came with anyone to 26 Federal Plaza?
14     MS. PRIVETERRE:   Do you know
15 that?
16     A.    I was told that he did, yes.
17     Q.    Do you recall if he was allowed
18 to go to his appointment before his arrest?
19     MR. SILVERMAN:   Note my
20 objection to the form.
21     A.    I don't remember.
22     Q.    Do you know if it was the policy
23 of 26 Federal Plaza to confiscate the badge,
24 but allow the person to go to their
25 immigration appointment and then come back to

Page 58

M. Visconti

1              M. Visconti
2  the office?
3       MS. PRIVETERRE:   Objection to
4  the form.   Are you aware of what the
5  policy of 26 Federal Plaza is?
6       THE WITNESS:   Specifically, no.
7       MR. ZELMAN:   Counsel, you
8  cannot suggest an answer, you could only
9  object.
10    Q.    Are you aware if Mr. Dikler was
11  allowed to go to his appointment on March 22,
12  2006?
13       MR. SILVERMAN:   Note my
14  objection to the form.
15    A.    I don't remember.
16    Q.    How long after Mr. Dikler
17  arrived at 26 Federal Plaza and his badge was
18  confiscated, did you arrive at 26 Federal
19  Plaza?
20       MS. PRIVETERRE:   Do you know?
21    A.    I think it was a few hours.
22    Q.    A few hours?
23    A.    Yes.
24    Q.    Where is your office in internal
25  affairs?

Page 59

M. Visconti

1              M. Visconti
2    A.    Long Island City.
3    Q.    Long Island City?
4    A.    Yes.
5    Q.    So you had to go from Long
6  Island City to 26 Federal Plaza?
7    A.    I don't think I was in my office
8  at the time.
9    Q.    Do you recall where you were
10  when you received this call?
11    A.    No.
12    Q.    Do you recall how long it took
13  you to get to 26 Federal Plaza?
14    A.    No.
15    Q.    Do you know if it was more than
16  an hour?
17    A.    Not for certain, no.
18    Q.    Was it your understanding that
19  Mr. Dikler could go out of the building while
20  he was waiting for you to arrive at 26 Federal
21  Plaza, or was it your understanding that he
22  was already in custody?
23    A.    Generally, when they call us
24  they are already in the building.   I don't
25  know if he was really in custody.

Page 60

M. Visconti

1              M. Visconti
2       MS. PRIVETERRE:   He is asking
3  you, specifically.
4       MR. ZELMAN:   You cannot stop him
5  from answering a question.
6       If this happens one more time, I
7  am calling the judge.   You cannot jump
8  in and give him your two cents.
9       MS. PRIVETERRE:   Yes or no?   Do
10  you understand the question?
11      [The requested portion of the
12  record was read.]
13       MR. ZELMAN:   This is the last
14  time, counsel.   I am warning you, I
15  will pick up the phone and I will call.
16       MS. PRIVETERRE:   We have been
17  through that before.
18       MR. ZELMAN:   He is answering
19  the question and you cannot interrupt
20  me.
21       MS. PRIVETERRE:   Do what you
22  will.
23       MR. ZELMAN:   Please read back
24  the question and answer.
25      [The requested portion of the

Page 61

M. Visconti

1              M. Visconti
2  record was read.]
3       MS. PRIVETERRE: Read back the
4  last question and answer again for me,
5  please.
6      [The requested portion of the
7  record was read.]
8      (Brief recess.)
9    Q.    Prior to the arrest of Mr.
10  Dikler, did you check his arrest record?
11    A.    No.
12    Q.    Do you know if he had ever been
13  arrested before?
14    A.    I am not sure.
15    Q.    Were there any phone calls
16  between you and the DA at any time?
17    A.    Yes.
18    Q.    How many?
19    A.    I don't remember.
20    Q.    Phone calls regarding Mr.
21  Dikler?
22    A.    Yes.
23    Q.    Do you recall the nature of
24  those phone conversations?
25    A.    With regard to the arrest?

