UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------X
YEVGENIY DIKLER,

                              PLAINTIFF,
                              Docket No.:
                              07 CIV 5984


          -against-


THE CITY OF NEW YORK,
DETECTIVE MICHAEL VISCONTI Shield # 06482,
SECURITY OFFICER WILSON VEGA,
HWA INC.,

                              DEFENDANTS.
-----------------------------------------------X


                    DATE: April 2, 2008
                    TIME: 10:50 a.m.



      EXAMINATION BEFORE TRIAL of the
Plaintiff, YEVGENIY DIKLER, taken by the
Defendants, pursuant to a Court Order, held at
the offices of LESTER SCHWAB KATZ & DWYER, LLP,
120 Broadway, New York, New York 10271, before
a Notary Public of the State of New York.



Page 2

APPEARANCES:

LAW OFFICE OF DAVID A. ZELMAN
    Attorney for the Plaintiff
    612 Eastern Parkway
    Brooklyn, New York 11225

MICHAEL A. CARDOZO, ESQ.
    CORPORATION COUNSEL
    Attorney for the Defendants
    THE CITY OF NEW YORK and
    MICHAEL VISCONTI Shield # 06482
    100 Church Street
    New York, New York 10007
    BY: JOYCE CAMPBELL PRIVETERRE,
    Assistant Corporation Counsel

LESTER SCHWAB KATZ & DWYER, LLP
    Attorneys for the Defendants
    SECURITY OFFICER WILSON VEGA and
    HWA INC.
    120 Broadway
    New York, New York 10271
    BY: LEONARD S. SILVERMAN, ESQ.

        *       *       *

Page 3

FEDERAL STIPULATIONS

    IT IS HEREBY STIPULATED AND AGREED
By and between the counsel for the respective
parties hereto, that the filing, sealing, and
certification of the within deposition shall
Be and the same are hereby waived;

    IT IS FURTHER STIPULATED AND AGREED
That all objections, except as to the form
Of the question, shall be reserved to the times
Of the trial.

    IT IS FURTHER STIPULATED AND AGREED
That the within deposition may be signed before
Any Notary Public with the same force and
effect
As if signed and sworn to before this court.

        *       *       *       *

Page 4

                DIKLER
    Y E V G E N I Y   D I K L E R , called as a
witness, having been first duly sworn by a
Notary Public of the State of New York, was
examined and testified as follows:
EXAMINATION BY
MS. PRIVETERRE:
    Q.   Please state your name for the
record.
    A.   Yevgeniy Dikler.
    Q.   Where do you reside?
    A.   1902 81st Street, Apartment 1F,
Brooklyn, New York 11214.
    Q.   Good morning, Mr. Dikler.
    A.   Good morning.
    Q.   My name is Joyce Campbell
Priveterre and I am an attorney with the
New York City Law Department.  I represent the
City of New York and also Detective Visconti
and I'm going to ask you some questions about
the lawsuit that you've commenced.
        Before I begin with my questioning,
I just have a few ground rules that I want to
discuss with you about these proceedings.
First and foremost is to keep your responses

Page 5

                DIKLER
verbal.  That is, don't nod your head or shake
your hands, the Court Reporter can't take down
gestures, so you have to speak your responses;
do you understand that?
    A.   I understand.
    Q.   And will you comply?
    A.   Yes.
    Q.   Okay.  Also if you anticipate what
I'm going to ask you, please allow me the
courtesy of completion because we want a clean
record so the Court Reporter can take down my
questions in its entirety and then take down
your response in its entirety; do you
understand that?
    A.   I understand.
    Q.   And will you comply?
    A.   Yes.
    Q.   If I ask you a question and you
don't understand that, just say so, I'm not
trying to trick you, say I don't understand or
please ask that again and I will; will you do
that?
    A.   I will.
    Q.   If you need a break, please say so.

Legal Ease Reporting, Inc.
212-481-3500

DIKLER

1
2  The only caveat is that you should not ask for
3  a break when there's a pending question so you
4  are obliged to give your response and then you
5  can have your break; do you understand?
6      A.  I understand.
7      Q.  And will you comply?
8      A.  Yes.
9      Q.  Are you taking any medications
10 presently?
11     A.  Yes.
12     Q.  What are you taking?
13     A.  Diovan 160.
14     Q.  How do you spell that; do you know?
15     A.  D-I-O-V-A-N 160.
16     Q.  Milligrams?
17     A.  This is the name, I don't know.
18     Q.  Okay.  Diovan 160.  And what is
19 that prescribed for?
20     A.  High blood pressure.
21     Q.  Okay.  Any other medications?
22     A.  No.
23     Q.  Did you take your Diovan this
24 morning?
25     A.  Not yet.

DIKLER

2      Q.  Have you taken any other
3  prescription drugs or non-prescription drugs
4  this morning?
5      A.  No.
6      Q.  Have you had anything to drink this
7  morning?
8      A.  Coffee.
9      Q.  Okay.  Any alcoholic beverages?
10     A.  No.
11     Q.  Is there anything that would
12 prevent you from testifying truthfully and
13 accurately this morning?
14     A.  No.
15     Q.  Okay.  When were you diagnosed with
16 high blood pressure?
17     A.  Couple years ago.
18     Q.  Couple, is that two, three or more?
19     A.  Two years ago, approximately.
20     Q.  And who was the physician that
21 prescribed the Diovan?
22     A.  Dr. Andrew Weiss.
23     Q.  Are you still consulting with him?
24     A.  Two weeks ago I change my doctor
25 but.

DIKLER

1
2      MR. ZELMAN:  Just try to answer the
3  question.  Are you still consulting with
4  him?
5      THE WITNESS:  I will.
6      Q.  You intend to go back to him?
7      A.  Yes.
8      Q.  Two weeks ago, you changed your
9  primary care physician?
10     A.  Yes.
11     Q.  And he was your primary care
12 physician; is that right?
13     A.  Yes.
14     Q.  Is there a reason that you changed
15 two weeks ago?
16     A.  I got problem with my low back so I
17 change for -- I make some osteopath doctor my
18 primary physician.
19     Q.  And what doctor is that, what's the
20 doctor's name?
21     A.  Michael Riskevich.
22     Q.  Can you help me with the last name?
23 If not, we'll leave a blank in the record.
24     A.  R-I-S-C, no, no (indicating), it's
25 much easier for me to put on the paper.

DIKLER

1
2      Q.  Okay.
3      A.  (Indicating).
4      MR. ZELMAN:  If you don't remember,
5  you don't remember.
6      THE WITNESS:  I remember.
7      A.  (Indicating).
8      MS. PRIVETERRE:  Mr. Dikler has
9  handed me a piece of paper with the
10 doctor's last name written out,
11 R-I-S-K-E-V-I-C-H.
12     Q.  Are there any other physicians that
13 you are presently treating with?
14     A.  No.
15     Q.  What's your date of birth, sir?
16     A.  May 15, 1961.
17     Q.  And where do you presently reside?
18     A.  I'm sorry, I don't understand.
19     Q.  Where do you live?
20     A.  1902 81st Street, Apartment 1F like
21 Frank, Brooklyn, New York 11214.
22     Q.  Are you married?
23     A.  Yes.
24     Q.  To whom?
25     A.  Svetlana Anuchina, A-N-U-C-H-I-N-A.

Page 10

DIKLER

1
2    Q.   Do you have any children?
3    A.   Yes.
4    Q.   How many?
5    A.   Four.
6    Q.   What are their names and ages?
7    A.   Igor, age 27 now.  Michael, age 25
8    now.  Jennifer, nine.  And Maria, six.
9    Q.   How long have you resided at
10   1902 81st Street?
11   A.   Since 2000.
12   Q.   Are you presently employed?
13   A.   Yes.
14   Q.   By whom?
15   A.   MTA.
16   Q.   What's your job title?
17   A.   Bus operator.
18   Q.   Since when have you been a bus
19   operator?
20   A.   I was hired January 12, 2004.
21   Q.   You hold a Class D license?
22   A.   Yes.
23   Q.   Any other licenses?
24   A.   I'm sorry.  Which class?
25   Q.   D as in Diane, is it D?

Page 11

DIKLER

2    A.   My license BP.  Commercial, B is
3    commercial, and P, passenger.
4    Q.   Do you hold any other licenses
5    professional or otherwise?
6    A.   No.
7    Q.   When did you obtain the Class B
8    license?
9    A.   Around 2000, I don't remember
10   exactly.
11   Q.   Where were you born?
12   A.   Soviet Union.
13   Q.   And when did you first come to the
14   United States to live permanently?
15   A.   1996.
16   Q.   Are you a citizen of the United
17   States?
18   A.   Yes.
19   Q.   Since when?
20   A.   Since 2002.
21   Q.   2002?
22   A.   Yes.
23   Q.   Is your wife also a citizen?
24   A.   Not yet.
25   Q.   Where were you employed prior to

Page 12

DIKLER

1
2    working as an MTA bus operator?
3    A.   I was working for Empire Auto
4    Corporation in New Jersey.
5    Q.   By the way, let me just step back.
6    What is your present bus route?
7    A.   You mean now?
8    Q.   Yes.
9    A.   B44, Nostrand Avenue.
10   Q.   Okay.  What was your job title with
11   Empire Auto Corporation?
12   A.   Truck driver.
13   Q.   For how long were you a truck
14   driver?
15   A.   Since 1997.
16   Q.   Did you have any other employment
17   since coming to the United States other than
18   the MTA and Empire Auto Corporation?
19   A.   Some period I work for myself like
20   self employee.
21   Q.   Doing what?
22   A.   Delivery on my own truck.
23   Q.   Since coming to the United States,
24   have you ever been a recipient of any public
25   aid or welfare?

Page 13

DIKLER

1
2    A.   No.
3    Q.   How about any Social Security
4    benefits, any disability benefits?
5    A.   No.
6    Q.   Prior to commencing this lawsuit,
7    have you ever sued anyone before?
8    A.   Yes.
9    Q.   When was that?
10   A.   This was a car accident in 1999.
11   Q.   And how did that lawsuit resolve?
12   A.   We win.
13   Q.   Was this your private vehicle or
14   was this while on the job?
15   A.   It was my private vehicle and I was
16   in the passenger, my wife drive.
17   Q.   I'm going to ask you some questions
18   about the incident, the date of the incident
19   being March 22nd 2006; is that correct?
20   A.   Correct.
21   Q.   Did you go to work on March 22nd
22   2006 or had you the day off?
23   A.   I have to work but I work late.
24   Q.   When you say late, what do you
25   mean?

4 (Pages 10 to 13)

Page 14

DIKLER

1
2     A.   I start like 4:00 p.m.
3     Q.   That was your shift?
4     A.   Yes.
5     Q.   From 4:00 p.m. to what?
6     A.   To 12:00.
7     Q.   What did you do earlier in the day
8   on March 22nd 2006?
9     A.   My wife, she got appointment on
10  federal building, Federal Plaza 26 and I
11  followed her.
12    Q.   And what was the reason for her
13  appointment at 26 Federal?
14    A.   It was her green card case.
15    Q.   Was she applying for the green
16  card?
17    A.   Yes.
18    Q.   Were you there for what's called
19  Stokes interview, do you know what that is?
20    A.   I don't understand, I'm sorry.
21    Q.   Withdrawn.  Were you being
22  interviewed jointly or was this just for your
23  wife?
24    A.   Jointly because petition from her
25  green card was from me.

