wvega.txt

```
0001
 1                                                    1
 2  UNITED STATES DISTRICT COURT
 3  SOUTHERN DISTRICT OF NEW YORK
 4  -------------------------------------X
 5  YEVGENIY DIKLER,
 6                              Plaintiff,
 7       -against-
 8  THE CITY OF NEW YORK, DETECTIVE MICHAEL
 9  VISCONTI, shield # 06482, SECURITY OFFICER
10  WILSON VEGA, HWA INC.,
11                              Defendants.
12  Index No:  07CV5984
13  -------------------------------------X
14
15                       May 12, 2008
16                       10:20 a.m.
17
18            EXAMINATION BEFORE TRIAL of Defendant,
19  WILSON VEGA, taken by Adverse Parties, pursuant to
20  Notice, held at the Offices of Lester Schwab Katz &
21  Dwyer, LLP, 120 Broadway, New York, New York,
22  before a Notary Public of the State of New York.
23
24            *           *           *
25
0002
 1                                                    2
 2  A P P E A R A N C E S :
 3
 4  DAVID ZELMAN, ESQ.
 5       Attorney for Plaintiff - Yevgeniy Dikler
 6  612 Eastern Parkway
 7  Brooklyn, new York 11225
 8
 9  MICHAEL A. CARDOZO, Corporation Counsel
10       Attorney for Defendants - The City of New York
11       and Detective Michael Visconti
12  100 Church Street
13  New York, New York 10007
14  BY:  JOYCE CAMPBELL PRIVETERRE, ESQ.
15
16  LESTER SCHWAB KATZ & DWYER, LLP
17       Attorneys for Defendants -
18       Wilson Vega and HWA Inc.
19  120 Broadway
20  New York, New York
21  BY:  SANDORO BATTAGLIA, ESQ.
22
23            *           *           *
24
25
0003
 1                                                    3
 2            IT IS HEREBY STIPULATED AND AGREED by
 3  and between the attorneys for the respective
 4  parties hereto that the sealing, filing and
 5  certification of the transcript of the within
 6  Examination Before Trail be, and the same hereby
 7  are waived and sworn to before any Notary Public
 8  or Commissioner of Deeds with the same force and
 9  effect as if signed before an Officer of the Court.
10            IT IS FURTHER STIPULATED AND AGREED that
```

                                        wvega.txt
11    all objections, except as to form of the question,
12    are reserved to the trial of this action.
13
14                *              *              *
15
16
17
18
19
20
21
22
23
24
25
0004
1                                                          4
2     W I L S O N    V E G A ,
3          a Defendant herein, after having been first
4          duly sworn before a Notary Public of the State
5          of New York, was examined and testified as
6          follows:
7                    THE REPORTER:  Ms. Priveterre, do
8          you want a copy of this transcript?
9                    MS. PRIVETERRE:  Yes.
10                   THE REPORTER:  Will you state your
11         name and address for the record.
12                   THE WITNESS:  Wilson Vega.  643
13                   Laurence Street, Elmont, New York 11030.
14    EXAMINATION BY
15    MR. ZELMAN:
16         Q    Good morning, Mr. Vega.
17         A    Good morning.
18         Q    My name is David Zelman.  I'm the
19    attorney for two plaintiffs, Yevgeniy Dikler and
20    Lajzer Goynsztaja, and it's my understanding you
21    are being deposed in both of these cases here
22    today.
23              If that your understanding?
24         A    No, no.
25         Q    What is your understanding?
0005
1                                                          5
2          A    One case, Mr. Dikler.
3                    MR. ZELMAN:  Counsel, do you agree
4          that we're also deposing Mr. Vega with
5          respect to Lajzer Goynsztanja, Index
6          number 07CV6538, as well as Yevgeniy
7          Dikler?
8                    MR. BATTAGLIA:  Yes.  By counsel,
9          when we requested that Mr. Vega come here
10         by letter, it was reflecting only the
11         Dikler case, but it's our intention to
12         provide him for both.
13                   MR. ZELMAN:  And is he prepared to
14         testify in the Goynsztaja case?
15                   MR. BATTAGLIA:  I think so, to the
16         the extent his information is limited.
17                   MR. ZELMAN:  Counsel, do you agree
18         he is being deposed in both cases at this
19         time?
20                   MS. PRIVETERRE:  I do.
21         Q    Good morning.  Are you currently
                              Page 2

wvega.txt

```
22  employed?
23      A    Yes.
24      Q    Where?
25      A    26 Federal Plaza.
0006
 1                                                 6
 2      Q    Who is your employer?
 3      A    Wachenhut.
 4      Q    You do security for them?
 5      A    Yes.
 6      Q    Who did you work for prior?
 7      A    They took over the contract the beginning
 8  of this year, January.
 9      Q    January of '08?
10      A    Yes.
11      Q    What is your title there with Wachenhut?
12      A    Security officer.
13      Q    Where do you work there?
14      A    In the main entrance to 26 Federal Plaza.
15  The Broadway Street entrance.
16      Q    Prior to your employment with Wachenhut,
17  were you employed?
18      A    Yes, sir.
19      Q    And who was your employer then?
20      A    HWA.
21      Q    When did you first become employed by
22  HWA?
23      A    When they took over the contract.
24      Q    What was the date?
25      A    I don't remember.
0007
 1                  W. Vega                         7
 2      Q    Do you remember the year?
 3      A    Yeah, different year.
 4      Q    What year?
 5      A    I -- 2002.
 6      Q    2002.  And you stopped working for HWA in
 7  January of '08?
 8      A    Yes, sir.
 9      Q    There was no gap between your employment
10  with HWA and Wachenhut?
11      A    No, sir.
12      Q    When you left HWA, what was your title?
13      A    Security officer.
14      Q    And were you employed at 26 Federal
15  Plaza?
16      A    Yes.
17      Q    During the entire tenure of 2002 to 2008?
18      A    Yes, sir.
19      Q    Before you became a security officer at
20  HWA, did you receive any training?
21      A    Yes, sir.
22      Q    What training did you receive?
23      A    X-ray technician.
24      Q    Anything else?
25      A    First aid.
0008
 1                  W. Vega                         8
 2      Q    First aid?
 3      A    Yes, sir.  And hand-to-hand combat.
 4      Q    Anything else?
 5      A    Handcuff procedures.
 6      Q    Anything else?
```