Page 62

M. Visconti

1
2     Q.     Specifically.
3     A.     Details of the arrest.
4     Q.     Do you remember any specific
5   questions that the DA asked?
6     A.     No.
7     Q.     Do you remember any answers that
8   you gave?
9     A.     Specifically, no.
10    Q.     In general.
11    A.     No.
12    Q.     Did you call the DA or did the
13  DA call you or both?
14    A.     Both.
15    Q.     Was this all on March 22?
16    A.     I am not sure.
17    Q.     It is possible that you spoke to
18  the DA after March 22, regarding Mr. Dikler?
19    A.     Yes.
20    Q.     Do you think that you did?
21          MS. PRIVETERRE:   Objection.
22    A.     You have to rephrase the
23  question.
24    Q.     Do you believe that you did?
25    A.     Rephrase the question again in

Page 63

M. Visconti

1
2   regard to that.
3     Q.     Do you believe that you spoke to
4   the DA with regard to Mr. Dikler after March
5   22, 2006?
6     A.     No.
7     Q.     You believe it happened all on
8   March 22?
9     A.     Yes.
10    Q.     If you had known that Mr. Dikler
11  had purchased his badge on MTA property, would
12  that have changed your decision about whether
13  to effectuate an arrest?
14    A.     No.
15    Q.     Did you ever inquire of the MTA
16  if it allowed its workers to purchase badges
17  on its premises?
18          MS. PRIVETERRE:   When?
19    A.     Rephrase the question.
20          MR. ZELMAN:   Please read it
21  back.
22          [The requested portion of the
23  record was read.]
24    A.     Yes.
25    Q.     When --

Page 64

M. Visconti

1
2     A.     I don't remember.
3     Q.     -- before or after the March 22,
4   2006 arrest?
5     A.     I am not sure.
6     Q.     Did you inquire in writing?  Did
7   you inquire orally?
8     A.     Orally.
9     Q.     You don't recall who you spoke
10  to?
11          MS. PRIVETERRE:   Objection.
12    A.     No.
13    Q.     Do you recall who you called?
14    A.     The MTA.
15    Q.     Do you remember what the
16  response was that you got?
17    A.     Yes.
18    Q.     What was it?
19    A.     They are not allowed to have
20  shields.
21    Q.     But you do not know who said
22  that?
23    A.     No.
24    Q.     And it was not in writing?
25    A.     No.

Page 65

M. Visconti

1
2     Q.     Before you arrested Mr. Dikler,
3   had you ever seen a TA employee with a shield?
4     A.     I don't remember.
5     Q.     You don't remember?
6     A.     No.
7          MS. PRIVETERRE:   In his
8   capacity --
9          MR. ZELMAN:   I am asking him
10  the questions.
11          MS. PRIVETERRE:   -- as an
12  officer?
13          MR. ZELMAN:   Counsel, you can't
14  ask questions.   You could object.
15  That is all you could do.
16          MS. PRIVETERRE:   Did I object
17  to that question about had he ever seen
18  an MTA shield?
19          Now I want to object to the
20  question.
21    Q.     Did you believe that Mr. Dikler
22  felt his badge was forged?
23          MS. PRIVETERRE:   Objection to
24  the form.
25    A.     I wouldn't know that.

Page 66

```
1                M. Visconti
2       Q.    You didn't develop an opinion on
3  that matter?
4           MS. PRIVETERRE:   Objection.
5       A.    No.
6       Q.    Did he deny that it was a forged
7  badge?
8       A.    I don't remember
9       Q.    After you arrested Mr. Dikler,
10 did you ever advise him about what would
11 likely happen to his case?
12          MS. PRIVETERRE:   Objection.
13      A.    I don't remember.
14      Q.    Did you ever say that the
15 forgery charge is likely to get dismissed?
16      A.    I don't remember.
17      Q.    Before you arrested Mr. Dikler,
18 did you have any knowledge about what the
19 court would likely do with this case?
20          MS. PRIVETERRE:   Objection.
21      A.    No.
22      Q.    When you made the arrest of Mr.
23 Dikler, it was not your contention that the
24 information contained within the badge was in
25 any way inaccurate; is that correct?
```

Page 67

```
1                M. Visconti
2           MS. PRIVETERRE:   Objection.
3  May I have that read back?
4           [The requested portion of the
5  record was read.]
6           MS. PRIVETERRE:   Do you
7  understand that question?
8           THE WITNESS:  No, I did not.
9       Q.    Was it your belief that the
10 information contained within the badge was in
11 any way inaccurate?
12          MR. SILVERMAN:   Objection to
13 the form.
14      A.    I don't understand the question.
15      Q.    Do you recall the information
16 that the badge had on it?
17      A.    Not specifically.
18      Q.    Do you recall that it had Mr.
19 Dikler's name?
20          MS. PRIVETERRE:   Objection.
21      A.    I don't remember.
22      Q.    Do you remember any information
23 that was on the badge?
24      A.    Specifically, no.
25      Q.    Do you remember what those types
```