Page 15

DIKLER

2     Q.   Okay.  Petitioning for your wife to
3   get a green card?
4     A.   Yes.
5     Q.   Had you ever been to 26 Federal
6   before?
7     A.   Yes.
8     Q.   When was the last time prior to
9   3/22/06 that you had been there?
10    A.   I know I was in June of 2005,
11  probably it was the last time, I don't remember
12  exactly.
13    Q.   And what was the purpose for that
14  visit in June 2005?
15    A.   Appointment for my wife's case.
16    Q.   Do you remember the date in June of
17  '05?
18    A.   Probably I'm wrong, June 5th,
19  something like that.
20    Q.   I don't want you to guess.  We'll
21  leave a blank in the record.
22                      _
23    Q.   Had you any problems getting into
24  the building that date in June 2005?
25    A.   Security officer realize I got

Page 16

DIKLER

1
2   shield and he stop me.
3     Q.   And what kind of shield did you
4   have?
5     A.   It was the inside my wallet, like
6   parts of the wallet, that shield like New York
7   City emblems and words New York City Transit,
8   my badge number and title operator.
9     Q.   Did anything else happen on that
10  date in June 2005?
11    A.   The security officer, he call for
12  federal security service detective.
13    Q.   Now, you realize we're talking
14  about the June 2005 date, not the present?
15    A.   Yes.
16    Q.   And then what happened?
17    A.   Federal security service detective
18  check my work ID, my pass, checked the badge
19  and he tell me and security officer the badge
20  is good and all papers is good.  He give me all
21  my stuff back and he release me.
22    Q.   How long were you detained, how
23  long did this whole thing take?
24         MR. ZELMAN:  In 2005?
25         MS. PRIVETERRE:  Yes.

Page 17

DIKLER

1
2     A.   Like five, ten minutes altogether.
3     Q.   Did the security officer say
4   anything else to you?
5     A.   No.
6     Q.   Okay.  What about the detective?
7     A.   Nothing, have a nice day.
8     Q.   How was the detective dressed; do
9   you remember?
10    A.   Dark blue uniforms.
11    Q.   Who told you that this was a
12  detective?
13         MR. ZELMAN:  Objection.  You could
14         answer.  If anyone told you this was a
15         detective.
16    A.   The security officer, he call by
17  radio for detective, I don't remember exactly.
18    Q.   So you don't know whether or not
19  this individual was a detective?
20    A.   Yes.
21         MR. ZELMAN:  Yes, you do?  Or yes,
22         you don't?
23         THE WITNESS:  I'm not sure it was
24         detective.
25    Q.   Okay.  With respect to the March

Legal Ease Reporting, Inc.
212-481-3500

Page 18

DIKLER

1
2  22nd '06 incident, that's what I'm going to ask
3  you about now.
4      A.  I understand.
5      Q.  When did you arrive at 26 Federal
6  on 3/22/06?
7      A.  After nine o'clock.
8      Q.  9:00 a.m.?
9      A.  Yes.
10      Q.  Did you have a specific
11  appointment?
12      A.  We book the appointment by
13  internet.
14      Q.  Did you have to wait on the line in
15  order to get into the building?
16      A.  Yes.
17      Q.  What happened when you stepped
18  inside of the building?
19      A.  When I come to the building, it's
20  like security point, so the people go through
21  the metal detector, and the personal things go
22  on different table through the screen machine.
23      Q.  Did you empty out your pockets to
24  put on the conveyor belt?
25      A.  I put all my personal things in

Page 19

DIKLER

1
2  some basket and put on the table for screening
3  machine.
4      Q.  And what kinds of personal things
5  did you empty out onto the basket?
6      A.  My phone, my wallet -- no, I'm
7  sorry.  Wallet still in the pocket of jacket.
8  My jacket.  Some change from my pocket, all
9  metal things.
10      Q.  Did you have to take off your belt?
11      A.  I don't remember.
12      Q.  Okay.  Did anyone at the security
13  checkpoint say anything to you about any of the
14  items in basket?
15      A.  Yes.
16      Q.  Okay.  Do you recall who said
17  anything to you, who was this person?
18      A.  Security officer.
19      Q.  Okay.  Can you describe this
20  individual?
21      A.  Black male, around 30, skinny.
22      Q.  Did he have any facial hair?
23      A.  Not really.
24      Q.  I'm sorry?
25      A.  Not really.

Page 20

DIKLER

1
2      Q.  Like a mustache or a beard or
3  goatee?
4      A.  I don't remember.
5      Q.  Was he wearing glasses?
6      A.  No.
7      Q.  What was his approximate height?
8      A.  5'8".
9      Q.  How tall are you, sir?
10      A.  5'7".
11      Q.  What is your present weight?
12      A.  215.
13      Q.  Okay.  What was he wearing?
14      A.  Brown uniforms.  Jacket, brown
15  jackets, all browns.
16      Q.  Light brown or dark brown?
17      A.  I don't remember, brown.  Dark.
18  Dark brown.
19      Q.  What did this individual say to
20  you?
21      A.  He ask me have I some shields in my
22  pockets, in my jacket.
23      Q.  And what did you say in response?
24      A.  Yes.
25      Q.  What did he do or say after that?

Page 21

DIKLER

1
2      A.  He called to federal security
3  office in the same building.
4      Q.  How did he call; did he use a radio
5  or did he call out?
6      A.  By radio.
7      Q.  Did he say anything to you before
8  calling on the radio?
9      A.  Wait aside.
10      Q.  So you had to step aside?
11      A.  Yes.
12      Q.  Okay.  What about your wife?
13      A.  She stay with me.
14      Q.  So had she gone through already or
15  was she behind you in the line?
16      A.  We was in different lines because
17  the one line to the building and after that
18  they divide for a few lines on different
19  checkpoints.
20      Q.  Okay.  Was she present when you
21  were emptying out your items into the basket?
22      A.  I'm sorry?
23      Q.  She was not near you as you emptied
24  out your items into the basket?
25      A.  I don't remember.

Legal Ease Reporting, Inc.
212-481-3500

Page 22

DIKLER

1
2  Q.  Was she standing near you when the
3  security officer addressed you about the
4  shield?
5  A.  Can you repeat, please.
6  MS. PRIVETERRE:  Can you repeat
7  that for him.
8  (Whereupon, the referred to
9  question and answer was read back by the
10  Reporter.)
11  A.  She was not so far.  I don't
12  remember exactly but.
13  Q.  Could you approximate how far she
14  was standing from you?
15  A.  Few feet.
16  Q.  Do you recall what the security
17  officer said over the radio?
18  A.  I don't remember.
19  Q.  Okay.  How long did you wait before
20  someone responded?
21  A.  Very short.
22  Q.  What is very short?
23  A.  One minute, probably two minutes.
24  Q.  Did someone come in response?
25  A.  Yes.

Page 23

DIKLER

2  Q.  Okay.  And who came?
3  A.  White male.
4  Q.  About how old?
5  A.  My age, around 45.
6  Q.  Height and build?
7  A.  I'm sorry?
8  Q.  What was his height and build?
9  A.  Approximately like me, little bit
10  higher.  Around six feet.
11  Q.  How much did you weigh at the time
12  of this incident, 3/22/06?
13  A.  What do you mean?
14  Q.  How much did you weigh at the time
15  of this incident?
16  A.  190, 195.
17  Q.  Did this individual say anything to
18  you?
19  A.  He check my ID, he took my ID, he
20  took my driver license and he took all my
21  wallet.
22  Q.  Well, was your ID and your driver's
23  license inside of your wallet?
24  A.  Yes.
25  Q.  Did this white male remove the

Page 24

DIKLER

1
2  wallet from the basket or was he handed the
3  wallet?
4  A.  No, the wallet was on security
5  officer, so security officer give my wallet to
6  federal security detective.
7  Q.  How do you know it was federal
8  security?
9  A.  He got chevron on his shirt.
10  Q.  What color was his uniform?
11  A.  Dark blue.
12  Q.  Was it a dark blue jacket?
13  A.  This was dark blue shirt and pants.
14  It was complete uniform.
15  Q.  Did he have any facial hair?
16  A.  It was a little bit big face, white
17  male.
18  Q.  Did he have any mustache, any beard
19  or goatee?
20  A.  I don't remember now.
21  Q.  Was he wearing glasses?
22  A.  No.
23  Q.  What color was his hair?
24  A.  I don't remember.
25  Q.  And did you see this individual

Page 25

DIKLER

1
2  take your ID out of your wallet and take your
3  driver's license out of your wallet?
4  A.  He take out all papers from my
5  wallet, he give me back my credit cards and he
6  left with him all my ID.
7  Q.  Did he ask you any questions about
8  what he removed from the wallet?
9  A.  I don't understand.
10  Q.  Did he ask you questions about the
11  items that he took from your wallet?
12  A.  Only about the badge.
13  Q.  What did he ask you about the
14  badge?
15  A.  Why I got it.
16  Q.  What kind of badge was it?
17  A.  It's the badge.
18  MR. ZELMAN:  Objection to form.
19  You can answer.
20  A.  Gold, the gold color, the emblem of
21  City of New York on the top.  The New York City
22  Transit Authority words, badge number, my
23  personal badge number and title operator on the
24  bottom, that's it.
25  Q.  Was this a badge issued by the MTA?

Page 26

DIKLER

1
2      A.   I make order for this badge in my
3   depot.
4      Q.   That's not my question.  Was this
5   badge issued by the MTA?
6         MR. ZELMAN:  Objection.  You can
7      answer.  If you understand.
8      A.   I understand the question.  I
9   bought this badge on my depot property from I
10  think official vendor.
11     Q.   Do you understand what I'm asking?
12  Did the MTA issue you this badge?  It's a yes
13  or a no.
14        MR. ZELMAN:  Objection.
15     A.   I don't know.
16     Q.   You don't know if the MTA issued
17  you this badge?
18        MR. ZELMAN:  Objection.
19     A.   I'm not sure it's MTA but I buy, I
20  bought this badge on my depot, the guy who sell
21  the different MTA stuff is all MTA logos, MTA,
22  like hats, jackets, T-shirts, wallets.  The
23  letter cases, letter, what's that?  For badges,
24  shoulder badges, and that's it.
25     Q.   Where is the human resources

Page 27

DIKLER

1
2   department for the MTA; do you know?
3      A.   Manhattan.  I was hired on the job
4   in Brooklyn.
5         MR. ZELMAN:  She's not asking where
6      you're hired, she's asking where is the
7      human resources department, if you know.
8      A.   I don't know.
9      Q.   You said you were hired in
10  Brooklyn, is that the Livingston Street
11  location?
12     A.   Yes.
13     Q.   And when you were hired at the
14  Livingston Street location, were you given
15  anything from the MTA at that time?
16     A.   Yes.
17     Q.   What items were you given?
18     A.   The pass, another name work ID and
19  the shoulder badge.
20     Q.   Could you describe for me the
21  shoulder badge?
22     A.   The badge, it's like MTA logo.  My
23  personal badge number and the title operator.
24     Q.   Anything else that you were given
25  at that time?