wvega.txt

```
 7        A    Metal detectors to detect metal on a
 8   person.
 9        Q    Anything else?
10        A    Search, how to search persons for metal
11   on them.
12        Q    How long did your training go on?  How
13   long was your training?  Was it more than a week?
14        A    Yes, sir.
15        Q    More than two weeks?
16        A    More than two weeks.
17        Q    How long were they?
18        A    They split up the training, two weeks.
19        Q    Two weeks, total?
20        A    Yes.
21        Q    After the two weeks, did you receive
22   anymore training?
23        A    Refresher courses.
24        Q    Okay, how often were the refresher
25   courses?
0009
                          W. Vega                    9
 1
 2        A    Like eight hours.
 3        Q    How often?
 4        A    Within the interval of one year.
 5        Q    Eight hours in one year.
 6        A    Yes, sir.
 7        Q    What was done at the refresher courses?
 8        A    Shooting courses, taking-down procedures.
 9   CPR.  Handcuff procedures.
10        Q    Okay.  You didn't carry a weapon as a
11   security officer, did you?
12        A    I did.  I'm armed.
13        Q    That was from 2002 to 2008?
14        A    Yes, sir.
15        Q    During your tenure from 2002 and 2008,
16   did you mostly work at the main entrance?
17        A    Yes.
18        Q    Did you always work at the main entrance?
19        A    Yes.
20        Q    Did you always work at the x-ray machine?
21        A    Yes.
22        Q    And that's still your function today?
23        A    Yes.
24        Q    When you started with HWA, did you fill
25   out an employment application?
0010
                          W. Vega                   10
 1
 2        A    Yes, sir.
 3        Q    How many pages was it?
 4        A    I can't remember.
 5        Q    Did they ask you if you had ever been
 6   arrested before?
 7        A    Yes.
 8        Q    What did you write?
 9        A    "Yes."
10        Q    Have you ever been arrested before?
11        A    Yes.
12        Q    When was that?
13        A    Nineteen -- but I know it was before that
14   date.
15        Q    Was it one time or more than one time?
16        A    One time.
17        Q    What was it for?
```

Page 4

wvega.txt

```
18        A    Family dispute.
19        Q    Were you convicted?
20        A    No, sir.
21        Q    The case was dismissed?
22        A    Yes.
23        Q    Any other arrests?
24        A    No.
25        Q    Were you ever disciplined while working
0011
1                       W. Vega                    11
2    for HWA?
3         A    No.
4         Q    Were you ever reprimanded while working
5    for HWA?
6         A    No.
7         Q    What about Wachenhut?
8         A    No, sir.
9         Q    From 2002 to 2008, did you have one
10   supervisor for HWA or more than one?
11        A    More than one.
12        Q    Did it change periodically?
13        A    Daily.
14        Q    Daily, okay.
15             Did you have one primary supervisor?
16        A    No.
17        Q    Okay.  Did you review any documents in
18   preparation for today's deposition?
19        A    Only one.
20        Q    Okay, and that's the affidavit that you
21   filled out with respect to the Dikler case?
22             MR. BATTAGLIA:  This is actually
23             the offense incident report with respect
24             to Dikler, and below is the two-page
25             affidavit.  There's actually a fourth
0012
1                       W. Vega                    12
2             page that you could look at.
3             MR. ZELMAN:  Okay, fine.
4         Q    Anything else?
5         A    No, sir.
6         Q    Did you read the complaint in the Dikler
7    case?
8         A    No.
9         Q    Are you aware of what he's complaining
10   about?
11        A    No, sir.
12        Q    All right, let me take a look at this and
13   we'll start.
14             Okay, while you were working for HWA, did
15   you ever receive any instructions about how to
16   handle people who came in with any type of badge?
17        A    Yes, sir.
18        Q    And when did you receive those
19   instructions?
20        A    When they took over the contract.  They
21   were in effect before, in force before that.
22        Q    In 2002?
23        A    Yes, sir.
24        Q    So --
25             MR. BATTAGLIA:  Just if I can
0013
1                       W. Vega                    13
2             interrupt.
```

Page 5

```
                              wvega.txt
 3                Off the record.
 4                (Whereupon, a discussion was held
 5           off the record.)
 6      Q    When did you first start working at 26
 7   Federal Plaza?
 8      A    1996.
 9      Q    And who was that for?
10      A    FJC.
11      Q    Did you work for FJC until 2002?
12      A    Yes.
13      Q    When was the first time you received
14   instructions as to how to handle somebody who came
15   to 26 Federal Plaza with a badge?
16      A    When I was first assigned to 26 Federal.
17      Q    In 1996?
18      A    Yes.
19      Q    What were you told at that point?
20      A    Any person coming in with a shield, can't
21   identify, call for a federal police officer.
22      Q    And is that true whether they presented
23   the badge or they had one in their possession, or
24   either way?
25      A    Either way.
0014
 1                  W. Vega                      14
 2      Q    So even if you saw a badge on the x-ray
 3   machine, you were to call the federal police.
 4      A    Yes, sir.
 5      Q    And would they come, would they respond?
 6      A    They would respond, and from there, we
 7   just hand it to them.
 8      Q    Hand them the badge.
 9      A    Yes, sir.
10      Q    Okay, so you started doing that in 1996.
11      A    Yes, sir.
12      Q    How often in 1996 to 2002 would you call
13   federal police and say someone came in with a
14   badge?
15      A    I don't recall how many times.
16      Q    Was it a daily occurrence?
17      A    Almost.
18      Q    Okay.  And were you asked to fill out
19   affidavits like the one you have in front of you
20   from 1996 to 2002?
21      A    Yes.
22      Q    With respect to badges.
23      A    Yes, sir.
24      Q    Did you ever become aware that people
25   were getting arrested for allegedly bringing a
0015
 1                  W. Vega                      15
 2   badge into 26 Federal Plaza?
 3      A    No, sir.
 4      Q    Never became aware of that?
 5      A    No, sir.
 6      Q    Are you aware of that today?
 7      A    Yes, sir.
 8      Q    When did you become aware of it?
 9      A    When they started mailing me this letter.
10   When they mailed me --
11      Q    You're talking about your lawsuit.
12      A    Yes.
13      Q    And when was that?
                         Page 6
```