Page 68

```
1                M. Visconti
2  of badges would typically say?
3           MS. PRIVETERRE:   Objection.
4  Objection to the word "typical."
5       A.    There is no --
6       Q.    No typical badge?
7       A.    No.
8       Q.    In possessing the type of badge
9  that Mr. Dikler had, did you form an opinion
10 as to whether or not he had an intent to
11 deceive with it?
12          MS. PRIVETERRE:   Objection.
13      A.    No.
14      Q.    You did not form an opinion?
15      A.    No.
16      Q.    Do you have an opinion today
17 about that?
18      A.    No.
19      Q.    Do you suspect that he was
20 trying to deceive somebody with it or not?
21          MS. PRIVETERRE:   Objection.
22 Asked and answered.
23          MR. SILVERMAN:   Objection to
24 the form.
25      A.    I don't know.
```

Page 69

```
1                M. Visconti
2       Q.    Who made the decision about the
3  arrest charges? Was it your decision or was
4  it someone else's?
5       A.    Mine.
6       Q.    Do you recall what the arrest
7  charges were?
8       A.    It was for the possession of a
9  forged instrument.
10      Q.    Do you recall anything else?
11      A.    I am not sure.
12      Q.    Was there also one charge for
13 the unauthorized use of detective
14 identification, General Business Law Section
15 80.
16      A.    I am not sure.  That might have
17 been one.
18      Q.    That might have been one?
19      A.    I am not sure.
20          MS. PRIVETERRE:   Are we going
21 to mark it as an exhibit, counselor?
22          MR. ZELMAN:   No, I am not.
23          MS. PRIVETERRE:   You are
24 referring to something.
25          MR. ZELMAN:   I could look at
```

Page 70

M. Visconti

1    anything I want.
2         MS. PRIVETERRE:  The witness
3    does not have the benefit of seeing
4    that.
5         MR. ZELMAN:  You could show him
6    whatever you want.  I am not here to
7    prepare your witness.
8         MS. PRIVETERRE:  You are
9    referring to a document --
10        MR. ZELMAN:  Counsel, please.
11   Q.    Was it your opinion that Mr.
12   Dikler had violated General Business Law
13   Section 80?
14   A.    I am not sure.
15   Q.    Do you recall what the General
16   Business Law Section 80 is?
17   A.    No.
18   Q.    How would you make a
19   determination about what the arrest charges
20   were?
21   A.    Based on the incident.
22   Q.    And how would you determine
23   which arrest charges to apply to the incident?
24   A.    Would you please rephrase the

Page 71

M. Visconti

1    question.
2    Q.    You were the one who decided
3    which arrest charges to apply to Mr. Dikler;
4    is that correct?
5         MS. PRIVETERRE:  Objection.
6    A.    Yes.
7    Q.    How did you determine those
8    arrest charges versus other arrest charges?
9    For example, the possession of a forged
10   instrument in the second degree?
11        MS. PRIVETERRE:  Objecting.
12   Q.    That was an arrest charge; is
13   that correct.
14        MS. PRIVETERRE:  Objection.
15   A.    Repeat that.
16   Q.    Was the possession of a forged
17   instrument in the second degree the arrest
18   charge?
19   A.    I think so, yes.
20   Q.    How did you determine that
21   particular charge as opposed to first degree,
22   the third degree or some other violation of
23   the statute?
24   A.    Based on the intelligence

Page 72

M. Visconti

1    bulletin that I had explained about earlier.
2    Q.    That is the same instruction
3    sheet that you had from the Federal Protective
4    Service or a different intelligent bulletin?
5         MR. SILVERMAN:  Note my
6    objection to the form.
7         MS. PRIVETERRE:  I join.
8    Q.    What intelligent bulletin are
9    you referring to?
10   A.    The one issued by the New York
11   Police Department.
12   Q.    Do you recall how many pages
13   that was?
14        MS. PRIVETERRE:  Asked and
15   answered.  Objection.
16   A.    One.
17   Q.    It was one page?
18   A.    Yes.
19   Q.    The way you extrapolated which
20   charge to charge Mr. Dikler, were those
21   charges listed on the form itself?
22        MS. PRIVETERRE:  Objection.
23   A.    What?
24   Q.    Before you charged Mr. Dikler