Page 28

DIKLER

1
2      A.   The key from wheelchair lift,
3   that's it.
4      Q.   With respect to the other badge
5   that you described, gold color with the emblem
6   of the City of New York and New York City
7   Transit Authority badge number and title, did
8   you get that badge at the Livingston Street
9   location?
10     A.   No.
11     Q.   Were you instructed by anyone at
12  the Livingston Street location to buy another
13  badge?
14     A.   No.
15     Q.   Did you require another badge in
16  order to perform your duties as a bus operator?
17     A.   I don't understand the question.
18        MS. PRIVETERRE:  Can you repeat
19     that.
20        (Whereupon, the referred to
21     question was read back by the Reporter.)
22     A.   No.
23     Q.   When did you get the second badge?
24     A.   Spring 2005.
25     Q.   You don't recall the month?

Page 29

DIKLER

1
2      A.   I don't remember exactly.
3      Q.   And from whom did you purchase this
4   other badge?
5      A.   The vendor.
6      Q.   What was the vendor's name?
7      A.   I don't know.
8      Q.   Where is the vendor's office
9   located?
10     A.   I don't know.
11     Q.   Where did you first meet this
12  vendor?
13     A.   He sell different stuff in my depot
14  once per two weeks for a long time.  Every two
15  weeks it was like tables inside the depot.
16     Q.   Which depot is this?
17     A.   Flatbush depot.
18     Q.   What's the vendor's name?
19     A.   I don't know.
20     Q.   When is the last time you met with
21  the vendor?
22     A.   I don't know.
23     Q.   Did you purchase anything else from
24  the vendor?
25     A.   Some souvenir stuff.

8 (Pages 26 to 29)

DIKLER

1
2    Q.   What kind of souvenirs?
3    A.   Like small toys, buses, because --
4  I'm sorry, that's it.
5    Q.   Anything else?
6    A.   Some T-shirts, MTA logos.
7    Q.   You said that the vendor sold the
8  items at the depot, was he inside of the
9  building or outside of the building or
10 somewhere else?
11   A.   Inside the building in the swing
12 room.
13   Q.   I'm sorry?
14   A.   Swing room, restroom for the bus
15 operator, swing room.
16   Q.   The swing room?
17   A.   Yes.
18   Q.   Okay.  Is that like a recreational
19 room?
20   A.   Yes, it's a TV, it's pool tables,
21 it's diner's tables.
22   Q.   Do you have any invoices for any
23 bills of sale for that badge that you purchased
24 from the vendor?
25   A.   I have one but I don't know where

DIKLER

2  it is.
3        MS. PRIVETERRE:  Okay.  I'm going
4  to call for production and I will
5  memorialize this demand in writing.
6        MR. SILVERMAN:  I join in that
7  request, I'm going to memorialize it as
8  well.
9        MR. ZELMAN:  He said he doesn't
10 know where it is.
11       MS. PRIVETERRE:  Well, he can think
12 about it when he leaves today.
13       MR. ZELMAN:  Are you sure you have
14 it or you don't know?
15       THE WITNESS:  This badge, you can't
16 just buy it, you make an order.
17       MR. ZELMAN:  Wait for the question.
18 Let's move on.
19   Q.   How did you place the order?
20   A.   I place the order from this vendor.
21   Q.   Did he show you any books or
22 magazines or catalogs?
23   A.   He got some samples.
24   Q.   He showed you a sample?
25   A.   Yes, this was different form,

DIKLER

1
2  different size.
3    Q.   Do you recall whether or not the
4  badge you chose had a specific catalog number
5  or style, name or number?
6    A.   No, I just point my finger on that.
7    Q.   Why did you choose the badge that
8  you chose?
9    A.   Because it was like part of the
10 wallet inside the wallet, you can't take it out
11 because it takes long time because it's already
12 part of the wallet so it's always with you and
13 you not supposed to be special like wear some
14 badge, it just I like the style and it was
15 comfortable for me.
16   Q.   So the badge came with inside of a
17 wallet?
18   A.   Yes.  You buy the wallet, you make
19 order for wallet.
20       MR. ZELMAN:  The question is, did
21 the badge come inside the wallet?
22   A.   Yes.
23   Q.   Did you have to purchase or make
24 two separate orders, one for the badge and one
25 for the wallet?

DIKLER

1
2    A.   No.
3    Q.   So how did the vendor know which
4  wallet to put with the badge?
5        MR. ZELMAN:  Objection.  You can
6  answer.
7    A.   He got the samples.  I show him
8  exactly what I want.
9    Q.   So you pointed out what badge and
10 what wallet?
11   A.   No, you can't put separate wallet
12 and badge.  It's like one piece.
13   Q.   Okay.  What color was the wallet?
14   A.   Black.
15   Q.   Was this leather?
16   A.   Yes.
17   Q.   How much did it cost you?
18   A.   $40 when you make an order, and six
19 weeks when you pick it up the stuff, another
20 $45.
21   Q.   Was the badge gold plated?
22   A.   Yes.
23   Q.   Do you have the badge with you
24 today?
25   A.   When I was arrested, the badge --

Page 34

DIKLER

1
2     MR. ZELMAN:  Do you have the badge
with you today?
4     THE WITNESS:  No.
5     Q.   Have you purchased another badge?
6     A.   No.
7     Q.   Do you still have the badge that
8  was issued to you by the MTA?
9     A.   Yes.
10    Q.   And did you wear that badge when
11 you were working as a bus operator?
12    A.   Yes.
13    Q.   Did you believe at the time that
14 you were purchasing this second badge that this
15 was being issued, this badge was being issued
16 by the MTA?
17       MR. ZELMAN:  Objection.  You can
18 answer.
19    A.   I don't know.
20    Q.   You didn't?
21    A.   I did know.
22    Q.   You did know?
23    A.   I did know.
24    Q.   You did know what?
25       MR. ZELMAN:  Objection.  You didn't

Page 35

DIKLER

2     know?  Or you did know?
3     A.   I did know -- I didn't know, I
4  didn't know.  When I bought this badge, I
5  didn't know this is from MTA or not.
6     Q.   Did you ask the vendor?
7     A.   No.
8     Q.   Why not?
9        MR. ZELMAN:  Objection.
10    A.   I was sure he sell the legal stuff
11 inside the depot.
12    Q.   Did he make that representation to
13 you?
14    A.   I'm sorry?
15    Q.   Did he tell that to you, that this
16 was legal?
17    A.   I don't remember.
18    Q.   Did he, did the vendor tell you
19 that what he was selling was issued by the MTA?
20    A.   He didn't.
21    Q.   Did you know any other bus operator
22 that had purchased from him?
23    A.   Yes.
24    Q.   Any friends of yours?
25    A.   It's not my friends but bus

Page 36

DIKLER

1
2  operators.
3     Q.   Okay.  Would you carry the gold
4  plated badge that you purchased from the
5  vendor, would you carry that while you were
6  working as a bus operator?
7     A.   It was inside my wallet.  It's
8  always with me.
9     Q.   And what was your purpose for
10 purchasing this second badge?
11    A.   It was actually two reasons.
12 First, almost all bus operators which I know,
13 they got these badges, and second one, when you
14 on work, I mean in uniform, you got the
15 shoulder badges, it's like proof of your work,
16 but when you civil clothing, out of a job, this
17 is like proof of your job.
18    Q.   Who told you that this second badge
19 was proof of your employment?
20       MR. ZELMAN:  Objection.
21    A.   Nobody tell me that.
22    Q.   Did you ever use this second badge
23 for that purpose, to prove that you worked as a
24 bus operator?
25    A.   No.

Page 37

DIKLER

1
2     Q.   Did you ever speak to anyone at
3  Livingston Street about purchasing this second
4  badge?
5     A.   No.
6     Q.   Have you subsequently purchased
7  anything from that vendor?
8     A.   From this vendor?
9     Q.   Yes, other than the souvenirs and
10 the badge.
11    A.   Yes, from this and from another
12 vendor too.
13    Q.   From the same company, do you know?
14    A.   I don't know.  They was on
15 different days.
16    Q.   When is the last time you made such
17 a purchase from a vendor?
18       MR. ZELMAN:  Objection.
19    A.   I don't remember.
20    Q.   You said that part of your reason
21 was that all bus operators have this badge?
22    A.   Almost everyone that I know.
23    Q.   How many people would you say that
24 you know that have purchased such a badge?
25    A.   I don't know.

10 (Pages 34 to 37)

Page 38

DIKLER

1
2    Q.   More than five?
3    A.   Excuse me?
4    Q.   More than five?
5    A.   Yes.
6    Q.   More than ten?
7    A.   I am not sure.
8    Q.   Had you any occasion to show this
9  badge to anyone else?
10    A.   No.
11        MR. ZELMAN: Objection.
12    Q.   Did you show it to friends?
13    A.   Sometimes.  It's like souvenir.
14    Q.   Why do you say it's like a
15  souvenir?
16    A.   Because when I bought this badge,
17  it was souvenir.
18    Q.   Why did you require a souvenir if
19  you already had an MTA issued badge?
20        MR. ZELMAN: Objection.
21    A.   Like I said before, two reasons.
22  First, just because almost everyone got this
23  badge.  And second one, just like it show you
24  work for MTA.
25    Q.   You were issued an ID from the MTA,

Page 39

DIKLER

2  correct?
3    A.   Yes.
4        MR. ZELMAN: Objection.
5    Q.   Didn't that prove that you worked
6  for the MTA?
7    A.   It's proof.
8    Q.   What else did you carry in this
9  wallet that had the MTA badge that you
10  purchased?
11    A.   Credit cards, ID, some money.
12    Q.   Was this the only wallet that you
13  were carrying?
14    A.   Yes.
15    Q.   Other than friends, did you show
16  the badge to anyone else?
17    A.   No.
18    Q.   Do you recall the name of the
19  second vendor that you purchased from?
20    A.   I don't know.
21    Q.   Can you approximate how many
22  different vendors you have purchased items
23  from?
24        MR. ZELMAN: Objection.
25    A.   Two.

Page 40

DIKLER

1
2    Q.   Just those two?
3    A.   In my depot, I know about two, I
4  saw two different vendors that sell the same
5  stuff.
6    Q.   Did you ever visit any other depots
7  to make other purchases?
8    A.   No.
9    Q.   You wear a uniform as a bus
10  operator, correct?
11    A.   Yes.
12    Q.   And where do you obtain your
13  uniforms?
14    A.   I'm sorry?
15    Q.   Where do you get your uniforms
16  from?
17    A.   From MTA.
18    Q.   Would that include your jacket,
19  your pants?
20    A.   Everything.
21    Q.   Your shirts?
22    A.   Everything.
23    Q.   And this is the MTA uniform, the
24  bus operator uniform?
25    A.   Yes.