wvega.txt

```
14        A     About a year ago.
15        Q     A year ago, so that would be 2007?
16        A     Yes, sir.
17        Q     How many affidavits like the one you have
18   in front of you did you fill out while you were
19   employed by HWA?
20        A     I don't recall.
21        Q     Would it be more than 100?
22        A     I don't recall.
23        Q     Was it a daily basis that you had to fill
24   out these affidavits?
25        A     Yes.
0016
1                      W. Vega                    16
2         Q     Did you have to sometimes fill out more
3    than one on the same day?
4         A     Yes, sir.
5         Q     Did you fill out more than one on the
6    same day?
7         A     Don't recall.
8         Q     More than five on the same day?
9         A     Don't recall.
10        Q     But you remember filling those out on a
11   daily basis?
12        A     Yes, sir.
13        Q     Generally speaking, those affidavits that
14   you would fill out, who asked you to fill them out?
15        A     FPO is federal police officers.
16        Q     Anyone in particular while you were
17   working for HWA?
18        A     No, sir.
19        Q     In 2007, you say you became aware that
20   people were getting arrested for carrying a badge,
21   correct?
22        A     Yes, sir.
23        Q     And at that time, did you learn how many
24   people were getting arrested for carrying a badge?
25        A     No, sir.
0017
1                      W. Vega                    17
2         Q     Today, do you know how many people were
3    getting arrested for carrying a badge at 26 Federal
4    Plaza?
5         A     No, sir.
6         Q     Did you ever learn what happened with
7    their criminal cases?
8         A     No, sir.
9         Q     Did you ever tell the police that the
10   badges that you saw were fraudulent?
11                  MR. BATTAGLIA:  Which police?
12        Q     Any police that you worked for.
13        A     No, sir.
14        Q     Did you ever express an opinion that this
15   particular badge was a forged badge?
16        A     No.
17                  MS. PRIVETERRE:  You're talking
18              about the badge in the subject incident?
19                  MR. BATTAGLIA:  Badges, generally.
20        Q     Did you ever learn the results of any
21   prosecution for carrying a fake badge into 26
22   Federal Plaza?
23        A     No, sir.
24        Q     When you say federal police came, would
```

Page 7

wvega.txt

25    they question the person right in front of you?
0018
1                          W. Vega                    18
2          A    No.
3          Q    Did you ever witness any of those
4    questions?
5          A    No.
6          Q    Did you ever go in the room when the
7    police officers asked the person about the badge?
8          A    No, sir.
9          Q    When HWA became your employer, did the
10   rules change at all with respect to how to handle
11   badges?
12         A    Yes, sir.
13         Q    And did you receive those rules in
14   writing?
15         A    Yes, sir.
16         Q    And that was when?
17         A    In the beginning of my employment.
18         Q    In 1996.
19         A    Yes, sir.
20         Q    Did you retain a copy of that?
21         A    No, sir.
22         Q    Whose rules were you given?  Were you
23   given those rules by HWA predecessor or by 26
24   Federal Plaza security or who --
25         A    26 Federal police.
0019
1                          W. Vega                    19
2          Q    26 Federal police.
3          A    Yes.
4          Q    But you remember seeing those rules --
5          A    Yes.
6          Q    When you started working for HWA, were
7    you given new procedures?
8          A    No.
9          Q    Were you given anything in writing by
10   Wachenhut about your job?
11         A    No.
12         Q    HWA?
13         A    Never.
14         Q    When you started working for HWA, did you
15   have additional training?
16         A    Yes, sir.
17         Q    And at that training, did they give you
18   instructions on paper about how to do your job?
19         A    Yes.
20         Q    Those instructions you got from HWA, did
21   they address anything to do with badges?
22         A    HWA?
23         Q    When you went to the training for HWA,
24   they gave you a document about how to do your job.
25         A    Yes.
0020
1                          W. Vega                    20
2          Q    How many pages of document?
3          A    I can't remember.
4          Q    And my question was:  That documentation,
5    if you recall, did it address the issue of badges
6    and how you were supposed to handle badges?
7          A    I don't recall.
8          Q    How much training did you receive when
9    you became employed by HWA?
                              Page 8

wvega.txt

```
10          A     Meaning --
11          Q     Hours or --
12          A     Hands-on.
13          Q     When HWA took over the contract, did you
14   receive another week of training or day of
15   training, or something else?
16          A     Maybe two days.
17          Q     Two days.  Was that right at the
18   beginning when HWA took over the contract?
19          A     No, sir.
20          Q     How long after?
21          A     About two months.
22          Q     And did HWA change how things were going
23   to be done by you?
24          A     No, sir.
25          Q     It was cone completely the same?
0021
 1                      W. Vega                    21
 2          A     The same.
 3          Q     But you would receive documentation from
 4   HWA on how they want you to perform your job?
 5          A     Yes, sir.
 6          Q     What specifically were your instructions
 7   if someone possessed a badge at 26 Federal Plaza?
 8          A     We see it on the x-ray machine or
 9   presented it, we have to hold it, asked them if
10   they have an I.D. to go with the shield.  Once we
11   have the I.D., we would call the federal police, to
12   please stand by over there.
13          Q     Told them to wait?
14          A     Yes, sir.
15          Q     How long would it be that the federal
16   police would come?
17          A     Anywhere between five and ten minutes.
18          Q     And typically, what would the federal
19   police do when they got to this person?
20                MR. BATTAGLIA:  Note my objection.
21                What did you see them do.
22          A     They -- we handed the shields to them and
23   I.D., this young or that gentleman had this on
24   them, and they would take them.  They would say to
25   them, "Please follow me," and they be off.
0022
 1                      W. Vega                    22
 2          Q     Okay.  And you never learned what
 3   happened after that?
 4          A     No, sir.
 5          Q     And even today, you don't know what
 6   happened to them after that?
 7          A     No, sir.
 8          Q     Were you ever told to put anybody who
 9   came through the security in cuffs?
10          A     No, sir.
11          Q     And those instructions that you just
12   stated, did anybody at HWA tell you to do that?
13          A     Meaning?
14          Q     Where did you receive those instructions
15   from --
16          A     Procedure.
17          Q     Yes.
18          A     GSA.
19          Q     What does that stand for?
20          A     Government administration office.
```