Page 73

M. Visconti

1    with an arrest charge, would you have read the
2    law on it?
3    A.    Explain it better.
4    Q.    One of the arrest charges was
5    the possession of a forged instrument in the
6    second degree; is that correct?
7    A.    Yes.
8    Q.    You indicated that you would use
9    the instruction sheet to make the
10   determination that was the arrest charge to
11   apply to Mr. Dikler --
12        MS. PRIVETERRE:  Objection.
13   Q.    -- is that correct?
14   A.    To some extent, yes.
15   Q.    Would you also then read that
16   particular statute, the possession of a forged
17   instrument, on your own?  Would you read that
18   item as to whether it applied to this
19   particular event?
20   A.    Not necessarily.
21   Q.    Do you recall if you did that in
22   this case?
23   A.    No.
24   Q.    How about generally?

19 (Pages 70 to 73)

Page 74

M. Visconti

1
2       MS. PRIVETERRE:   No, you don't
3  recall or no, you didn't?
4       A.    No, I don't recall.
5       MS. PRIVETERRE:   Then you
6  should say so.
7       Q.    With regard to General Business
8  Law Section 80, do you recall whether you read
9  that before you determined it was an arrest
10 charge?
11      A.    No.
12      Q.    So, typically, the way that you
13 determine an arrest charge is to read an NYPD
14 memo or instruction sheet?
15      MS. PRIVETERRE:   Objection to
16 the form.
17      A.    No.
18      Q.    How do you typically determine
19 what the arrest charges are?
20      A.    It depends on the incident.
21      Q.    How do you determine what the
22 charges are?
23      A.    It depends on the incident.
24      MS. PRIVETERRE:   Asked and
25 answered.

Page 75

M. Visconti

1
2       Q.    In this particular case one of
3  the arrest charges was possession of a forged
4  instrument in the second degree.
5       A.    Yes.
6       Q.    My question is, how did you make
7  a determination that it was possession of a
8  forged instrument in the second degree and not
9  possession of a forged instrument in the third
10 degree?
11      MS. PRIVETERRE:   Objection.
12      A.    I don't understand what it is
13 you are asking?
14      Q.    You don't understand that
15 question?
16      A.    No.
17      Q.    What don't you understand about
18 it?
19      MS. PRIVETERRE:   That is
20 badgering.   I think he is asking you to
21 rephrase the question.
22      MR. ZELMAN:   I rephrased it four
23 times.   I don't know what he doesn't
24 understand about it.
25      MS. PRIVETERRE:   Don't badger

Page 76

M. Visconti

1
2  the witness.
3       MR. ZELMAN:   I am not badgering
4  him.
5       MS. PRIVETERRE:   You are being
6  argumentative.
7       MR. ZELMAN:   No, I am not.
8  If you want to talk, this is not the
9  time.   You are allowed to object.   I
10 said it four times.
11      MS. PRIVETERRE:   I won't allow
12 you to badger the witness.
13      MR. ZELMAN:   Let's call the
14 court.   I am sick of this.   If you
15 want to call the court, then let's do
16 it.
17      MS. PRIVETERRE:   You are
18 badgering him.   He is asking you for a
19 clarification.   You keep saying, what
20 doesn't he understand.
21      MR. ZELMAN:   You can't speak
22 during a deposition, doesn't that sink
23 in with you?
24      MS. PRIVETERRE:   I am not the
25 one badgering the witness.