Page 41

DIKLER

1
2    Q.   Does the jacket have the insignia
3  or any words that indicate MTA?
4    A.   MTA logo on the sleeve, that's it.
5    Q.   Have you ever purchased a uniform
6  from a vendor?
7    A.   No.
8    Q.   Did either of these vendors that
9  you purchased items from, did they tell you
10  that they worked with the MTA?
11    A.   No.
12    Q.   Did they tell you that they had
13  been authorized to sell items by the MTA?
14        MR. ZELMAN: Objection.
15    A.   I don't know, but they sell the
16  stuff inside the MTA depot.
17    Q.   Was it your understanding that the
18  second badge was an official MTA shield?
19    A.   Now I know that.
20    Q.   Know that what?
21    A.   Now, you know, it's unofficial.
22    Q.   It's an official?
23    A.   Now I know that.
24        MR. ZELMAN: Unofficial.
25    Q.   When did you first become aware

11 (Pages 38 to 41)

Page 42

DIKLER

1
2  that it's an unofficial badge?
3      A.  When I was arrested.
4      Q.  Prior to being arrested, you
5  thought that it was an official badge?
6      A.  Yes.
7      Q.  Why?
8      A.  I'm sorry, can you repeat the
9  question.
10         (Whereupon, the referred to
11  question was read back by the Reporter.)
12      A.  I'm sorry, can you rephrase this
13  question?
14      Q.  Sure.  What was the basis of your
15  belief that the second badge was an official
16  MTA badge?
17         MR. ZELMAN:  Objection.
18      A.  Police detective tell me this is a
19  fake badge, police detective tell me.
20      Q.  When were you told this by a police
21  detective?
22      A.  When they arrest me.
23      Q.  What did he say?
24      A.  They say you have fake badge.
25         MR. ZELMAN:  Let's take five

Page 43

DIKLER

2  minutes before you ask the next
3  question.
4         MS. PRIVETERRE:  I don't want you
5  coaching him because you didn't like how
6  that came out.
7         MR. ZELMAN:  There's no question
8  pending.
9         MS. PRIVETERRE:  I am going to
10  rephrase the question, it's not
11  complete, allow me the courtesy of
12  rephrasing the question because I think
13  there is some misunderstanding.
14         MR. ZELMAN:  There is obviously.
15         MS. PRIVETERRE:  So I want to clean
16  it up.
17         MR. ZELMAN:  How many questions
18  before I can go to the bathroom?
19         MS. PRIVETERRE:  Let me clean this
20  up and you can take your break.
21      Q.  Mr. Dikler, I'm asking, it's your
22  testimony that following your arrest you first
23  became aware that the second badge was not an
24  official MTA badge?
25      A.  I don't understand the question.

Page 44

DIKLER

1
2         MR. ZELMAN:  Objection.
3      A.  I don't understand the question.
4      Q.  Is it your statement that following
5  your arrest, that's when you first were
6  informed that the second badge was not an
7  official MTA badge?
8         MR. ZELMAN:  Objection.
9      Q.  Is that correct?
10      A.  It's first time when I was
11  arrested, it's first time when I got some
12  knowledge about it's illegal badge.
13      Q.  Okay.
14      A.  Before, I didn't know that.
15      Q.  And my question was, what was the
16  basis for your understanding prior to your
17  arrest?  What was the basis for your
18  understanding that you had an official MTA
19  badge?
20         MR. ZELMAN:  Objection.
21      Q.  And I'm talking about the one you
22  purchased from the vendor.
23         MR. ZELMAN:  Objection.
24      A.  When I bought it from the vendor, I
25  didn't know it's unofficial MTA badge.

Page 45

DIKLER

1
2         MR. ZELMAN:  That's your answer.
3         Can I take a break now please?
4  Let's go outside.
5         (Whereupon, a short recess was
6  taken.)
7         MR. ZELMAN:  I think it's clear he
8  didn't understand the question.
9      Q.  Why did you believe that the second
10  badge was official?
11         MR. ZELMAN:  Objection.
12      A.  I don't know.
13      Q.  What other items did the vendor
14  sell or either vendor that you dealt with?
15         MR. ZELMAN:  Objection.
16      A.  Either vendor, different, some
17  jewelry with MTA logo, hair pieces, some
18  jewelry, bracelets with the buses.
19      Q.  Did all of the items have the MTA
20  or an MTA logo?
21      A.  You have to make order for this
22  jewelry because they put your pass number.
23      Q.  And in the order, do you also
24  specify the company?
25      A.  I don't remember.

12 (Pages 42 to 45)

Page 46

DIKLER

1
2    Q.   Well, when you were ordering the
3    second badge, did you have to specify that you
4    wanted MTA on the badge?
5    A.   It's already was some samples.
6    Q.   What kind of symbols?
7    A.   Samples of the badge, so you just
8    point your finger, I want that.
9    Q.   The sample that you pointed to, did
10   that already have the MTA, the words MTA
11   spelled out?
12   A.   New York City Transit Authority.
13   Q.   Yes, did it have that?
14   A.   Yes.
15   Q.   And did you see that on the other
16   items that the vendors were selling?
17   MR. ZELMAN:  Objection.
18   A.   Yes.
19   MS. PRIVETERRE:  Let me mark that
20   as an exhibit.
21   (Whereupon, the aforementioned
22   Documents were marked as Defendant's
23   Exhibit A-B for identification as of
24   this date by the Reporter.)
25   Q.   All right. Mr. Dikler, I'm going

Page 47

DIKLER

1
2    to show you what's been marked as Defendant's
3    Exhibit A and let you take a look at this
4    (indicating).
5    A.   (Indicating).
6    Q.   Do you recognize what's depicted?
7    A.   Yes.
8    Q.   And could you describe for the
9    record what you see?
10   A.   This the wallet completely open, my
11   driver license, the badge inside the wallet and
12   my work pass.
13   Q.   Okay. And though this is a black
14   and white copy, the badge that's in the middle
15   of the two cards you're saying is gold plated?
16   A.   It's gold plated and blue and white
17   New York City emblems on the center.
18   MR. SILVERMAN:  Is this the badge
19   that was taken from you on the date of
20   this incident?
21   THE WITNESS:  I'm sorry?
22   MR. SILVERMAN:  Do you believe this
23   to be a copy of the badge that was taken
24   from you on the day of the incident?
25   THE WITNESS:  I don't know.

Page 48

DIKLER

1
2    Q.   Did the vendor give you any
3    information about this style of this badge?
4    A.   No.
5    Q.   When you looked in the catalog or
6    the book and pointed out this badge --
7    A.   This was not catalog.
8    MR. ZELMAN:  You have to let her
9    finish the question.
10   Q.   What kind of then document did you
11   point at to indicate that you wanted that
12   badge?
13   A.   It was the badge.
14   Q.   Oh, the badge itself, so it was a
15   sample?
16   A.   It was a sample.  Different wallets
17   and different badges.
18   Q.   Were all of the samples that the
19   vendor showed you in this style?
20   A.   I don't remember.
21   Q.   And why is it that you chose this
22   particular style?
23   MR. ZELMAN:  Objection.
24   A.   I like it.
25   Q.   Okay.  Had you seen this styling

Page 49

DIKLER

1
2    anywhere else?
3    A.   No.
4    Q.   Do you know this style to be
5    referred to as the Starburst, is that a name
6    that's familiar to you?
7    A.   No.
8    Q.   Did the vendor describe the badge
9    in that manner?
10   A.   No.
11   Q.   So the sample, as you first saw it,
12   had this emblem?
13   A.   Yes.
14   Q.   With the exception of the badge
15   number?
16   A.   It was different number.
17   Q.   Okay.  And it was your
18   understanding that you could purchase the badge
19   and then have your number, your shield number
20   inserted; is that correct?
21   A.   When you put the order, he check
22   your pass, he check your badge number from MTA
23   and he receive your order.
24   Q.   Did the vendor sell handcuffs?
25   A.   I'm sorry?

Page 50

DIKLER

1
2  Q.  Handcuffs.
3  A.  No.
4  Q.  Did the vendor sell any guns?
5  A.  No.
6  Q.  Did the vendors sell any batons?
7  A.  No.
8  Q.  Did the vendors sell any items that
9  did not say New York City Transit Authority?
10  A.  Yes.
11  Q.  And what kinds of items were those?
12  A.  It was too many items, too much
13  different items, the watches, it's like two
14  tables like that, different stuff.  Not just
15  MTA logo stuff.
16  Q.  Did you see any other agency logo
17  on any of these other items?
18  A.  No.
19  Q.  I'm going to show you what's been
20  marked as Defendant's Exhibit B, I'll let you
21  take a look at that (indicating).
22  A.  (Indicating) This is my work badge.
23  Q.  Okay.  Is that the badge that was
24  issued to you at the Livingston Street
25  location?

Page 51

DIKLER

1
2  A.  Yes.
3  Q.  And is this the badge that you wear
4  when you are on the job as a bus operator?
5  A.  Yes.
6  Q.  Did you have the badge that's
7  depicted in Defendant's Exhibit B on the date
8  of the incident, March 22nd 2006?
9  A.  I don't have this badge with me.
10  Q.  And why were you not wearing that
11  or carrying that badge?
12  A.  I wear this badge when I wear
13  uniform only.
14  Q.  So you only wear what's depicted in
15  Defendant's Exhibit B when you're on the job?
16  A.  Correct.
17  Q.  Okay.  Can you give me a physical
18  description of the second vendor that you say
19  you purchased from?
20  A.  Old man, between 60 and 70.  My
21  height, and slim, gray hair, like haircut,
22  nice, glasses, gold glasses.  Always white
23  shirt and dark pants, that's it.
24  Q.  Did the second vendor have anything
25  identifying himself as an MTA employee?

Page 52

DIKLER

1
2  A.  Both of them, they got MTA passes.
3  Q.  What kind of MTA pass?
4  A.  Regular like I got, the same MTA
5  pass (indicating).
6  Q.  A bus operator pass?
7  A.  I don't know.  MTA pass.
8  Q.  How did you know it was an MTA
9  pass?
10  A.  By form, by color.  And when you
11  enter the MTA property, you must wear the MTA
12  pass on your chest.
13  Q.  Describe for me the form and the
14  color, is it the same that's depicted in
15  Defendant's Exhibit --
16  A.  Absolutely the same.
17  Q.  What color?
18  A.  The red color for men and blue
19  color for women.
20  Q.  When you say they were wearing it,
21  is this a pass that you can affix to your shirt
22  or your jacket?
23  A.  It doesn't matter.  Usually it's
24  like on some (indicating).
25  MR. ZELMAN:  Can you affix it to

Page 53

DIKLER

1
2  your shirt or your jacket?  That's the
3  question.
4  A.  If you got some clips, yes.
5  Q.  Is it sometimes worn in a card
6  holder around the neck?
7  A.  Yes.
8  Q.  Do you have any invoices from the
9  second vendor?
10  A.  No.
11  Q.  Do you have any business cards from
12  either vendor?
13  A.  No.
14  Q.  Did you purchase any other items
15  from either vendor that were related to your
16  work as a bus operator?
17  A.  No.
18  Q.  Stepping back to what happened at
19  26 Federal.  The white male security officer,
20  after checking your ID and your driver's
21  license, did he say anything to you?
22  A.  He let me go to the appointment
23  with my wife.  But he tell me I have to come
24  back to security office when appointment will
25  be finished.