Page 9

wvega.txt
```
21        Q    Who told you to do that?  Or how?  In
22  writing, was it oral?
23        A    Both.  I don't remember the instructions.
24        Q    But you received those instructions in
25  writing at one point --
0023
```
                              W. Vega                    23
```
 2        A    Yes.
 3        Q    -- that was from GAO?
 4        A    Yes, sir.
 5        Q    Was this government --
 6        A    Government administration office.
 7        Q    Is that GAO?
 8        A    I believe I'm misspelling it.  It's GSA,
 9  but they changed the name over so many years.  I
10  only know them as Homeland Security.
11        Q    And when did you get those instructions
12  in writing, what year?
13        A    First time I saw them was 1996 when I
14  first started.
15        Q    To your knowledge, was there ever a
16  change while you were employed at 26 Federal Plaza
17  as to how you were supposed to handle badges?
18        A    No, sir.
19        Q    It's always been the same.
20        A    Yes, sir.
21        Q    So even back in 1996, federal security
22  would come and take the person away?
23        A    Yes.
24        Q    With respect to the affidavit that you
25  have in front of you, do you recall who asked you
0024
```
                              W. Vega                    24
```
 2  to fill that out?
 3        A    I don't recall.
 4        Q    Would that be someone -- you know which
 5  office they were from?
 6        A    Don't recall.
 7        Q    Do you know who Federal Police Officer
 8  Torres is?
 9        A    There are so many of them.  I can't
10  remember him.
11        Q    Do you recall if in the Dikler case, you
12  told Mr. Torres that you observed a badge on the
13  x-ray monitor?
14        A    Yes, sir.
15        Q    You did do that.
16        A    I -- I don't remember telling him that.
17  When they came, he asked what do I have.  I gave
18  him the I.D. and the shield.
19        Q    Do you remember the Dikler case?
20        A    No, sir.
21        Q    So --
22             MR. BATTAGLIA:  You could refer to
23             your report if you'd like, if he's asking
24             you questions specifically about it.
25             MR. ZELMAN:  Let's mark it as
0025
```
                              W. Vega                    25
```
 2  Plaintiff's 1.
 3             (Plaintiff's Exhibit # 1 - Four page
 4             Offense incident report - received and
 5             marked for identification, as of this
```

wvega.txt

```
 6            date.)
 7       Q    Okay, with respect to Plaintiff's Exhibit
 8  1, does that refresh your recollection as to
 9  handling Mr. Dikler's badge?
10       A    I don't recall.
11       Q    Okay.  Is that because you filled out so
12  many of these they kind of all blend into one?
13       A    Yes, sir.
14       Q    Did you ever speak to New York City
15  police officers with respect to recovering badges?
16       A    A few times.
17       Q    How many times did you speak to New York
18  City police officers?
19       A    I can't recall.
20       Q    And the times that you did speak to them,
21  was it in person or on the phone?
22       A    In person.
23       Q    Would they come over to the conveyor
24  belt, to the entrance where you were stationed?
25       A    No.  They never came.
0026
                        W. Vega                    26
 1
 2       Q    So where did you speak to them?
 3       A    Once in a while they will go to federal
 4  police office.  If not, upstairs, in their main
 5  office upstairs on the 18th floor.
 6       Q    Okay.  Do you remember if in the Dikler
 7  case you spoke to any NYPD?
 8       A    I don't recall.
 9       Q    When you were asked to speak to NYPD, was
10  it with respect to badges?
11       A    Yes, sir.
12       Q    And approximately how many times were you
13  asked to speak to NYPD?
14       A    I don't recall.
15       Q    More than ten?
16       A    I don't recall.
17       Q    It was not an unusual occurrence that you
18  would speak to NYPD; is that correct?
19       A    Yes, sir.
20       Q    When you did speak to NYPD, what would
21  they ask you about?
22       A    Where did the gentleman have it on him?
23  Did he present it?  And what was his -- what's the
24  word I'm looking for -- was he nervous when he came
25  in the building.
0027
                        W. Vega                    27
 1
 2       Q    Okay, with respect to Mr. Dikler, did he
 3  present it when he came in or you saw it on the
 4  belt?
 5       A    I saw it on the belt.
 6       Q    But you don't recall speaking to the
 7  police on the Dikler case?
 8       A    No, sir.
 9       Q    Did you ever tell the police that you
10  recovered this shield from Mr. Dikler's jacket?
11            MR. BATTAGLIA:  Take a look at the
12            report if you want to refresh your
13            memory.
14       A    I don't remember telling the police that.
15       Q    And that's because you saw it on the
16  conveyor belt?
```

Page 11

wvega.txt

```
17        A    Yes, sir.
18        Q    Do you have any notes other than what is
19   in front of you with respect to Mr. Dikler's case?
20        A    Notes on Mr. Dikler, no.
21        Q    You wouldn't typically keep any memo
22   book?
23        A    Not on this.
24        Q    Would you typically keep a memo book?
25        A    Yes.
0028
1                      W. Vega                      28
2         Q    Why wouldn't you have --
3         A    I meant the pages.
4         Q    What would be contained in your memo
5    book?
6         A    The time, the date.  Pretty much the same
7    information here.
8         Q    You have a copy of your memo book for
9    this day, March 22, 2006?
10        A    No, sir.  Memo books at 26 Federal Plaza
11   are property of HWA, they would have it.
12        Q    So you did write a memo book entry for
13   March 28, 2008?
14        A    Yes, sir.
15        Q    And typically, you would put what in
16   there?
17        A    The same information on this page.
18        Q    Okay, you believe there would be some
19   information regarding Mr. Dikler in your memo book?
20        A    It would be the same one, yes, sir.
21        Q    Now you never told the NYPD that Mr.
22   Dikler's was forged, correct?
23        A    No, I never told him.
24        Q    You never said this is a forged badge or
25   non-forged badge?
0029
1                      W. Vega                      29
2         A    No, sir.
3         Q    Do you recall whether Mr. Dikler was
4    nervous when he came into the building?
5         A    I don't recall.
6         Q    Do you recall being asked that?
7         A    No, I don't.
8         Q    Mr. Dikler didn't try to use his badge to
9    get into the building, correct?
10        A    No, sir.
11        Q    Do you recall if you handed Mr. Torres a
12   gold in color NYC style sunburst detective shield?
13             MR. BATTAGLIA:  With respect to Mr.
14        Dikler?
15             MR. ZELMAN:  Yes.
16        A    Yes, sir.
17        Q    You recall that?
18        A    Yes, sir.
19        Q    You recall it being gold in color?
20        A    Yes.
21        Q    Just typically with respect to Mr.
22   Dikler.
23        A    Yes.
24        Q    How is it you recall that?  Is it from
25   your notes?
0030
1                      W. Vega                      30
```