Page 77

M. Visconti

1
2       MR. ZELMAN:   I am not the one
3  badgering anyone but you at this time.
4       MS. PRIVETERRE:   You can't
5  badger anyone, let alone the deponent.
6       MR. ZELMAN:   You can't speak
7  during the deposition.   It is just that
8  simple.
9       MS. PRIVETERRE:   He is asking
10 you to clarify.   You don't come back
11 with, what don't you understand.
12      MR. ZELMAN:   And this is all on
13 the record.
14      Q.    Sir, I am going to ask you
15 again: With respect to Mr. Dikler, it was
16 your determination, was it not, that he was in
17 violation of the law, possession of a forged
18 instrument in the second degree; is that
19 correct?
20      A.    Yes.
21      Q.    That is a specific charge in the
22 law; is that correct?
23      A.    Yes.
24      Q.    My question is:   How did you
25 determine that specific law was the law that

Page 78

M. Visconti

1    he violated and not some other law?
2    A.    I was guided by the NYPD
3    bulletin.
4    Q.    Other than the NYPD bulletin,
5    was there any other instrument or any other
6    influence in your determination about what the
7    arrest charge was other than the bulletin?
8    A.    No.
9    Q.    Did someone tell you that this
10   is what you were supposed to charge him with,
11   you read that law or was it something else?
12   A.    No.
13   Q.    What did the bulletin say that
14   made you determine to charge Mr. Dikler with
15   possession of a forged instrument in the
16   second degree?
17   A.    I don't remember specifically.
18   Q.    The same is true with respect to
19   General Business Law Section 80?
20   A.    Yes.
21          MS. PRIVETERRE:    Objection.
22   Q.    You don't remember what
23   specifically the instruction sheet said with
24   regard to that, but that is where you believe

Page 79

M. Visconti

1    that you got the information to charge him
2    with that offense?
3    A.    Yes.
4    Q.    Okay.    Thank you very much.
5    A.    You are welcome.
6    Q.    Do you know if the DA decided to
7    use the arrest charges as criminal charges?
8    A.    I don't remember.
9    Q.    Did you ever become aware that
10   criminal possession of a forged instrument in
11   the second degree requires an intent to
12   defraud, deceive or injure somebody?
13   A.    No.
14   Q.    Are you aware of that today?
15   A.    No.
16   Q.    Did you speak to Security
17   Officer Wilson Vega regarding Mr. Dikler?
18   A.    I don't remember.
19   Q.    Do you know if he told you
20   anything about what had happened?
21   A.    I don't remember.
22          MR. ZELMAN:    Please mark this
23   as Plaintiffs' Exhibit 1 for
24   identification.

Page 80

M. Visconti

1          (Plaintiffs' Exhibit 1, document
2    dated March 22, 2006 marked for
3    identification, as of this date.)
4    Q.    I would ask you and your counsel
5    to take a look at that.
6          MR. SILVERMAN:    May I see that
7    too?
8          MS. PRIVETERRE:    Sure.
9    Q.    Is that your signature on the
10   bottom of that page?
11   A.    Yes.
12   Q.    And you signed that on 3/22/06?
13   A.    Yes.
14   Q.    Before you signed that, you read
15   this document?
16   A.    Yes.
17   Q.    On the first paragraph of the
18   document, it indicates that Mr. Dikler had an
19   intent to defraud, deceive and injure another;
20   is that correct?
21   A.    Yes.
22   Q.    And you also indicated that you
23   were informed by Mr. Vega that the informant
24   recovered a forged New York City Police

Page 81

M. Visconti

1    Department detective-type shield; is that
2    correct?
3    A.    Yes.
4    Q.    And it was recovered from inside
5    the detective's jacket?
6    A.    Yes.
7    Q.    That is what the document says?
8    A.    Yes.
9    Q.    Did he indicate that he had
10   recovered a forged detective-style shield?
11   A.    I don't remember if I spoke to
12   him specifically.
13   Q.    If he denies that he said that,
14   would you believe that is incorrect?
15          MS. PRIVETERRE:    Objection.
16          MR. SILVERMAN:    Objection to
17   the form.
18   A.    No.
19   Q.    Do you recall if Mr. Vega ever
20   in writing advised you that he recovered a
21   forged New York City police detective-style
22   shield?
23   A.    I think that was in the report
24   that I indicated earlier.

Page 82

M. Visconti
1
2     Q.     Did Mr. Vega ever express an
3  opinion about whether the shield was forged?
4     A.     Not that I know.
5     Q.     Is there anything else about
6  this particular arrest that you recall that I
7  have not asked you about?
8     A.     No.
9     Q.     Did you place handcuffs on Mr.
10 Dikler?
11    A.     Yes.
12    Q.     How long was he in handcuffs
13 for?
14    A.     I don't know.
15    Q.     Do you know how long he was in
16 custody for?
17    A.     A few hours.   I am not sure.
18    Q.     Did you transport him to central
19 booking?
20    A.     I don't remember.
21    Q.     Do you remember being at central
22 booking that day, March 22?
23    A.     I don't remember.
24    Q.     Do you remember anything that he
25 told you?