14 (Pages 50 to 53)

Page 54

DIKLER

1
2    Q.   How long was the appointment?
3    A.   I don't remember, 30 minutes.
4    Q.   And did you return?
5    A.   Sure.
6    Q.   And where did you go?
7    A.   Excuse me?
8    Q.   Where did you go?
9    A.   On the first floor, federal
10   security service office.
11   Q.   Did you see the same security
12   officer?
13   A.   Yes, I knock the door and the same
14   officer tell me wait before the door.
15   Q.   I'm sorry, wait for?
16   A.   Wait outside.  Wait outside the
17   office.
18   Q.   How long did you wait?
19   A.   Around one and a half hours, about
20   two hours.
21   Q.   And what happened during those two
22   hours?
23   A.   My wife, she leave me because she
24   supposed to go to the kids to home.  I ask
25   officer how long I supposed to wait and he tell

Page 55

DIKLER

2    me he try connect to the MTA office for get
3    some information about me and about this badge.
4    Q.   Did he say anything else?
5    A.   No.
6    Q.   Where did you wait during the two
7    hours, were you inside of the security office?
8    A.   No, it was two chairs just right
9    behind the door outside the office.
10   Q.   Approximately what time was it when
11   you were first told to sit outside?
12   A.   Around maybe 10:30, 11:00, I don't
13   remember.
14   Q.   At this point, had any of your
15   items been returned to you?
16   A.   Only credit cards.
17   Q.   What about the cell phone?
18   A.   It was with me.  I carry.
19   Q.   After about two hours, did the
20   security officer come outside?
21   A.   He call me to the room.
22   Q.   He called you inside?
23   A.   Right.
24   Q.   What did he say to you?
25   A.   Not him.  The detective.  Detective

Page 56

DIKLER

1
2    tell me I got illegal, fake badge and they're
3    going to arrest me.
4    Q.   How do you know this individual was
5    a detective?
6    A.   He identify himself.  The call the
7    name and tell me the detective from 5th
8    Precinct.
9    Q.   Okay.  So you were introduced to
10   this person by the security officer?
11   A.   I don't remember because I was
12   shocked.
13   Q.   Did you see any sort of badge on
14   this individual that you say was a detective?
15   A.   Yes, they carry some badges, I
16   don't remember but they got something.
17   Q.   I'm sorry?
18   A.   They have some badges.
19   Q.   Do you remember seeing though a
20   badge on this person you're calling a
21   detective?
22   A.   No, I don't remember.
23   Q.   Did he show you any badge?
24   A.   I remember one officer got badge on
25   the neck and another on the belt, something

Page 57

DIKLER

1
2    like that.  But I don't remember exactly.
3    Q.   Were these other officers federal
4    security officers or New York City police
5    department officers?
6    A.   It was federal security officer and
7    another three men.  Two detectives from 5th
8    Precinct and one more detective, I don't know.
9    Q.   You don't know if it was a federal
10   or NYPD?
11   A.   I don't know who the third man.  He
12   didn't introduce himself.
13   Q.   But my question is, with respect to
14   the two men that you identified as detectives,
15   did either of them show you any sort of shield
16   or badge?
17   A.   I'm sorry, can you repeat the
18   question.
19   Q.   The two people that you identify as
20   having been detectives, did either of these
21   people show you any sort of badge or shield?
22   A.   Yes, they show me some badge.
23   Q.   Can you describe for me the badge?
24   A.   No, I can't.
25   Q.   Do you recall what color it was?

15 (Pages 54 to 57)

DIKLER

1
2    A.  I don't remember nothing.
     Q.  Do you recall what shape?
4    A.  I don't, no, it was some police
5  badges, I don't know.
6    Q.  Had you seen that type of police
7  badge before?
8    A.  Just on regular police officer in
9  the streets, like patrol police got badge on
10  their jackets, that's it.
11    Q.  What about a detective's badge?
12    A.  I never see that before.
13    Q.  Before March 22nd 2006?
14    A.  Yes, I never speak with detective
15  before.
16    Q.  Did the badge that you saw, the
17  detective's badges that you saw on March 22nd
18  2006 resemble what's depicted in Defendant's
19  Exhibit A?
20    A.  I don't remember.
21    Q.  Had anyone ever informed you that
22  what's depicted in Defendant's Exhibit A, the
23  shield that is in the middle of the two cards
24  that have been also copied, did anyone ever
25  tell you that this badge resembles a detective

DIKLER

2  shield?
3    A.  Nobody.
4    Q.  When you showed this to friends,
5  did they ever mention that it had a resemblance
6  to a detective shield?
7    A.  No.
8    Q.  How many friends would you say you
9  showed that shield to?
10    A.  Maybe two.
11    Q.  Are they also bus operators?
12    A.  One bus operator, another work for
13  subway, MTA.
14    Q.  Did you show this to your wife?
15    A.  Yes.
16    Q.  Did you show this badge to any of
17  your relatives?
18    A.  No.
19    Q.  Did the detectives speak to you
20  after you were introduced?
21    A.  He just call me I'm arrested.
22    Q.  Did they tell you why you were
23  being arrested?
24    A.  About I carry illegal, fake badge.
25    Q.  Did you say anything in response?

DIKLER

1
2    A.  I don't remember, I don't remember
3  this day.
4    Q.  Can you give me a physical
5  description of either detective?
6    A.  One detective exactly like me, just
7  two white guys, men, one, too, my age.
8  Another, a little bit younger.  One, the same
9  like me.  Another, the fat guy.  That's it.
10    Q.  What about the height?
11    A.  I don't remember.
12    Q.  Taller than you or shorter than
13  you?
14    A.  One of them, probably the same like
15  me.  Another, a little bit higher.
16    Q.  Hair color, do you remember?
17    A.  No.
18    Q.  Were they in uniform or plain
19  clothes?
20    A.  Plain clothes.
21    Q.  Did either of them have any facial
22  hair; mustache, goatee, beard?
23    A.  I don't remember.
24    Q.  Did either of them wear glasses?
25    A.  I don't remember.

DIKLER

1
2    Q.  What did the detectives do after
3  you were informed that you were placed under
4  arrest?
5    A.  Handcuff me.
6    Q.  Anything else?
7    A.  That's it.
8    Q.  Were you removed from 26 Federal?
9    A.  Yes.
10    Q.  How were you removed?  Were you
11  driven in a car or did you walk somewhere?
12    A.  We walk so far because detectives'
13  car was parked so far from federal building,
14  Federal Plaza, 26, through the building,
15  through the street, all the way out.
16    Q.  Did you recall what kind of vehicle
17  it was?
18    A.  Chrysler or Dodge, black, that's
19  it.
20    Q.  So this was not a marked blue and
21  white NYPD patrol car?
22    A.  No.
23    Q.  Where were you placed, in the front
24  or the back seat?
25    A.  On the back seat.

Page 62

DIKLER

1
2    Q.    Where did the second detective sit?
3  Passenger?
4    A.    Both of them in the front seat,
5  driver and passenger.
6    Q.    Did you say anything to the
7  detectives as you were walking out of 26
8  Federal?
9    A.    No, I just -- I look on my legs, I
10  just -- no.
11    Q.    Did you make any phone calls before
12  you left 26 Federal?
13    A.    No. They took my phone when I was
14  arrested.
15    Q.    Did you say anything to the
16  detectives while you were in the car?
17    A.    I don't remember.
18    Q.    Did they say anything to you?
19    A.    I don't remember.
20    Q.    How long was the drive?
21    A.    Short.
22    Q.    What happened after you got to the
23  precinct?
24    A.    Detective just put me on cell and
25  uncuff me, take out my belt, take out my laces,

Page 63

DIKLER

2  that's it.
3    Q.    Did he say anything to you?
4    A.    Yes, we got some conversation. She
5  let me call to my wife.
6    Q.    This was a female officer?
7    A.    Two male, two male officers.
8    Q.    Okay.
9    A.    And they let me make a call to my
10  wife.
11    Q.    What did you tell your wife?
12    A.    True.
13    Q.    I'm sorry?
14    A.    True, I'm arrested.
15    Q.    Did you tell her why?
16    A.    Yes.
17    Q.    Okay. What did she say?
18          MR. ZELMAN: Objection, that's
19  spousal privilege, don't answer.
20          MS. PRIVETERRE: I believe only the
21  wife could assert that privilege, right?
22          MR. ZELMAN: No. Privilege.
23          MS. PRIVETERRE: Mark that for a
24  ruling.
25    Q.    Did the detective say anything else

Page 64

DIKLER

1
2  to you?
3    A.    They tell me they going to bring me
4  to the jail to Central Booking.
5    Q.    How long were you at the precinct?
6    A.    I'm sorry?
7    Q.    How long were you at the precinct?
8    A.    You mean, oh, 5th Precinct?
9    Q.    Yes.
10    A.    Two hours, maybe a little bit
11  longer, I don't remember.
12    Q.    Did the same detective take you to
13  Central Booking?
14    A.    Yes.
15    Q.    And how long were you at Central
16  Booking?
17    A.    Till 11:00, 11:30 next day, 11:30
18  a.m.
19    Q.    Were you brought before a judge?
20    A.    I'm sorry?
21    Q.    Were you taken to see a judge?
22    A.    Yes, next day about 11:30, I saw
23  the judge.
24    Q.    And what, if anything, did the
25  judge say to you?

Page 65

DIKLER

1
2    A.    Judge said me, see you June 15.
3    Q.    Were you told then anything else
4  about the charges against you?
5    A.    No.
6    Q.    Did you say anything to the judge?
7    A.    No.
8    Q.    Did you enter any plea?
9    A.    No.
10    Q.    Or any explanation?
11    A.    No.
12    Q.    So your return date was June?
13    A.    June 15.
14    Q.    And did you return on June 15th
15  2006?
16    A.    Yes.
17    Q.    What happened then?
18    A.    Case dismissed.
19    Q.    Do you know why it was dismissed?
20  Was it something that you or your lawyer did?
21    A.    I don't know. My lawyer, I don't
22  know why it was dismissed.
23    Q.    Did you retain a lawyer for this
24  case?
25    A.    Yes.

17 (Pages 62 to 65)

Page 66

DIKLER

1
2    Q.   So you only made one appearance,
that appearance on June 15th 2006?
4    A.   Correct.
5    Q.   Was this the first time you had
6 been arrested?
7    A.   Yes.
8    Q.   Had you ever been arrested in the
9 Soviet Union?
10    A.   Never in my life.
11    Q.   Do you claim any psychological
12 injuries stemming from this incident?
13    A.   No.
14    Q.   Did you sustain any physical
15 injury?
16    A.   I complain to my doctor about the
17 on few days after that I start feel the kidney
18 stone pain.
19    Q.   Had you ever suffered from kidney
20 stones before this incident?
21    A.   I got surgery before.
22    Q.   And did you attribute this kidney
23 stone problem to the arrest and detainment?
24    A.   I don't know.
25    Q.   Did you ask your doctor whether it

Page 67

DIKLER

2 was related?
3    A.   I just complain him.
4    Q.   Well, what was your doctor's
5 response or diagnosis?
6    A.   He tell me it could be connect to
7 your arrest but could be not, he didn't know
8 exactly.
9    Q.   Did he take any tests?
10    A.   No.
11    Q.   How soon after you were released
12 did you seek consultation regarding the kidney
13 stones?
14    A.   I was released on Wednesday and I
15 see the doctor on Sunday.
16    Q.   Is this Dr. Weiss?
17    A.   Yes.
18    Q.   Did you have any complaints other
19 than the kidney stones?
20    A.   No.
21    Q.   When did you have that surgery
22 related to the kidney stones?
23    A.   2004.
24    Q.   Do you claim any damage to your
25 reputation because of this incident?