Page 12

wvega.txt

```
 2      A    Yes.
 3      Q    Do you recall Torres asking you to
 4  respond to the tour commander's office to fill out
 5  an affidavit with respect to Mr. Dikler?
 6      A    I don't remember.
 7      Q    Do you recall telling Torres that you
 8  were on the conveyor belt, you were watching the
 9  conveyor belt when you saw the shield?
10      A    Yes, sir.
11      Q    Did you ask Mr. Dikler for I.D.?
12      A    Yes.
13      Q    Did he show it to you?
14      A    Yes, sir.
15      Q    And then you called for federal security.
16      A    Yes, sir.
17      Q    Do you recall anything else regarding Mr.
18  Dikler's case?
19      A    No.
20           MR. ZELMAN:  Let's mark this.
21      Q    If I gave you the name Lajzer Goynsztaja,
22  does that ring any bell for you?
23      A    No, sir.
24           MR. ZELMAN:  Let's mark this as
25           Plaintiff's 2.
0031
 1                  W. Vega                     31
 2           (Plaintiff's Exhibit # 2 - HWA
 3           general service offense incident report -
 4           received and marked for identification,
 5           as of this date.)
 6      Q    With respect to Plaintiff's Exhibit 2, is
 7  that something you authored?
 8      A    Yes, sir.
 9      Q    You signed it at the bottom?
10      A    Yes, sir.
11      Q    Does that refresh your recollection
12  regarding Mr. Goynsztaja?  What he looked like, the
13  incident involving him?
14      A    No, sir.
15      Q    Again, this was a common occurrence that
16  you filled out these affidavits?
17      A    Yes, sir.
18      Q    And the date of this incident was May 23,
19  2006?
20      A    Yes, sir.
21      Q    Do you recall telling Michael Williams of
22  Internal Affairs that you observed Mr. Goynsztaja
23  in possession of a badge resembling a New York City
24  Police Department detective shield bearing words
25  New York City Transit Authority?
0032
 1                  W. Vega                     32
 2      A    I don't recall.
 3      Q    And according to your notes, did Mr.
 4  Goynsztaja try to use this badge to get into the
 5  building?
 6      A    No, sir.
 7      Q    It's simply that you saw it on the x-ray
 8  machine.
 9      A    Yes, sir.
10      Q    People were required to put their
11  possessions on the x-ray machine --
12      A    Correct.
```

Page 13

wvega.txt

```
13       Q    -- even their jacket, empty their pockets
14  and --
15       A    Yes.
16       Q    -- take off their shoes --
17       A    Yes, sir.
18       Q    -- belts?
19       A    Yes, sir.
20       Q    So neither Mr. Goynsztaja or Mr. Dikler,
21  according to your notes, attempted to use the badge
22  to get in the building, correct?
23       A    Correct.
24       Q    And nonetheless, with respect to Mr.
25  Goynsztaja, because you saw a badge, you then asked
0033
1                        W. Vega                    33
2   him for I.D.?
3        A    Yes, sir.
4        Q    And that he produced I.D. to you?
5        A    Yes.
6        Q    And you called federal security?
7        A    Yes.
8        Q    And they took Mr. Goynsztaja away --
9        A    Yes.
10       Q    -- and that's the last you heard of that?
11       A    Yes, sir.
12       Q    Do you recall if in Mr. Goynsztaja's
13  case, you were asked to speak to NYPD?
14       A    No.
15            MS. PRIVETERRE:  No, you don't
16       recall or no, you weren't?
17            THE WITNESS:  I don't recall.
18       Q    If you review your notes, your memo book
19  for that day, would you be able to determine
20  whether you spoke to NYPD or not?
21       A    I don't recall.
22       Q    Would you typically keep that in your
23  memo book?
24       A    Typically, yes.
25       Q    But you weren't asked to write on this
0034
1                        W. Vega                    34
2   affidavit whether you were asked to speak to NYPD.
3        A    No, sir.
4        Q    This was an HWA form, referring to
5   Exhibit 2, that you're asked to fill out by HWA or
6   by the federal security?
7            MR BATTAGLIA:  Note my objection.
8        Exhibit 2, like Exhibit 1 is several
9        different documents, so the offense
10       incident report does have HWA's
11       letterhead.  But the affidavit, I'm not
12       sure if the affidavit is part of that
13       same form.
14            MR. ZELMAN:  I heard you.  Let's
15       stick to the question.
16            MR. BATTAGLIA:  You're referring to
17       the exhibit as one thing.
18       Q    The exhibit you have in front of you is
19  Plaintiff's 2, correct?
20       A    Yes.
21       Q    Do you recall who asked you to fill that
22  out?
23            MR. BATTAGLIA:  We're talking about
```

Page 14

wvega.txt

24          the offense incident --
25              MR. ZELMAN:  First page.
0035
1                   W. Vega                      35
2              MR. BATTAGLIA:  Could you recall who
3       asked you to fill that out?
4              THE WITNESS:  No, sir.
5       Q    And it has HWA's letterhead on the top.
6       A    Yes.
7       Q    Does that mean that HWA asked you to fill
8  it out?
9       A    I don't recall.
10      Q    And with respect to the affidavit on the
11 second page, were you asked to fill that out by HWA
12 or somebody else?
13      A    Someone else.
14      Q    Would that be Sergeant Mahoney?
15      A    I couldn't tell you.
16      Q    "I, Wilson Vega being duly sworn hereby
17 make the following affidavit to Sergeant Mahoney."
18           Do you see that?
19      A    Yes, sir.
20      Q    Does that mean Sergeant Thomas Mahoney
21 asked you to fill that out?
22              BATTAGLIA:  Just note my objection
23           on the question.  I'm not certain that
24           pre-text is sergeant.  I'm looking
25           at the S/A.
0036
1                   W. Vega                      36
2       Q    Let's go with Thomas Mahoney.  Does that
3  seem that Thomas Mahoney asked you to fill that
4  out?
5       A    Yes, sir.
6       Q    Do you know who Thomas Mahoney is?
7       A    I don't know the rank.
8       Q    Do you know who he's employed by?
9       A    GSA.
10      Q    Did you make a determination when the
11 person presented I.D. to you, if that person who
12 presented I.D. was actually employed by the entity
13 represented on the I.D.?
14      A    No, sir.
15      Q    That wasn't part of your job.
16      A    No, sir.
17      Q    At any point, did you become aware that
18 the statements that you provided to either the
19 police or federal security were used in part of a
20 prosecution against people?
21      A    No, sir.
22      Q    Did you become aware of that when you
23 received that letter from the lawyer?
24      A    Yes, sir.
25      Q    Did you ever seek to inquire about which
0037
1                   W. Vega                      37
2  statements you made were used as part of the
3  prosecution?
4       A    No, sir.
5       Q    Were you ever called to testify before
6  with respect to a criminal case or civil case
7  arising from the recovery of badges at 26 Federal
8  Plaza?