Page 83

M. Visconti
1
2     A.     No.
3     Q.     Did you speak to any civilian
4  witnesses about this event?
5     A.     I don't remember.
6     Q.     And you never spoke to his
7  employer about this?
8     A.     No.
9         MR. ZELMAN:   Please mark this
10 exhibit as Plaintiffs' Exhibit 2 for
11 identification.
12        (Plaintiffs' Exhibit 2, document
13 marked for identification, as of this
14 date.)
15    Q.     I would just ask you if you
16 recognize that document?
17    A.     No.
18    Q.     Does it have your name on the
19 top of the page?
20    A.     No.
21    Q.     Did you write that?
22    A.     No.
23    Q.     Do you know who did?
24    A.     No.
25    Q.     Do you know what this document

Page 84

M. Visconti
1
2  is?
3     A.     No.
4     Q.     You never saw it before?
5     A.     No.
6     Q.     Do you believe that you
7  completed this document?
8     A.     No.
9     Q.     The shield that was recovered
10 from Mr. Dikler, do you know if it was ever
11 given back to him?
12    A.     No.
13    Q.     You don't know?
14    A.     No.
15    Q.     The shield that was recovered
16 from Mr. Dikler, do you recall if it had an
17 identifying number on it?
18    A.     I think so, but I am not sure.
19    Q.     That identifying number, was
20 that ever corresponded to Mr. Dikler's
21 employment at the Transit Authority?
22        MS. PRIVETERRE:   Objection.
23        MR. SILVERMAN:   Objection.
24        MR. PRIVETERRE:   Objection to
25    the form.

Page 85

M. Visconti
1
2     A.     I don't remember.
3     Q.     You understand the question,
4  though?
5     A.     Yes.
6     Q.     Have you ever had a discussion
7  at the Internal Affairs Bureau about,
8  generally, a policy of inspecting badges at 26
9  Federal Plaza?
10    A.     I don't understand the question.
11    Q.     At internal affairs with your
12 colleagues or supervisor have you ever had a
13 discussion about the fact there is a policy of
14 inspecting badges at 26 Federal Plaza?
15    A.     Yes.
16    Q.     Is it common knowledge at
17 internal affairs that anybody who goes through
18 26 Federal Plaza and has a badge, that badge
19 will be examined?
20        MS. PRIVETERRE:   Objection.
21    A.     I don't understand the question.
22    Q.     In general, at internal affairs,
23 what is discussed specifically regarding 26
24 Federal Plaza regarding badges?
25    A.     Now?

Page 86

1           M. Visconti
2    Q.    Yes.
3    A.    Today?
4    Q.    Or in 2006.
5    A.    I don't understand.
6    Q.    Is it a fairly typical
7  assignment for an internal affairs
8  investigator to have to report to 26 Federal
9  Plaza in 2003 or 2004, in order to inspect the
10  shield or badge?
11          MS. PRIVETERRE:  Objection to
12      the form.
13          You could answer the question,
14      if you understand it.
15    A.    Not necessarily.
16    Q.    But this was the first time you
17  did an arrest at 26 Federal Plaza; is that
18  correct?
19    A.    That I remember.
20    Q.    Did you ever speak to other
21  colleagues if they had performed an arrest at
22  26 Federal Plaza with regard to similar shield
23  or badge issues?
24    A.    Yes.
25    Q.    How many other times have you

Page 87

1           M. Visconti
2  had any other discussion with other people at
3  internal affairs?
4    A.    I don't remember.
5    Q.    Do you have any idea how many
6  other people got stopped at 26 Federal Plaza
7  with respect to their badges?
8    A.    I don't know.
9    Q.    Do you know if it was more than
10  100?
11    A.    I don't know.
12    Q.    Do you know if any other persons
13  were arrested on March 22, 2006, with respect
14  to carrying a badge at 26 Federal Plaza?
15    A.    I don't know.
16    Q.    Would it surprise you to learn
17  that 20 people that day were arrested at 26
18  Federal Plaza for the same thing?
19          MS. PRIVETERRE:  Objection to
20      the form.
21    A.    Could you ask the question
22  again? I don't understand it.
23    Q.    Would this be unusual in your
24  opinion, that 20 people got arrested in one
25  day for carrying badges at 26 Federal Plaza?