Page 68

DIKLER

1
2    A.   Yes.
3    Q.   What damage was done?
4    A.   I was called to general
5 superintendent, supervision office, I was
6 suspended from job for five days.  And
7 detective, when I was in the precinct, 5th
8 Precinct on this day, I have to go to my job
9 and detectives tell me call to your job about
10 you're sick so.
11       MR. ZELMAN:  The question is, how
12    was your representation damaged?  That's
13    the question.
14    A.   And I called my job about I'm sick.
15 So when I show up in office, they call me liar
16 because there was not sick, you were arrested
17 and you call about you're sick.
18    Q.   Which detective told you to call in
19 as a sick day?
20    A.   Both of them.
21    Q.   Did they force you to do that?
22       MR. ZELMAN:  Objection.
23    A.   I don't remember.  I tell them I
24 need to call to my job.
25       MR. ZELMAN:  The question is, did

Page 69

DIKLER

2 they force you?
3       THE WITNESS:  No, just advice.
4    Q.   Why did you take their advice?
5    A.   I have to call to my job anyway
6 about the reasons why I can't report to the
7 job.
8    Q.   So would you have called --
9    A.   The officer told them don't tell
10 them you're arrest, just tell them you're sick
11 today.  That's what I do.
12    Q.   Would you have called in sick
13 regardless of what the detectives advised you?
14    A.   I called in for my job and call
15 myself sick.
16    Q.   My question is, would you have
17 called in sick anyway regardless of what the --
18    A.   No.
19    Q.   How would you have called it in?
20    A.   I want to call to my job and tell
21 them true, I'm arrest, but detective tell me
22 don't tell them you're arrest, tell them that
23 you are sick.
24       MR. ZELMAN:  Two seconds while
25    there's no question.

18 (Pages 66 to 69)

DIKLER

1
2    (Whereupon, Mr. Zelman and the
3    Witness stepped out of the room and
4    returned.)
5        MS. PRIVETERRE: Can I have the
6    last read back.
7        (Whereupon, the referred to
8    question and answer was read back by the
9    Reporter.)
10    A.   They tell me you are not first who
11   was arrest for this badge and everybody called
12   to the sick to the job.
13       Q.   But they didn't force you to call
14   in sick, correct?
15       MR. ZELMAN: Objection.
16       A.   Yes.
17       Q.   Yes, they did force you?
18       A.   They give me the advice.
19       Q.   But did they force you to call in
20   sick; yes or no?
21       MR. ZELMAN: Objection.
22       A.   I don't know.
23       Q.   So are you changing your response?
24       MR. ZELMAN: Objection.
25       A.   They hardly advise me.

DIKLER

2        Q.   I'm sorry, they?
3        A.   Hardly advise me.
4        MR. ZELMAN: Objection.
5        A.   Strongly advise me, I'm sorry.
6        Q.   Did you feel forced to make the
7    call in sick?
8        MR. ZELMAN: Objection.
9        A.   I have to call to my job.  And I
10   want to say I'm arrest but the detective tell
11   me don't say you're arrest, call them you're
12   sick today.
13       Q.   And you made the decision to call
14   in sick?
15       A.   Yes.
16       Q.   Okay.  What's the name of the
17   person who told you that you would be suspended
18   for five days?
19       A.   Dennis Outlaw.
20       Q.   What is his title?
21       A.   General superintendent, he's the
22   boss for Flatbush depot.
23       Q.   What specifically did he tell you
24   was the reason for the suspension?
25       A.   I must report about my arrest on

DIKLER

1
2    first 24 hours and I failed because I called
3    myself sick so I lied to MTA.
4        Q.   Did Mr. Outlaw know the reason why
5    you were arrested?
6        MR. ZELMAN: Objection.
7        A.   Yes.
8        Q.   Did you tell them the reason?
9        A.   Yes.
10       Q.   What did you say to him?
11       A.   (No verbal response.)
12       Q.   What did you say to Mr. Outlaw?
13       A.   I say I will be arrested because I
14   have a fake badge.
15       Q.   Did Mr. Outlaw say anything to you
16   in response?
17       A.   I don't remember now.
18       Q.   Did he tell you that you had broken
19   any MTA rules with respect to the badge, the
20   fake badge?
21       A.   I don't remember.
22       Q.   Did he give you anything in writing
23   concerning your suspension?
24       A.   Yes, I sign some paper.
25       Q.   Do you have a copy of that?

DIKLER

1
2        A.   Probably I got some copy.
3        MS. PRIVETERRE: I'm going to call
4    for production, I'll memorialize this
5    request in writing.
6        MR. SILVERMAN: Join in that
7    request.
8        Q.   Did you read what you signed before
9    you signed it?
10       A.   Yes.
11       Q.   Did the document make reference to
12   any rules that the MTA had concerning fake
13   badges?
14       A.   I don't remember.
15       Q.   Did you have any hearing concerning
16   this suspension, did you have to go before
17   any --
18       A.   Before suspension?
19       Q.   Yes, was there a hearing?
20       A.   I don't understand the question.
21       Q.   Did you have to -- well, withdrawn.
22   Were you represented by a union?
23       A.   Yes.
24       Q.   And was the union rep with you
25   during your meeting with Mr. Outlaw?

Page 74

DIKLER

1
2   A.   Yes.
3   Q.   Was anyone else present?
4   A.   No.
5   Q.   Was it your understanding that you
6   had broken an MTA rule concerning badges?
7        MR. ZELMAN:  Objection.
8   A.   I don't remember, I don't know.
9   Q.   Did you ask during your meeting
10  with Mr. Outlaw if you had violated any MTA
11  rules?
12  A.   He tell me something.
13  Q.   What did he say?
14  A.   I don't remember exactly but it was
15  some conversation about that.
16  Q.   About what?
17  A.   I broke some MTA rules.
18  Q.   Concerning fake badges?
19  A.   Yes, but.
20  Q.   Did you have any out-of-pocket
21  expenses?
22  A.   Oh, yes.
23  Q.   How much?
24  A.   I pay around 6500 to Mr. Belleck
25  (phonetic).

Page 75

DIKLER

2   Q.   Was he your attorney?
3   A.   Yes.
4   Q.   Was this your attorney appointed by
5   a union?
6   A.   No, this is attorney hired by my
7   wife.
8   Q.   So a private attorney?
9   A.   Yes.
10  Q.   Any other expenses?
11  A.   Five days without pay.  One day
12  without pay when I was arrested.
13  Q.   You lost a day's pay when you were
14  arrested?
15  A.   Yes.
16  Q.   Did you have any sick time to use?
17  A.   I have sick time but because I lied
18  them, they just suspend this day.
19  Q.   So you were charged a day?
20  A.   Right.
21  Q.   Although you had called in sick?
22  A.   Yes.
23  Q.   And how much could you approximate
24  that you lost from six days without pay?
25  A.   I don't remember.  Now I got 27,

Page 76

DIKLER

1
2   probably on this time $24 per hour, I don't
3   remember exactly.
4   Q.   What's your base pay?
5   A.   I'm sorry?
6   Q.   Your yearly pay.
7   A.   It was my first three years on the
8   job, it's increase so.
9   Q.   Well, what was it at the time of
10  2006?
11  A.   I don't remember, I need to check
12  my tax form.
13       MS. PRIVETERRE:  I'm going to call
14       for production of that information and
15       I'll memorialize it in writing.
16  Q.   What's your current base pay?
17  A.   60,000.
18  Q.   Any other expenses?
19  A.   Well, after that, I buy some
20  medicine like because I can't sleep, I can't
21  sleep for weeks.  What else?
22  Q.   Was this prescription medicine?
23  A.   No.
24  Q.   Over the counter?
25  A.   No, it just from pharmacy.

Page 77

DIKLER

1
2   Q.   But did a doctor prescribe this?
3   A.   No.
4   Q.   How much out of pocket did you
5   spend on sleep medicine?
6   A.   Probably a hundred dollars
7   altogether.
8   Q.   For what period of time?
9   A.   A few weeks.
10  Q.   A few meaning three?
11  A.   Three, four weeks because almost
12  whole month I got problem with my sleeping.
13  Q.   Did you complain to Dr. Weiss about
14  this?
15  A.   Yes.
16  Q.   What did he say?
17  A.   He told me you need some time,
18  relax, something like that.
19  Q.   Any other expenses?
20  A.   No, just my reputation, I don't
21  know how much cost.
22  Q.   Who told you that your reputation
23  had been damaged?
24       MR. ZELMAN:  Objection to form.
25       You can answer if you understand the

20 (Pages 74 to 77)

Page 78

DIKLER

1
2  question.
3      A.   I mean, until I wait for June 15
4  from March 23rd, I didn't know how the case
5  will be, what the significance will be.  And
6  Mr. Outlaw tell me if this case will be not
7  dismissed, any another decision like fee or
8  something like that, you will be fired because
9  you guilty.  Only one way when you stay on the
10 job the case dismissed so, and I, until I wait
11 for June 15, I was worried every day.
12         Plus I didn't spend the night at
13 home, it happened first time for 15 years and
14 my kids, they ask me.  It's terrible, it's real
15 terrible.  And after that, next week, next week
16 after I was arrested, and I got vacation and I got
17 air tickets, I have to go to Russia.  And
18 Mr. Belleck, my attorney, he tell me I can't
19 leave the country, so I cancelled whole trip.
20 And the last day when I still get about three
21 hours before plane, I was Mr. Belleck' office
22 and he called to the district attorney, in the
23 last second they let me left the country.
24         So I just call again to air
25 company, I activate my tickets again, I go from

Page 79

DIKLER

2  Manhattan right to JFK without my luggage.
3      Q.   But you were able to go on your
4  trip?
5      A.   Yes.
6      Q.   When was that trip?
7      A.   This was the -- I spent ten days in
8  Russia to my relatives.
9      Q.   But do you recall what month?
10     A.   It was -- I leave like this was the
11 Monday, I remember it was Monday.  This why I
12 ask my doctor can I -- what I have to do
13 because I got the back pain from the kidney
14 stone and but I'm not sure I can fly at all
15 because of the district attorney doesn't let
16 me, so this week, it was terrible week on my
17 wife.  I never was arrested before, I never was
18 handcuffed, I don't know how it feel.  Now I
19 know.
20     Q.   So did you have insomnia during
21 your trip in Russia?
22     A.   I'm sorry?
23     Q.   Did you experience sleeplessness
24 during your stay in Russia?
25     A.   First two weeks I sleep probably

Page 80

DIKLER

1  one hour per day.  Every time because when I
2  was on vacation, I didn't know when I come back
3  to my job, I didn't know, probably I already
4  don't have the job.  It's not about the judge
5  decision about June 15, it just about the job,
6  when I come back, I was suspended for five days
7  after my vacation, and after that, when I work
8  all the time, I keep in my mind about June 15,
9  probably I work last months.  I didn't know how
10 it's finished, the case.
11     Q.   After you got back from Russia,
12 your vacation in Russia, were your duties as an
13 MTA operator curtailed or were your hours cut?
14 Was your route changed?
15     A.   When I come back from Russia, they
16 suspend me for five days after my vacation, and
17 after that, I come back on full duty.
18     Q.   Full duty, same route?
19     A.   Yes, nobody can take from you on
20 the job.
21         MR. ZELMAN:  Full duties, same
22 route?
23         THE WITNESS:  Yes.
24     Q.   Other than Mr. Outlaw and your

Page 81

DIKLER

1
2  union rep, did you tell anyone else at the MTA
3  about this arrest?
4      A.   Another bus operator, they know
5  that, they know I was arrested.
6      Q.   How did he know or she know?
7          MR. ZELMAN:  If you know.
8      A.   I told somebody and somebody tell
9  another guy, so everybody, almost everybody in
10 depot knew I was arrested.
11     Q.   Because you told them?
12         MR. ZELMAN:  Objection.
13     A.   Yes, because everybody got the same
14 badges.
15     Q.   Did you seek any counselling or
16 therapy?
17     A.   I'm sorry?
18     Q.   Did you seek any counselling or
19 therapy because of this incident?
20     A.   I don't remember.
21     Q.   Have you ever been to a
22 psychiatrist?
23     A.   No.
24     Q.   Have you ever been to a
25 psychologist?