                        Page 15

```
                                         wvega.txt
 9          A       No, sir.
10          Q       This is your first time?
11          A       Yes, sir.
12          Q       To your knowledge, how many suits were
13   filed against you with respect to recovering of
14   badges?
15          A       To my knowledge?  None.
16          Q       You are aware of the Dikler lawsuit,
17   correct?
18          A       I don't know if it's a lawsuit.
19          Q       Okay.
20          A       They just tell me I have a case.  I don't
21   know.
22          Q       Since 2006, has there been any change in
23   how badges -- with respect to your instructions,
24   about how to handle badges?
25          A       My instruction?  No, sir.
0038
 1                               W. Vega                      38
 2          Q       The same instructions are if you see a
 3   badge on the security belt, you ask the person for
 4   I.D.
 5          A       Yes, sir.
 6          Q       What happens if they don't produce I.D.?
 7          A       Same procedure fall into it.  Tell the
 8   gentleman or lady stand by, federal police is on
 9   the way.
10          Q       Even in 2008, that's still the same
11   procedure?
12          A       Yes, sir.
13          Q       How often does that happen?  In 2008?
14          A       Maybe few times.  Few.
15          Q       Few times a week, a day?
16          A       A month.
17          Q       A lot of people don't come in with
18   badges?
19          A       No, sir.
20          Q       Are there any signs saying if you have a
21   badge, present it?
22          A       No, sir.
23          Q       Have you seen any difference in the way
24   that the federal police handle recovery of the
25   badges now?
0039
 1                               W. Vega                      39
 2          A       No.
 3          Q       Do you know if they're still arresting
 4   people?
 5          A       I have no idea.
 6          Q       After the person who gives I.D., the
 7   federal police come, do you ever see people be put
 8   in handcuffs?  Do you ever see people leave the
 9   building in handcuffs?
10          A       No, sir.
11          Q       When you went up to the federal office,
12   the GSA office --
13          A       Yes, sir.
14          Q       -- did you see the person who had the
15   badge there?
16          A       Maybe once or twice.
17          Q       And when you saw them, were they in
18   handcuffs?
19          A       No, sir.
                                 Page 16
```

wvega.txt
```
20      Q    And when you saw them, did you realize
21 why they were there?
22      A    No, sir.
23      Q    Did you ever ask them?
24      A    No, sir.
25      Q    Did anybody ever tell you?
0040
1                    W. Vega                    40
2       A    No.
3       Q    Were you ever given instructions about
4  what is a legitimate badge and what is a forged
5  badge?
6       A    No, sir.
7            MS. PRIVETERRE:  Objection.  What
8            do you mean, genuine?
9       Q    You were never told, look out for this
10 type of badge or this is a suspicious looking badge
11 or something like that.
12      A    No, sir.
13      Q    You were just told anybody with a badge,
14 call federal security.
15      A    Yes, sir.
16      Q    Since your employment at 26 Federal
17 Plaza, have they installed a new metal detector?
18      A    Yes.
19      Q    And a new x-ray machine?
20      A    Yes, sir.
21      Q    And the x-ray machine is powerful enough
22 to see if there's a badge anywhere within the
23 things that are presented.
24      A    Yes.
25      Q    Even if it's presented under a jacket.
0041
1                    W. Vega                    41
2       A    Yes, sir.
3       Q    What is it about the badge that stands
4  out?
5       A    The shape.  And the color.  They would
6  tell me what dense the metal is.
7            MR. ZELMAN:  I have no further
8            questions.
9  EXAMINATION BY
10 MS. PRIVETERRE:
11      Q    Good morning.  My name is Joyce Campbell
12 Priveterre and I'll be asking you some questions
13 about the Dikler and Goynsztaja case this morning.
14 I just have a few questions I'd like to go through
15 before I begin to ask you deposition questions.
16           Are you taking any medication that would
17 impair your ability to testify truthfully?
18      A    No, ma'am.
19      Q    Have you taken any medication at all this
20 morning?
21      A    No, ma'am.
22      Q    I'm going to ask you questions.  If you
23 don't understand any of my questions, just say so.
24 If I ask you for a name, date or place, you can't
25 recall, just let me know and we'll leave a blank in
0042
1                    W. Vega                    42
2  the record so when you and your attorney review the
3  transcript, you can supplement it.
4            Have you understood what I just said?
```

wvega.txt

```
 5        A    Yes, sir.  Ma'am.
 6        Q    With respect to Dikler -- and actually,
 7   for the sake of my questioning, I'm going to ask
 8   you the same questions for Goynsztaja -- did you
 9   have any discretion at all with respect to visitors
10   holding badges or bringing in any badges to 26
11   Federal?
12             Did you have any discretion which you
13   would report to a police officer and which you
14   would let go through?
15        A    No, ma'am.
16        Q    So what was your understanding whether
17   what you would do if you saw a visitor with a badge
18   going into 26 Federal Plaza?
19        A    Follow the procedures on all shields
20   coming into the federal building.
21        Q    Would that include officers with whom you
22   are acquainted or that you recognized coming into
23   the building at another time?
24        A    I don't understand the question.
25        Q    Okay.  Had you occasion to see members of
0043
 1                     W. Vega              43
 2   NYPD or any other law enforcement personnel come to
 3   26 Federal on a frequent basis?
 4        A    Not on my tour.  Not at my door.  They
 5   have a separate entrance for them.
 6        Q    Did anyone from NYPD ask you specifically
 7   to fill out any of the forms that you have been
 8   presented in either Plaintiff's 1 or 2?
 9        A    NYPD?  No, ma'am.
10        Q    If I asked you today to give me a
11   physical description of either Detective Michael
12   Visconti or Detective Michael Williams, could you
13   do so?
14        A    No, ma'am.
15        Q    Do you know whether or not since two
16   these events, Dikler and Goynsztaja, whether you
17   had reported them to Detective Visconti or
18   Detective Michael Williams?
19        A    I don't know, ma'am.
20        Q    With respect to the memo books that you
21   referenced in response to Mr. Zelman, you said
22   they're property of HWA; is that correct?
23        A    Yes, ma'am.
24        Q    If requested, could you obtain copies of
25   those memo books?
0044
 1                     W. Vega              44
 2        A    I do not know.
 3             MS. PRIVETERRE:  We're going to call
 4             for copies of the memo books.  I will
 5             follow up in writing.
 6             MR. ZELMAN:  I join in this request.
 7             MR. BATTAGLIA:  Take it under
 8             advisement.
 9        Q    How detailed or not detailed would you
10   have to be in these memo books?
11        A    Pretty much what's on here.
12        Q    When you say here, with respect to either
13   Plaintiff's 1 or 2, are you referring to all 4
14   pages or just select pages?
15        A    All four pages.
```