Page 88

1           M. Visconti
2    A.    Yes.
3    Q.    Would that be very unusual?
4    A.    Yes.
5    Q.    What about five people, would
6  that be unusual?
7    A.    The question, it is not -- there
8  is no specific answer.
9    Q.    Are you aware of a policy of
10  arrest at 26 Federal Plaza with respect to
11  badges?
12    A.    Yes.
13    Q.    What is that policy?
14    A.    At 26 Federal Plaza, if someone
15  would go into 26 Federal Plaza with a shield
16  they would notify my office.
17    Q.    Are you aware of any other
18  facility that has that policy, that when
19  anyone comes into the facility with a badge,
20  they are going to notify internal affairs?
21    A.    My unit is notified in regard to
22  all shields.
23    Q.    My question is this, with
24  respect to the policy, are you aware of
25  another facility, a federal facility or a

Page 89

1           M. Visconti
2  state facility or some other type of facility
3  that if someone comes in with a badge they
4  would call internal affairs?
5          MS. PRIVETERRE:  Objection.
6    A.    Yes.
7    Q.    What other facility?
8    A.    One Police Plaza.
9    Q.    Any other facility?
10    A.    I don't know.
11    Q.    Where did you first learn about
12  the policy that 26 Federal Plaza had?
13    A.    Where?
14    Q.    Yes.
15    A.    At my office.
16    Q.    How did you learn that?  Did
17  someone tell you?  Did you read a memo?  Did
18  you receive a phone call?
19    A.    I was informed by a supervisor.
20    Q.    Do you remember which supervise
21  told you about it?
22    A.    No.
23    Q.    Pursuant to that policy of
24  inspecting badges at 26 Federal Plaza, are you
25  aware of approximately how many arrests had

Page 90

1        M. Visconti
2   taken place?
3        A.    No.
4        Q.    Do you remember when that policy
5   began?
6        A.    No.
7        Q.    Is it safe to say that Mr.
8   Dikler's arrest was not the only arrest for
9   violation of that policy?
10        A.    Yes.
11             MS. PRIVETERRE:   Objection to
12   the form.
13        Q.    Can you estimate how many more
14   people were arrested?
15        A.    No.
16             MR. ZELMAN:   No further
17   questions.   Thank you.
18             MR. SILVERMAN:   I have no
19   questions.   Thank you.
20             THE WITNESS:  Thank you.
21
22             (Whereupon, at 1:15 p.m., the
23   examination of the witness was
24   concluded.)
25        _____

Page 91

1        M. Visconti
2             MICHAEL VISCONTI
3   Subscribed and sworn to
4   before me this _____ day
5   of _____, 2008.
6   _____
7    Notary Public
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 92

1
2        C E R T I F I C A T I O N
3
4
5        I, MINDY CORCORAN, hereby
6   certify that the within was held before
7   me on the 21st day of May, 2008.
8        That the testimony was taken
9   stenographically by myself.
10        That the within transcript is a
11   true and accurate record.
12        That I am not connected by blood
13   or marriage with any of the parties.  I
14   am not interested directly or indirectly
15   in the matter in controversy.
16        IN WITNESS WHEREOF, I have
17   hereunto set my hand this 21st day of
18   May, 2008.
19
20
21        MINDY CORCORAN
22
23
24
25

Page 93

1             I N D E X
2        WITNESS: MICHAEL VISCONTI
3   EXAMINATION                    PAGE
4     By Mr. Zelman            5
5
6
7   PLAINTIFFS'
8   EXHIBITS  DESCRIPTION         PAGE
9   1 Document dated March 22,
10     2006                80
11   2 Document              83
12
13        DIRECTIONS
14        PAGE LINE
15        (None)
16
17        REQUESTS
18
19        PAGE LINE
20
21        (None)
22
23
24
25

Page 94

ERRATA SHEET FOR TRANSCRIPT

PAGE/LINE          CORRECTION

Page 95

MICHAEL VISCONTI

Subscribed and sworn to

before me this _____

day of _____, 2008.

NOTARY PUBLIC