21 (Pages 78 to 81)

Page 82

DIKLER

1
2    A.   No.
3    Q.   Have you ever been to a mental
4  health provider?
5    A.   No.
6    Q.   Does that refresh your recollection
7  as to whether or not you sought counselling?
8    A.   I'm sorry?
9    Q.   Repeat that?
10   A.   Can you rephrase, please.
11   Q.   You stated that you've never seen a
12  psychiatrist, you never consulted with a
13  psychologist, you never consulted with a mental
14  health professional.  So going back to my
15  question, the question which you answered "I
16  don't remember", have you sought any
17  counselling because of this incident?
18   A.   I don't remember.
19   Q.   Were you up for a promotion at the
20  time of this arrest?
21   A.   I'm sorry.
22   Q.   Were you in line for any promotion
23  at the time of this arrest?
24   A.   I don't remember.
25   Q.   Were you informed by Mr. Outlaw

Page 83

DIKLER

2  that you were under consideration for a
3  promotion that might be affected because of
4  this arrest?
5    A.   I don't remember.
6    Q.   From 3/22/06 to the present, April
7  2nd 2008, have you been promoted in any way
8  from a bus operator for the MTA?
9    A.   No.
10   Q.   Has your route changed since March
11  22nd 2006?
12   A.   Every three, four months.
13   Q.   Did the changes have anything to do
14  with your arrest?
15   A.   No.
16   Q.   In what way were you caused to feel
17  terror because of this incident?
18   A.   I'm sorry?
19   Q.   In what way were you caused any
20  terror, any fright?
21   A.   I don't understand the question,
22  I'm sorry.
23   Q.   Mr. Dikler, your complaint states
24  that you suffered terror among other --
25   A.   Oh.

Page 84

DIKLER

1
2    Q.   -- conditions.
3    A.   It's from different way, you know.
4    Q.   What different way?
5    A.   Now when I see the police
6  detective, I am real afraid.
7    Q.   Why?
8    A.   I don't know why, it just inside me
9  because on my job, you must be cooperative with
10  the police officer and I was and I am
11  cooperative, but anyway, it's some feeling I
12  can't explain.  And if something when I see the
13  regular police cop, but when I see the
14  detective, I -- it's really scaring me.
15   Q.   How often do you see detectives?
16   A.   Now I know the detective when I see
17  the guys with the badge and clothing and some
18  special car, unmarked, I know this is
19  detective.
20   Q.   Did you know what a detective's
21  badge looked like before this arrest?
22   A.   No, I never saw them.
23   Q.   Are there any other ways in which
24  you feel terror or fright?
25   A.   Sometimes in my job somebody tell

Page 85

DIKLER

1
2  me oh, I remember when you was arrested.
3  It's -- I feel bad after that, you know.  Every
4  time when I just remember this day, it's like
5  four months ago, my oldest daughter, she's
6  almost ten now, she tell me, she didn't know I
7  was arrested, but she tell me, dad, you
8  remember when you don't sleep at home?  I
9  didn't know if she remembered that, but she
10  remembered and it feels...
11   Q.   Did the children go --
12        MR. ZELMAN:  Can you let him
13   finish.
14   A.   I am finished.
15   Q.   And I only interrupted because it's
16  nonresponsive to my question.  Did your
17  children accompany you on the vacation to
18  Russia?
19   A.   No.
20   Q.   Who went on that vacation?
21   A.   I was alone.
22   Q.   So you didn't sleep at home with
23  your children during those ten days, correct?
24   A.   Absolutely.
25   Q.   Does your daughter speak to you

22 (Pages 82 to 85)

Page 86

```
1                    DIKLER
2    about the ten days that you didn't sleep at
3    home?
4        A.   She knows I was on vacation.
5        Q.   Okay.  Were you caused any other
6    mental injury that you can tell me about?
7        A.   A few months after that, it was
8    just -- it was a terrible time for me, real
9    terrible.  Every time when I wear this badge
10   (indicating), I remember about another badge,
11   it's how it's connected.
12       Q.   And when you say this badge, you're
13   pointing to Defendant's Exhibit B, the MTA?
14       A.   The shoulder badge.
15       Q.   Also the MTA issued badge?
16       A.   Right.
17       Q.   Okay.  And this makes you remember
18   the badge that you bought on your own?
19       A.   Yes, just refresh my memory every
20   time.
21       Q.   That was not issued by the MTA?
22       A.   No.
23       Q.   No, it was not?
24       A.   No.
25       Q.   Have you lost any time from work
```

Page 87

```
1                    DIKLER
2    because of this feeling upset?
3        A.   I don't remember.  I call myself
4    sick a few times but I don't remember exactly
5    what the reason was.
6        Q.   Could it have been related to your
7    lower back problems?
8        A.   Yes.
9        Q.   And your kidney stones?
10       A.   Once.
11       Q.   And in terms of your co-workers
12   that remind you that you were arrested, is this
13   the person that you told about your arrest?
14       A.   I told him, just few people, but
15   they told somebody else and after that almost
16   everybody knew that.
17       Q.   Why did you tell a few people about
18   your arrest?
19       A.   Because I want to inform them
20   because they got the same badges.  Like almost
21   hundred percent of the bus operators, they
22   carry the same badges.
23       Q.   As you sit here today, do you know
24   if there is an MTA regulation against
25   purchasing or wearing badges that are depicted
```

Page 88

```
1                    DIKLER
2    in Defendant's Exhibit A?
3            MR. ZELMAN:  Listen to the
4        question.  Do you know if there's an MTA
5        regulation?
6        A.   Yes, now I know.
7        Q.   When did you first find out about
8    this regulation?
9        A.   When I was arrested in few weeks
10   after that in the depot, they put, the MTA put
11   the big signs about the fake badges.
12       Q.   Do you know if this was in response
13   to your arrest?
14       A.   I don't know.
15       Q.   Did you make any inquiries or did
16   you ask Mr. Outlaw if that posting was related
17   to your arrest?
18       A.   No, I didn't ask.
19       Q.   Do you know if any of your other
20   colleagues, other bus operators have been
21   arrested?
22       A.   Yes.
23       Q.   How many?
24       A.   I know two or three.
25       Q.   Were they arrested before or after
```

Page 89

```
1                    DIKLER
2    you?
3        A.   Before and after.
4        Q.   And did you know about those
5    arrests before March 22nd 2006?
6        A.   No.
7        Q.   When did you find out that there
8    were bus operators arrested before March 22nd
9    2006?
10       A.   After I was arrested when I come
11   back to the job.
12       Q.   Who told you?
13       A.   I don't remember.
14       Q.   Was it Mr. Outlaw?
15       A.   No.
16       Q.   Do you know if those bus operators
17   were suspended from work?
18       A.   I don't remember.
19       Q.   Have you purchased another badge
20   similar to the one that's depicted in
21   Defendant's Exhibit A?
22       A.   I'm sorry, I don't understand the
23   question.
24           MS. PRIVETERRE:  Can you read back.
25       (Whereupon, the referred to
```

23 (Pages 86 to 89)

Page 90

DIKLER

1
2      question was read back by the Reporter.)
3      A.   No.
4      Q.   Do you intend to?
5      A.   No.
6      Q.   Have you read the posting in the
7   depot about fake badges?
8      A.   I'm sorry?
9      Q.   Did you read the posting?
10     A.   Yes, I read it.  It was still on
11  the wall for a few months.
12     Q.   Did you see either of the vendors
13  that you testified about before at the depot
14  after the posting was put up?
15     A.   No.
16     Q.   Did you say anything to Mr. Outlaw
17  about these vendors?
18     A.   No.
19     Q.   Did you make any inquiries?  Did
20  you ask him why the vendors were permitted to
21  sell out of the depot?
22     A.   No, I didn't ask him.
23     Q.   Why not?
24          MR. ZELMAN:  Objection.  You can
25      answer it if you understand the

Page 91

DIKLER

1
2      question.
3      A.   If somebody sell any stuff inside
4   the depot, it's mean he got official permission
5   for that.
6      Q.   Who told you that it means that the
7   vendor has official permission?
8      A.   Nobody can enter to MTA property
9   without the permission to presence and make any
10  business on MTA property.
11     Q.   But, sir, my question is, who told
12  you?
13     A.   I don't remember.
14     Q.   Somebody did tell you and you
15  forgot?
16     A.   I don't remember.
17     Q.   Did you use this as a part of a
18  defence when you met with Mr. Outlaw that there
19  was a vendor authorized to sell these badges
20  out of the depot?
21     A.   I don't remember.
22     Q.   Did you ask Mr. Outlaw why you were
23  being suspended if they were allowing vendors
24  to sell out of the depot?
25     A.   I don't remember.

Page 92

DIKLER

1
2      Q.   Did your union rep make any
3   inquiries about why a vendor was allowed to
4   sell out of the depot?
5      A.   I don't know.
6      Q.   Did you tell your attorney or your
7   union rep that you purchased this badge out of
8   the depot?
9      A.   Sure, yes.
10     Q.   Other than the badge and the wallet
11  that's depicted in Defendant's Exhibit A, is
12  there any other property that you say was not
13  returned to you?
14     A.   No, just wallet and badge, it's one
15  piece actually.
16     Q.   The cards that are depicted in
17  Defendant's Exhibit A, your license, New York
18  State license and your MTA identification, they
19  were returned?
20     A.   Yes.
21     Q.   Okay.  Is there anything that you
22  could do that you no longer do and you blame
23  the arrest for it?
24     A.   After arrest, I stop play soccer.
25     Q.   Why is that?

Page 93

DIKLER

1
2      A.   Because I got the low back pain.
3   And after that, I got the high blood pressure
4   and my doctor tell me you can't anymore take
5   this pressure and I stop play soccer, and it
6   was the real big part of my life because it was
7   my job for almost ten years in the Soviet
8   Union.
9      Q.   Were you a professional soccer
10  player?
11     A.   For ten years.
12     Q.   Have you been treated for
13  hypertension prior to the arrest?
14     A.   I'm sorry?
15     Q.   Prior to the arrest, March 22nd
16  2006, had you been treated by any doctors for
17  hypertension?
18     A.   I don't remember, I don't remember.
19     Q.   Had you been advised by any doctors
20  to lose weight because it affected your blood
21  pressure?
22     A.   Yes.
23     Q.   Prior to your arrest?
24     A.   After.  I don't have problems,
25  blood pressure before arrest.