Page 18

wvega.txt

```
16        Q    So essentially, what appears before you
17   in Exhibits 1 or 2 is the information you would
18   have put in your memo books?
19        A    Yes, ma'am.
20        Q    As you testified today, if I asked you if
21   you knew Robert Alleyne, what would your response
22   be?
23        A    Yes.
24        Q    You do.
25        A    Yes.
```
0045
```
1                        W. Vega                    45
2         Q    In what capacity do you know this
3    individual?
4         A    We work together.
5         Q    Presently?
6         A    No.
7         Q    For how long did you work with this
8    individual?
9         A    About three years.
10        Q    And can you give me an approximate start
11   and approximate end of that working relationship?
12        A    No, ma'am.
13        Q    Was it recently, these three years?
14        A    No, a while back.
15        Q    A while back --
16        A    Two years.
17        Q    Two years ago, possibly?
18        A    Yes.
19        Q    And what was his rank?
20        A    Sergeant.
21        Q    Was he supervisor of you?
22        A    Yes, ma'am.
23        Q    Did he work with HWA?
24        A    Yes, ma'am.
25        Q    Is this a person with whom you would have
```
0046
```
1                        W. Vega                    46
2    to speak before you referred a visitor to police
3    officers?
4         A    Yes, ma'am.
5         Q    So there'a another tier between yourself
6    and the police officers.
7         A    Yes.
8         Q    Was it his, Mr. Alleyne's job to sign off
9    essentially the confiscation of the badge, or what
10   would you call it?  What was his duty in terms of
11   giving you the green light?
12        A    I don't understand the question.
13        Q    Okay, let me rephrase that.
14             What exactly did you seek from Robert
15   Alleyne with respect to supervisory functions, what
16   were you asking him to do?
17             MR. BATTAGLIA:  When people came in
18        with shields.
19             MR. PRIVETERRE:  Yes.
20             MR. BATTAGLIA:  What was Mr.
21        Alleyne's role in that process.
22        A    How can I put that in words.
23             That's a supervisor.  Proper procedure to
24   follow.
25        Q    Did you ever have an incident where you
```
0047

wvega.txt

```
 1                        W. Vega                    47
 2    brought to Mr. Alleyne's attention a situation
 3    where you thought that you had a badge that should
 4    be confiscated and he said no?
 5        A    No, ma'am.
 6        Q    So is it your recollection that
 7    throughout the three years that he supervised you,
 8    that whenever you brought him -- for lack of a
 9    better phrase -- a badge situation, that he would
10    sign off on that?
11        A    I don't understand the question.
12        Q    Okay.  The three years that he supervised
13    you, when you brought him a situation where you had
14    a visitor bringing in a badge --
15        A    Mm-hmmm.
16        Q    -- did he approve of you bringing this to
17    his attention in the federal office?
18        A    Don't recall.
19             Don't understand the question still.
20             Normal procedures were we let the
21    supervisor know and they would go to FBO, same
22    office.
23        Q    You never directed calls to FBO?
24        A    No, ma'am.
25        Q    That's always through your supervisor?
0048
 1                        W. Vega                    48
 2        A    Yes, ma'am.
 3        Q    In your presence, did you observe any
 4    conversations between Mr. Alleyne and the federal
 5    officers?  Did they talk in front of you?
 6        A    No, ma'am.
 7        Q    Was there ever an occasion where you had
 8    to directly speak to federal police officers
 9    because Mr. Alleyne's not available?
10        A    When he was supervisor?
11        Q    Yes.
12        A    No, ma'am.
13        Q    Okay.  Are you acquainted with a Captain
14    Rodriguez?
15        A    Yes.
16        Q    What function did he play?
17        A    Supervisor.
18        Q    Did he come after or before or something
19    else, in terms of Captain Alleyne?
20        A    You could say they were there at the same
21    time.
22        Q    So how many supervisors would you say,
23    besides Alleyne and Rodriguez, did you go to?
24        A    At the same time?  Or?
25        Q    During the same three years, I would say.
0049
 1                        W. Vega                    49
 2        A    About ten, ten different supervisors.
 3        Q    And in all instances, the supervisor, in
 4    your recollection, would be the one to actually
 5    speak to FPOs.
 6        A    Yes, ma'am.
 7             MS. PRIVETERRE:  Off the record.
 8             (Whereupon, a discussion was held
 9        off the record.)
10        Q    Is there any way for you to approximate
11    the period of time from, say March 1st '06 to June
```