Page 94

DIKLER

1
2  Q.  Had you been advised by any
3  physician concerning your weight prior to the
4  arrest?
5  A.  No.
6  Q.  Did Dr. Weiss attribute your
7  hypertension to the arrest?
8  A.  I'm sorry?
9  Q.  Did Dr. Weiss blame your arrest as
10 the cause of the hypertension?
11 A.  He call it, it's maybe one of
12 reason.
13 Q.  What are the other reasons?
14 A.  Now it's my weight.
15 Q.  But when you first complained to
16 Dr. Weiss about hypertension, did he say that
17 it was a number of reasons?
18 A.  He call me just about my job,
19 because you almost not move, just sit job.
20 Arrest and weight.  Because I spend the night
21 in the jail, I didn't sleep, I sit on the
22 floor, it's like that.
23 Q.  But Dr. Weiss also blamed the
24 hypertension partly because your job is to sit
25 a lot, to be sedentary, is that what he was

Page 95

DIKLER

2  saying?
3  MR. ZELMAN:  Objection.
4  A.  I don't remember.
5  Q.  And the soccer, why do you blame
6  the arrest for not being able to play soccer?
7  A.  Because I start feel the low back
8  pain after arrest.
9  Q.  But isn't it your testimony that
10 Dr. Weiss said that the lower back problems
11 were partly caused by the kidney stones?
12 A.  It's could be connect.
13 Q.  Did he explain how it could be
14 connected to the arrest?
15 A.  Yes, because he tell me you spend
16 the night on the metal bench, doesn't move for
17 almost 12 hours, it was about, I don't
18 remember, 35, 40 guys in the cell and he tell
19 me it could be the reason.
20 Q.  Had you experienced lower back pain
21 prior to March 22nd 2006?
22 A.  Once many times ago, far ago.
23 Q.  Did Dr. Weiss say that your job as
24 a bus driver being sedentary for a number of
25 hours a day was also a reason for the lower

Page 96

DIKLER

1
2  back pain?
3  A.  He tell me it could be one of
4  reasons.
5  Q.  Anything else other than the
6  hypertension and the soccer?
7  MR. ZELMAN:  Objection to form.
8  A.  Before, before, I can spend like 16
9  hours driving the car and I didn't feel
10 nothing.  And now, after each two hours, I have
11 to make some warmup, stretch my legs, like
12 that.  And now I real feel it.
13 Q.  Presently, you still feel problems
14 in your lower back?
15 A.  Yes, I just -- I lost ten days on
16 the job just two weeks ago and that's why I
17 change my doctor because I need a specialist.
18 Q.  What's the new doctor's name?
19 A.  Michael Riskevich.
20 Q.  I'm sorry.
21 A.  I gave it.
22 Q.  Yes, you did.  Has Dr. Riskevich
23 told you that the reason for your lower back
24 pain is the arrest?
25 A.  No.

Page 97

DIKLER

1
2  Q.  And the subsequent detention?
3  A.  No.  I just changed the doctor like
4  three weeks ago.
5  MS. PRIVETERRE:  I have no further
6  questions.
7  EXAMINATION BY
8  MR. SILVERMAN:
9  Q.  In connection with your job at the
10 MTA, you're required to take annual physicals?
11 A.  I'm sorry?
12 MR. SILVERMAN:  Can you read back
13 the question.
14 (Whereupon, the referred to
15 question was read back by the Reporter.)
16 A.  What do you mean physicals?
17 Q.  Were you ever given a physical by
18 anyone on behalf of the MTA?
19 MR. ZELMAN:  Physical examination.
20 Q.  That you're okay to work.
21 A.  I got physical examination every
22 six months.
23 Q.  Is that by a doctor on behalf of
24 MTA?
25 A.  By MTA doctors.

25 (Pages 94 to 97)

DIKLER

1
2     MR. SILVERMAN:  I would just ask
3  for authorization to obtain the medical
4  records for the MTA pertaining to any
5  six-month or biannual physical
6  examinations for a period of two years
7  prior to this incident up to the present
8  time.
9     MS. PRIVETERRE:  I join.
10    MR. ZELMAN:  I ask any document
11  demands be put in writing.
12    MR. SILVERMAN:  Sure.
13    Q.   As a result of this incident, was
14  any reprimand ever placed in your personnel
15  file?
16    A.   I don't understand.
17    Q.   Was any letter or report or
18  anything generated concerning this incident, to
19  your knowledge, in your personnel file for the
20  MTA?
21    A.   Yes, sure.
22    Q.   Do you have a copy of that letter
23  whatever it was?
24    A.   No, but I signed some paper on my
25  job, this is going to my file, the sentence

DIKLER

1
2  from judge going to my file, the paper about my
3  suspension what I signed goes to my file.
4     MR. SILVERMAN:  Okay. I would just
5  ask for an authorization which we'll
6  follow up in writing for Mr. Dikler's
7  personnel file with the MTA to the
8  extent that there were any issues of any
9  privileged or private records or
10  documents as part of that MTA file, I
11  would be willing to concent to an in
12  camera inspection by the judge. I have
13  no further questions.
14    MS. PRIVETERRE:  I join.
15    MR. ZELMAN:  I have a quick
16  question.
17  EXAMINATION BY
18  MR. ZELMAN:
19    Q.   Earlier she asked you if you
20  sustained a psychological injury as a result of
21  the incident and you said no, correct?
22    A.   No, it was a wrong answer.
23    MS. PRIVETERRE:  It was the wrong
24  what?
25    THE WITNESS:  Wrong answer.

DIKLER

1
2     Q.   Why did you say --
3     A.   Because if I can't sleep for
4  months, I call it suffering too now. But I
5  don't understand this question before, that's
6  why I say no.
7     MS. PRIVETERRE:  When did you
8  realize you didn't understand the
9  question?
10    MR. ZELMAN:  Can I finish my
11  questioning?
12    Q.   In addition, you indicated that you
13  were suspended from the MTA for five days
14  because you told them that you were sick
15  instead of telling them you were arrested,
16  correct?
17    A.   It's all connected, yes.
18    Q.   Was there any other reason that you
19  were disciplined by the MTA other than the fact
20  that you told them you were sick when you were
21  arrested?
22    A.   No.
23    Q.   That's the only reason?
24    A.   Yes.
25    MR. ZELMAN:  No further questions.

DIKLER

1
2  CONTINUED EXAMINATION BY
3  MS. PRIVETERRE:
4     Q.   The paper that you signed during
5  your meeting or following your meeting with
6  Mr. Outlaw, is it still your testimony that
7  that document made reference to your having
8  been arrested for carrying a fake badge?
9     MR. ZELMAN:  Objection.
10    A.   I'm sorry?
11    MS. PRIVETERRE:  Can you read that
12  back, please.
13    (Whereupon, the referred to
14  question was read back by the Reporter.)
15    A.   Yes.
16    Q.   And in terms of your changed
17  response concerning psychological injuries, is
18  it still your testimony that you have never
19  seen a psychologist?
20    MR. ZELMAN:  Objection.
21    A.   No, I never seen psychologist.
22    Q.   Have you ever seen a psychiatrist?
23    A.   No.
24    MR. ZELMAN:  Objection.
25    Q.   Have you ever seen a mental health

Page 102

DIKLER

1    provider?
2        A.   No.
3        Q.   Is there a reason why you didn't
4    seek help if you were bothered by sleepless
5    nights?
6        A.   The reason why I didn't seek the
7    psychologist or psychiatrist, that's because my
8    insurance doesn't cover that, it's about money,
9    I got the kids.  But I really can't sleep for
10   months, that's my answer.
11            MS. PRIVETERRE:  No further
12       questions.
13   CONTINUED EXAMINATION BY
14   MR. SILVERMAN:
15       Q.   Is it your testimony, as we sit
16   here today, that for an extended period after
17   this incident you didn't sleep more than an
18   hour a night?
19       A.   Yes.
20       Q.   And that went on for weeks, months?
21       A.   With months.
22       Q.   Did you ever mention any lack of
23   sleep to any of the doctors who examined you on
24   behalf of the MTA?

Page 103

DIKLER

1
2        A.   No.
3        Q.   Did you ever mention any lack of
4    sleep to any doctors after this incident?
5        A.   No, because...
6        Q.   I'm just asking, did you ever
7    mention that to any of your doctors?
8        A.   No, I was on vacation, and after
9    that I was suspended, it was almost month.
10       Q.   For how long a period of time was
11   it that you had the sleep issues that you're
12   referring to?
13       A.   About month.
14       Q.   One month?
15       A.   Yes.
16       Q.   Did you ever work for that
17   one-month period of time?
18       A.   No.
19            (Continued on next page to include
20       jurat.)

Page 104

DIKLER

1
2        Q.   So for the one-month period you had
3    these sleep issues, you were not working?
4        A.   No.
5            MR. SILVERMAN:  Okay.  I have
6    nothing further.  Thank you.
7            (Whereupon, at 1:08 p.m., the
8    Examination of this Witness was
9    concluded.)
10

11   _____
         YEVGENIY DIKLER
12
13   Subscribed and sworn to before me
14   this _____ day of _____, 20___.
15   _____
         NOTARY PUBLIC
16

Page 105

DIKLER
E X H I B I T S

DEFENDANT'S EXHIBITS:

| EXHIBIT LETTER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| A-B | Documents | 46 |

Legal Ease Reporting, Inc.
212-481-3500

Page 106

```
 1              DIKLER
 2              I N D E X
 3
 4   EXAMINATION BY              PAGE
 5   MS. PRIVETERRE           4, 101
 6   MR. SILVERMAN            97, 102
 7   MR. ZELMAN                  99
 8
 9
10   INFORMATION AND/OR DOCUMENTS REQUESTED
11   INFORMATION AND/OR DOCUMENTS        PAGE
12   Line left for last time prior to
13   3/22/06 that Plaintiff had been to
14   26 Federal Plaza            15
15
16   Any invoices for any bills of sale
17   for that badge Plaintiff purchased
18   from the vendor             30
19
20   Anything in writing concerning
21   suspension                  73
22
23   Base pay in 2006            76
24
25       (Continued on following page.)
```

Page 107

```
 1              DIKLER
 2   INFORMATION AND/OR DOCUMENTS REQUESTED (Cont'd)
 3   INFORMATION AND/OR DOCUMENTS        PAGE
 4
 5   Authorization to obtain the medical
 6   records for the MTA pertaining to
 7   any six-month or biannual physical
 8   examinations for a period of two
 9   years prior to this incident up to
10   the present time            98
11
12   Authorization for Mr. Dikler's
13   personnel file with the MTA    99
14
15
16       QUESTION MARKED FOR RULING
17       PAGE    LINE
18        63     17
19
20
21
22
23
24
25
```

Page 108

```
 1              DIKLER
 2          C E R T I F I C A T E
 3
 4   STATE OF NEW YORK    )
 5                        : SS.:
     COUNTY OF KINGS      )
 6
 7
 8       I, MARGALIT EWART, a Notary Public for
 9   and within the State of New York, do hereby
10   certify:
11       That the witness whose examination is
12   hereinbefore set forth was duly sworn and that
13   such examination is a true record of the
14   testimony given by that witness.
15       I further certify that I am not related
16   to any of the parties to this action by blood
17   or by marriage and that I am in no way
18   interested in the outcome of this matter.
19       IN WITNESS WHEREOF, I have hereunto set
20   my hand this 2nd day of April, 2008.
21
22
23              *Margalit Ewart*
                MARGALIT EWART
24
25
```

1                    ERRATA SHEET

2   I wish to make the following changes, for the

3   following reasons:

4   PAGE   LINE

5   ----   ----                    CHANGE:---------------------

6                                  REASON:---------------------

7   ----   ----                    CHANGE:---------------------

8                                  REASON:---------------------

9   ----   ----                    CHANGE:---------------------

10                                 REASON:---------------------

11  ----   ----                    CHANGE:---------------------

12                                 REASON:---------------------

13  ----   ----                    CHANGE:---------------------

14                                 REASON:---------------------

15  ----   ----                    CHANGE:---------------------

16                                 REASON:---------------------

17  ----   ----                    CHANGE:---------------------

18                                 REASON:---------------------

19  ----   ----                    CHANGE:---------------------

20                                 REASON:---------------------

21  ----   ----                    CHANGE:---------------------

22                                 REASON:---------------------

23  ----   ----                    CHANGE:---------------------

24                                 REASON:---------------------

25