Page 20

wvega.txt
```
12  1st '06, how many of these incidents with visitors
13  bringing in badges did you deal with?
14      A    No.
15      Q    Would it be more than ten?
16      A    I don't recall.
17      Q    Okay.  Well, let's broaden the scope.
18  Say from March 1st of '06 to present, May 9 '08,
19  last Friday, how many badges have you had to stop
20  visitors for?
21      A    Couldn't give you precise numbers.
22      Q    Okay, again, more than ten, more than 20?
23      A    About more than 30.
24      Q    More than 30, okay.
25           And again, to your knowledge, the only
0050
1                    W. Vega                    50
2  lawsuit commenced against you are the ones that
3  bring us here today, Goynsztaja and Dikler?
4      A    Yes.
5      Q    Have you ever had occasion to hear any
6  complaints about force being used on any visitors
7  from 26 because of badges?
8      A    No, sir.  No, ma'am.
9      Q    Have you heard anything about how either
10  Mr. Dikler or Mr. Goynsztaja was questioned by
11  either federal police officers or NYPD?
12      A    No, ma'am.
13      Q    Did you witness any questioning of these
14  plaintiffs by NYPD?
15      A    No, ma'am.
16      Q    Were you obligated to do any sort of
17  follow-up after reporting to your supervisor with
18  respect to these badges?
19      A    No, ma'am.
20      Q    In terms of I.D.,, was there a particular
21  form of I.D. you asked for after you saw a badge go
22  through the magnetometer?
23      A    Normally asked the one that would go with
24  the shield.
25      Q    Which would be?
0051
1                    W. Vega                    51
2      A    If it's NYPD.  NYPD I.D. EMT, they would
3  have it.  The detectives.  We ask them, namely.
4      Q    And in the scenario where a visitor was
5  able to give you the NYPD card, in addition to the
6  shield, would that person be able to go through the
7  door area and go into the building and conduct
8  business?
9      A    No, ma'am.
10      Q    It wasn't simply the cards, the I.D.
11  cards, it was the shield that you had to report it
12  to your supervisor?
13      A    Yes, ma'am.
14      Q    Having reported it to your supervisor,
15  let's say if the person had the correct I.D. card
16  from whatever entity that was displayed on the
17  shield, do you know what would happen at that
18  point?
19      A    The FPO would still respond to the call.
20      Q    Would they necessarily take that
21  individual away to another office or just examine
22  the I.D.?
```
Page 21

wvega.txt

```
23        A    They would take them away.
24        Q    Is there any part of the person's
25   belongings that you would keep after you refer the
0052
 1                      W. Vega                    52
 2   matter to your supervisor?
 3        A    No, ma'am.
 4        Q    Did you ever have occasion to speak to a
 5   D.A. with respect to doing a supporting affidavit?
 6        A    This was only one time.  I don't recall
 7   the information on that.
 8        Q    Did it involve either plaintiff?
 9        A    To my recall, no, ma'am.
10        Q    Is this a case that you believe there has
11   ever been a lawsuit, a civil lawsuit against you?
12        A    No, ma'am.
13        Q    Do you recall in what context you were
14   given to give any kind of supporting affidavit?
15        A    It was -- they wanted to find out how to
16   spell my name right, Vega, that was it.
17        Q    Was this a D.A.?
18        A    Yes, ma'am.
19        Q    Now we've talking about FPOs.  Was Thomas
20   Mahoney the only person in charge of FPOs?
21        A    I don't recall.
22        Q    In what context do you know his name?
23        A    I don't know.  Whenever -- again, we
24   follow the procedures, we fill out the forms.  Once
25   in a while they call us in the room.  He looks over
0053
 1                      W. Vega                    53
 2   the paperwork.
 3        Q    He, who?
 4        A    Mr. Mahoney.  And whoever he sends to
 5   testify about that, and that would be it.
 6        Q    Do you have an understanding of the chain
 7   of command where Mahoney fits in?
 8        A    No, ma'am.
 9        Q    Did the FPOs answer to him?
10        A    I do believe so, yes, ma'am.
11        Q    Did NYPD answer to him?  If you know.
12        A    I don't know.
13        Q    Okay.  Now in terms of Exhibits,
14   Plaintiffs' Exhibits 1 and 2, you say that you
15   swore to these statements, correct?
16        A    Yes.
17        Q    And so that everything that appears in
18   both exhibits, Plaintiff's 1 and 2, were truthful
19   and accurate, as you knew them.
20        A    Yes, ma'am.
21        Q    Sitting here today, is there anything in
22   either exhibit that you would change?
23        A    No, ma'am.
24        Q    Were you coerced in any way for
25   completing either of these exhibits?
0054
 1                      W. Vega                    54
 2        A    No.
 3        Q    Or any of the documents contained
 4   therein?
 5        A    No, ma'am.
 6        Q    Could you describe Thomas Mahoney, if I
 7   asked you to?
```

Page 22

```
                                      wvega.txt
 8      A    No, ma'am.
 9             MS. PRIVETERRE:   I have no
10             further questions.
11   MR. ZELMAN:
12      Q    I just want to serve you with a copy of
13   the summons and complaint regarding Allen
14   Bernshtein versus City of New York.  Show it to
15   your attorney.
16             Can you acknowledge that you received
17   that document?
18                 (Continued on next page so that
19             Jurat will be part of the testimony.)
20
21
22
23
24
25
0055
 1                         W. Vega                       55
 2      A    Yes.
 3             MR. ZELMAN:   Thank you.
 4             (Time noted:  11:25 a.m.)
 5
 6             _____
 7                         WILSON VEGA
 8
 9
10
11   Subscribed and sworn to
12   before me this _____
13   day of _____, 2008.
14
15   _____
16             Notary Public
17
18
19
20
21
22
23
24
25
0056
 1                                                       56
 2
 3                      I N D E X
 4   EXAMINATION BY                          PAGE
 5             MR. ZELMAN                     6
 6                                           54
 7             MS. PRIVETERRE                41
 8                   E X H I B I T S
 9   PLAINTIFF'S    DESCRIPTION             PAGE
10       1         Dikler incident report   25
11       2         Goynsztaja incident report 30
12
13                   R E Q U E S T S
14                   PAGE       LINE
15                    44          2
16
17             *          *           *
18
```

wvega.txt

```
19
20
21
22
23
24
25
0057
 1                   C E R T I F I C A T E                    57
 2
 3
 4
 5    STATE OF NEW YORK:
 6                       :
 7    COUNTY OF KINGS  :
 8
 9          I, LYNETTE YUEN, a Notary Public
10    within and for the State of New York, do hereby
11    certify:
12          That the witness(s) whose examination(s)
13    are therein before set forth were duly sworn and
14    that such examination(s) are true records of the
15    testimonies given by such witness(s).
16          I further certify that I am not related
17    to any of the parties to this action by blood or
18    marriage, and that I am in no way interested in
19    the outcome of this matter.
20          IN WITNESS WHEREOF, I have hereunto set
21    my hand this 29th day of May, 2008.
22
23
24
25                    _____
                              LYNETTE YUEN
```

Page 24